**IN THE UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY MURRAY, MICHELLE MURRAY, TAMMY WANEK, JASON WANEK, and EDELMAN, COMBS, LATTURNER & GOODWIN, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 08-CV-4407 |
| v. | ) ) ) | Judge Andersen |
| GMAC MORTGAGE LLC, formerly known as GMAC MORTGAGE CORPORATION, doing business as DITECH.COM, | ) ) ) ) ) | Magistrate Judge Cole |
| Defendant. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Defendant, GMAC Mortgage, LLC ("GMACM"), by its attorneys, Thomas. J. Cunningham, Simon Fleischmann, and Julia C. Webb, in support of Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), states as follows:

**Introduction and Background**

This dispute should be dismissed because it was previously resolved on its merits by the Seventh Circuit in the case of *Nancy Murray v. GMAC Mortgage Corp.* No. 05 C 1229 (N.D. Ill.), Appeal No. 07-2776 (the "Prior Action"). In that case, the Plaintiff sought relief against GMACM under the Fair Credit Reporting Act, 15 U.S.C § 1681 et seq. GMACM was awarded a summary judgment, which was affirmed on appeal. *Nancy Murray v. GMAC Mortgage Corp.*, 532 F. Supp. 2d 938 (N.D. Ill. 2007) (attached as Exhibit 1), *aff'd*, 07-2776, 2008 U.S. App. LEXIS 8864 (7th Cir. Apr. 18, 2008) (attached as Exhibit 2) (affirming summary judgment in favor of GMACM). (Complaint, ¶¶ 2, 9-10.)

The dispute in this case arose while the appeal of GMACM's summary judgment was pending in the Prior Action. Counsel for the parties reached a settlement, subject to the final approval of their clients, under which the appeal in the Prior Action would be dismissed with prejudice in exchange for the payment of money plus attorneys fees by GMACM. (Complaint, ¶ 14, Ex. 1.)[1] Counsel for the parties reduced the terms to an unsigned written agreement and sent it to their respective clients for review, approval, and execution. (Complaint, ¶¶ 15-16.)

Before the settlement agreement was signed by GMACM, however, the Seventh Circuit affirmed GMACM's summary judgment. (Complaint, ¶ 18.) The order affirming GMACM's summary judgment came as a surprise to all parties because it was issued prior to oral argument and with no notice to the parties from the court that it would decide the appeal without taking argument. As a result of the Seventh Circuit's ruling, the Plaintiffs could not perform their contractual obligation to dismiss the appeal in the Prior Action with prejudice. GMACM took the position, therefore, that the pending settlement was void for impossibility of performance and lack of consideration. (Complaint, ¶ 19.)

Rather than pursuing an action for breach of contract, the Plaintiff filed a Motion to Vacate the Seventh Circuit's ruling. The Plaintiff asked the Seventh Circuit to vacate its decision affirming GMACM's summary judgment based on the settlement agreement between the parties, which Plaintiff argued was enforceable. (Complaint, ¶ 20; Exhibits 3, 7.)[2] GMACM

---

[1] The exhibits identified and attached to Plaintiffs' Complaint are incomprehensible. The Complaint refers to Exhibits 1, 2, and 3; however, the Complaint actually attaches fourteen separate documents identified as Exhibits A through N.

[2] GMACM attaches the following documents from the Prior Action to its motion to dismiss: Plaintiffs' Motion to Vacate Order in the Prior Action (Exhibit 3); GMACM's Response to Plaintiffs' Motion to Vacate (Exhibit 4); Plaintiffs' Reply in Support of Motion to Vacate (Exhibit 5); Seventh Circuit Order denying Motion to Vacate (Exhibit 6); Plaintiffs' Motion to Reconsider (Exhibit 7); and Seventh Circuit Order denying Motion to Reconsider (Exhibit 8). These documents are properly attached to a Rule 12(b)(6) motion because they are referred to in

2

opposed the motion to vacate, arguing there, as it does here, that the settlement was void due to

the now impossibility of Plaintiff's performance and lack of consideration. (Exhibit 4.) The

Seventh Circuit denied the motion. (Exhibit 6.) The sole issue on the Motion to Vacate was the

Plaintiff's contention that a binding and enforceable settlement agreement existed—the identical

basis for the claim in this case. (*See* Exhibits 3-5.) The Seventh Circuit specifically found that

there was no enforceable settlement. (Exhibit 6.) The Seventh Circuit also denied the

subsequent Motion to Reconsider after being presented with Plaintiff's argument that a valid

settlement agreement existed for a second time. (Exhibit 8.) The issue raised in the Complaint

in this case, therefore, has already been adjudicated on the merits twice and finally resolved by

the Seventh Circuit.

In a blatant attempt to re-litigate the same issue in a different venue, the Plaintiffs

commenced this case in the Circuit Court of Cook County. GMACM removed this action to the

United States District Court for the Northern District of Illinois pursuant to this Court's diversity

jurisdiction, and now moves to dismiss the Complaint. Plaintiffs should not be given a second

bite at the apple here; their claims and the underlying facts and issues have already been litigated

on the merits before the Seventh Circuit and are barred by the doctrines of *res judicata* and

collateral estoppel. In addition, for the reasons briefed and accepted before the Seventh Circuit,

the Plaintiffs do not and cannot state a claim for breach of contract because it is impossible for

the Plaintiffs to perform their obligations under the contract. Accordingly, Defendant's Motion

to Dismiss should be granted.

---

the Complaint and central to Plaintiffs' claim. *See Rosenblum v. Travelbyus.com*, 299 F.3d 657, 661 (7th Cir. 2002). In addition, court papers and orders are properly considered on a motion to dismiss because they are part of the public record. *See Offutt v. Kaplan*, 884 F. Supp. 1179, 1187 (N.D. Ill. 1995).

3

## Argument

### I.    PLAINTIFFS' COMPLAINT IS BARRED BY THE DOCTRINES OF RES JUDICATA AND COLLATERAL ESTOPPEL.

Where a claim, issue, or fact has been previously litigated in federal court, resulting in a final adjudication on the merits, federal common law precludes a party from re-litigating the claim, issue, or fact in a later proceeding. *See Semtek Intern, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001); *Convington v. Mitsubishi Motors North America, Inc.*, No. 04-cv-1315, 2007 U.S. Dist. LEXIS 38080, *13 (C.D. Ill. Mar. 27, 2007) (attached as Exhibit 9) ("federal law governs the preclusive effect of federal court judgments"). There are two types of former adjudications that will create this bar on future actions: *res judicata* and collateral estoppel. Plaintiffs' Complaint, which raises claims and issues already litigated in response to Plaintiffs' own motion to vacate the Seventh Circuit's opinion, is barred by both of these doctrines.

### A.    Plaintiffs' Complaint is Barred by the Doctrine of *Res Judicata*.

The doctrine of *res judicata* precludes litigants from bringing a claim where the following circumstances are present: (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or privies in the two suits. *Cole v. Board of Trustees of University of Illinois*, 497 F.3d 770, 772 (7th Cir. 2007); *Highway J Citizens Group v. U.S. Dept. of Transportation*, 456 F.3d 734, 741 (7th Cir. 2006). *Res judicata* is not "a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, of public policy and of private peace, which should be cordially regarded and enforced by the courts." *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir. 1986) (quoting *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299 (1917)).

4

Arguments made in a motion to vacate an order in a prior action are *res judicata* in a subsequent action once they have been ruled upon in the prior action. *See Locklin v. Switzer Bros., Inc.*, 335 F.2d 331 (7th Cir. 1964). Here, the Seventh Circuit's denial of Plaintiffs' Motion to Vacate in the Prior Action (Exhibit 6), as well as its decision denying the subsequent Motion to Reconsider (Exhibit 8), constitute a final judgment on the merits. The Seventh Circuit expressly acknowledged the briefs of the parties in its decision (Exhibits 3-5), and ruled on the issues presented therein rather than basing its decision on any procedural issue. (Exhibit 6.) Plaintiffs asked the Panel to reconsider its denial of the Motion to Vacate, again arguing that the settlement agreement was enforceable, but that motion was also denied. (Exhibits 7, 8.) The requirement of a final judgment on the merits is therefore easily met in this case.

The "same transaction" test is used in the Seventh Circuit to determine whether or not an identity of causes of action is present for the purposes of *res judicata*. *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 913 (7th Cir. 1993); *Car Carriers, Inc.*, 789 F.2d at 593; *Convington*, 2007 U.S. Dist. LEXIS 38080 at *14; *Trans Helicopter Serv. v. Jet Support Servs., Inc.*, No. 03-C-0498, 2004 U.S. Dist. LEXIS 25182, *9 (N.D. Ill. Dec. 13, 2004) (attached as Exhibit 10). Under the same transaction test, the term "cause of action" is interpreted to mean "a single core of operative facts which give rise to a remedy." *Car Carriers, Inc.*, 789 F.2d at 593. "[A] subsequent suit is barred if the claim on which it is based arises from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment." *Cole*, 497 F.3d at 772-73 (quoting *Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir. 1999)); *see also Convington*, 2007 U.S. Dist. LEXIS 38080 at *15-16 (finding that a plaintiff's claims for race discrimination, retaliation, and failure to re-hire were identical causes of action to

5

his claim that his employer violated his union's collective bargaining agreement when firing him due to his race because each claim arose from the same "core fact," namely his firing).

The Complaint is based on the same core facts that were adjudicated by the Seventh Circuit on the Motion to Vacate in the Prior Action. The Motion to Vacate asserted that the matter had been settled at the time the Seventh Circuit rendered its decision, even while stating to the court that "the only items necessary to complete this settlement are (a) the signature of the settlement agreement by a representative of GMAC Mortgage. . . ." (Exhibit 3.)  In its Response, GMACM argued that the agreement had not been signed when the Seventh Circuit issued its decision, and that Plaintiffs' performance under the alleged contract was rendered impossible by the Seventh Circuit's ruling. (Exhibit 4.)  Acknowledging these documents, the Seventh Circuit denied Plaintiffs' Motion to Vacate on May 7, 2008, finding that "[w]hen this court's order issued, the case had not been settled." (Exhibit 6.)  Seven days later, the Seventh Circuit denied Plaintiffs' Motion to Reconsider, in which Plaintiffs again argued that the case had been settled at the time of the court's decision. (Exhibits 7, 8.)  These are the same facts asserted in the Complaint in this case.  Moreover, each party to the alleged settlement agreement in the Prior Action was represented by the same counsel in that case, and they are all Plaintiffs in this case. Accordingly, the same parties are present in both the Prior Action and this action.

Plaintiffs essentially ask this Court to review and overturn the Seventh Circuit's decision, again asserting (as they did in the Seventh Circuit) that the unsigned settlement agreement constitutes an enforceable contract. (Complaint, ¶¶ 13, 18, 19.)  Plaintiffs' election to present this dispute to the Seventh Circuit, asking that court to consider and pass upon the merits of their position, prevents them from now re-litigating the same issue before another Court hoping for a different result.

6

**B.    Plaintiffs' Complaint is Also Barred by the Doctrine of Collateral Estoppel.**

Collateral estoppel, also known as issue preclusion, is similar to *res judicata* but does not require an identity of parties.  In order to show that a claim is precluded under the doctrine of collateral estoppel, a party must show that:

> (1) the issue sought to be precluded is the same as that involved in the prior action,
> (2) the issue was actually litigated;
> (3) the determination of the issue was essential to the final judgment, and
> (4) the party against whom estoppel is invoked was fully represented in the prior action.

*Washington Group Int'l, Inc. v. Bell, Boyd & Lloyd LLC*, 383 F.3d 633, 636 (7th Cir. 2004); *Easley v. Reuss*, 247 Fed. Appx. 823, 826-27 (7th Cir. 2007) (unpublished) (attached as Exhibit 11); *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000); *Talano v. Bonow*, No. 00-C-1208, 2002 U.S. Dist. LEXIS 17387, *11-12 (N.D. Ill. Sept. 16, 2002) (attached as Exhibit 12). "[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits ..." *Adair v. Sherman*, 230 F.3d at 893 (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).

As discussed above, the issue in this case is the same as the issue before the Seventh Circuit on the Motion to Vacate and Motion to Reconsider in the Prior Action.  (*Compare* Complaint *with* Exhibits 3-5.)  The question of whether a binding and enforceable settlement had been reached before the Seventh Circuit issued its order affirming GMACM's summary judgment was litigated in the Seventh Circuit, and this Court should not review the Seventh Circuit's decision on that issue. *See Talano*, 2002 U.S. Dist. LEXIS 17387 at *12-13 (finding that the question of whether a valid and enforceable contract existed was actually litigated, for the purposes of collateral estoppel analysis, where the District Court granted summary judgment and Seventh Circuit dismissed the appeal).  The language of the Seventh Circuit's Order denying the Motion to Vacate demonstrates that the determination of this issue was essential to the final

7

judgment: "When this court's order issued, this case had not been settled."  (Exhibit 6.)

Plaintiffs in this case were all fully represented in the Prior Action by the same law firm,

Edelman, Combs, Latturner, and Goodwin, LLC.  That firm itself is now a party in this action.

Accordingly, none of the Plaintiffs in this case can colorably claim that they were "strangers to

the cause" of the Motion to Vacate and Motion to Reconsider before the Seventh Circuit. *See*

*Montana v. United States*, 440 U.S. 147, 154 (1979).  Therefore, collateral estoppel also

precludes Plaintiffs' re-litigation of the claims alleged in the Complaint presently before this

Court.

## II.    PLAINTIFFS CANNOT STATE A CLAIM FOR BREACH OF CONTRACT BECAUSE IT IS IMPOSSIBLE FOR THEM TO PERFORM UNDER THE ALLEGED CONTRACT.

Even if this dispute was not previously adjudicated on the merits, Plaintiffs' Complaint

should be dismissed because it fails to sufficiently state a claim for breach of contract.  In order

to state a claim for breach of contract a party must allege performance of its own obligations

under the contract it seeks to enforce. *See Burke v. Lakin Law Firm*, No. 07-cv-0076-MJR, 2008

U.S. Dist. LEXIS 241, *5 (S.D. Ill. Jan. 3, 2008) (attached as Exhibit 13) (dismissing breach of

contract claim where plaintiff failed to allege that it had performed its obligations under the

contract).  Allegations are insufficient to withstand a motion to dismiss where they lack

sufficient factual matter to raise a plaintiff's right to relief above a speculative level. *See Bell*

*Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

Here, Plaintiffs assert a wholly conclusory allegation of performance.  (Complaint, ¶ 23.)

Such conclusory allegations cannot withstand a motion to dismiss.  Plaintiffs do not and cannot

allege that they performed their obligation to voluntarily dismiss the appeal in the Prior Action—

their only obligation under the purported settlement—thereby eliminating GMACM's risk of an

adverse decision, which was the consideration GMACM was to receive under the agreement.

8

They do not and cannot allege that they performed their specific obligations because performance was rendered impossible when the Seventh Circuit affirmed GMACM's summary judgment in the Prior Action.  GMACM should not be forced to pay money for a settlement that cannot be performed by the Plaintiffs to eliminate a risk that no longer exists.  *See, e.g., Roche v. Liberty Mut. Managed Care, Inc.*, No. 07-cv-331-JPG, 2008 U.S. Dist. LEXIS 49602 (S.D. Ill. June 30, 2008) (attached as Exhibit 14) (ordering a plaintiff to show cause why defendant's motion to dismiss should not be granted in an action for breach of contract where the express terms of the contract attached to the Complaint appeared to preclude the interpretation alleged by Plaintiff); *Robinson v. Morgan Stanley*, No. 06-C-5158, 2007 U.S. Dist. LEXIS 70604, *12 (N.D. Ill. Sept. 24, 2007) (attached as Exhibit 15) ("[A] plaintiff can plead herself out of court if a complaint includes facts that undermine its own allegations.").

Illinois law excuses one party to a contract from performing its obligations under certain circumstances.  For example, when "an unanticipated circumstance . . . has made performance of the promise vitally different from what should reasonably have been within the contemplation of the parties when the contract was entered," the "doctrine of impossibility" excuses performance. *Illinois-American Water Co. v. City of Peoria*, 774 N.E.2d 383, 391 (3d Dist. 2002); *In re Marriage of Corkey*, 645 N.E.2d 1384, 1389 (2d Dist. 1995).  Similarly, performance is excused when there is "a frustrating event not reasonably foreseeable and the value of the parties' performance [has been] totally or almost destroyed by the frustrating cause." *Illinois-American Water Co.*, 774 N.E.2d at 390-91 (labeling this "the doctrine of commercial frustration"); *Farm Credit Bank of St. Louis v. Dorr*, 620 N.E.2d 549, 555-56 (5th Dist. 1993); *American Nat'l Bank v. Richoz*, 545 N.E.2d 550, 553 (2d Dist. 1989).

9

Here, GMACM's proposal to pay money to Plaintiffs was made in consideration for Plaintiffs' proposal to eliminate the risk that GMACM might face continued costly litigation. The value of this exchange for GMACM was the elimination of the risk. That risk was then eliminated before the parties could consummate the settlement and before either party performed. In the parlance of *Illinois-American Water Co.*, the "value of the parties' performance [was] totally or almost totally destroyed by the frustrating cause." 774 N.E.2d at 390-91.

In the unsigned draft settlement agreement, Plaintiffs agreed to release GMACM from liability on all issues "based on, arising out of, or in any way relating or pertaining to the issues raised" in the federal court action. *See* Settlement Agreement and Release, Exhibit L to Plaintiffs' Complaint, at ¶ 2. Plaintiffs also agreed to "submit a stipulation to dismiss the [pending federal court action] with prejudice to the United States Court of Appeals for the Seventh Circuit, and [] take any further steps necessary to effectuate a dismissal with prejudice of the Murray Action." *See* Settlement Agreement and Release, Exhibit L to Plaintiffs' Complaint, at ¶ 3. Even if the agreement were enforceable, as Plaintiffs claim, the performance called for by Plaintiffs under the plain terms of the agreement is no longer possible. Accordingly, GMACM's performance was excused.

### Conclusion

The issues in this case have already been ruled upon by the Seventh Circuit. This Court should decline to review that decision. Even if this Court were willing and able to reconsider the Seventh Circuit's decision, Plaintiffs have not and cannot state a claim for breach of contract in this case. Accordingly, Defendant GMAC Mortgage, LLC respectfully requests an Order dismissing Plaintiffs' Complaint, with prejudice, under Federal Rule of Civil Procedure 12(b)(6) and granting such further relief as the Court deems just and appropriate.

10

DATED: August 11, 2008                    GMAC MORTGAGE, LLC


                                          By: /s/ Simon Fleischmann
                                             One of its attorneys


Thomas J. Cunningham (6215928)
Simon Fleischmann (6274929)
Julia C. Webb (6294050)
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, IL 60606
Telephone: 312.443.0731
Facsimile: 312.896.6731


11

## CERTIFICATE OF SERVICE

The undersigned on oath states that he served the foregoing on:

Karl Halperin
Rosenfield, Kaplan & Halperin
6160 North Cicero Avenue, Suite 320
Chicago, IL 60646

by placing said document into a properly addressed envelope, first class postage prepaid, and placing said envelope into the U.S. Mail depository located at 111 South Wacker Drive, Chicago, Illinois on August 11, 2008 before the hour of 5:00 p.m.


DATED: August 11, 2008


By:   /s/ Simon A. Fleischmann
          Simon A. Fleischmann

# EXHIBIT 1

532 F.Supp.2d 938
532 F.Supp.2d 938
**532 F.Supp.2d 938**

Page 1

▷Murray v. GMAC Mortg. Corp.
N.D.Ill.,2007.

United States District Court,N.D. Illinois,Eastern
Division.
Nancy MURRAY, Plaintiff,
v.
GMAC MORTGAGE CORPORATION d/b/a
Ditech.com, Defendant.
**No. 05 C 1229.**

July 23, 2007.

**Background:** Suit was brought on behalf of a class
of consumers against residential mortgage lender for
violations of the Fair Credit Reporting Act (FCRA).
Lender moved for reconsideration of court's denial of
its summary judgment motion.

**Holding:** The District Court, David H. Coar, J., held
that lender, which excluded essentially all substantive
offer information from its mailer, was not
"objectively unreasonable" in its interpretation of
FCRA's firm offer requirement, and therefore its
erroneous interpretation of requirement was not
willful.

Motion granted in part.

West Headnotes

**[1] Federal Civil Procedure 170A ☞928**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(I) Motions in General
      170Ak928 k. Determination. Most Cited
Cases
Motion to reconsider will only be granted where the
court has patently misunderstood a party, or has made
a decision outside the adversarial issues presented to
the court by the parties, or has made an error not of
reasoning but of apprehension; a further basis for a
motion to reconsider would be a controlling or
significant change in the law or facts since the
submission of the issue to the court.

**[2] Credit Reporting Agencies 108A ☞1**

108A Credit Reporting Agencies
   108Ak1 k. Credit Bureaus and Credit Reports in
General. Most Cited Cases
Residential mortgage lender, which excluded
essentially all substantive offer information from its
mailer, was not "objectively unreasonable" in its
interpretation of Fair Credit Reporting Act's (FCRA)
firm offer requirement, and therefore its erroneous
interpretation of requirement was not willful; legal
rules were not "clearly established" at time lender
designed and implemented the mailer, and the
interpretation of "firm offer" used by lender had been
accepted by other courts. Consumer Credit Protection
Act, §§ 603(*l* ), 616, 15 U.S.C.A. §§ 1681a(*l* ),
1681n.

**[3] Federal Civil Procedure 170A ☞182.5**

170A Federal Civil Procedure
   170AII Parties
     170AII(D) Class Actions
      170AII(D)3 Particular Classes Represented
       170Ak182.5 k. Consumers, Purchasers,
Borrowers, and Debtors. Most Cited Cases
To the extent that non-representative class members
had not been made aware of class action against
residential mortgage lender prior to termination of the
case, the intended class of consumers was invalid.
Fed.Rules Civ.Proc.Rules 23(c)(2), 23(b)(3), 28
U.S.C.A.

*939 Daniel A. Edelman, Cathleen M. Combs,
Thomas Everett Soule, Edelman, Combs, Latturner &
Goodwin, LLC, Chicago, IL, for Plaintiff.
Thomas Justin Cunningham, Angela Lashawn
Stinson-Marti, James Matthew Goodin, Phillip
Russell Perdew, Lord Bissell & Brook, Chicago, IL,
for Defendant.

### *MEMORANDUM OPINION AND ORDER*

DAVID H. COAR, District Judge.
Plaintiff Nancy Murray ("Murray" or "Plaintiff") has
brought suit on behalf of a now-certified class of
consumers against GMAC Mortgage Corporation
d/b/a Ditech ("GMACM" or "Defendant") for
violations of the Fair Credit Reporting Act, 15 U.S.C.
§ 1681 *et seq* ("FCRA"). Before this Court is
Defendant's Motion for the Court to Consider New
Supreme Court Authority in Support of Summary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Judgment and Certification for Immediate Appeal (Doc. No. 112). For the reasons stated below, this motion is GRANTED in part and DISMISSED AS MOOT in part.

## 1. FACTS

The facts of this case were outlined in this Court's summary judgment opinion dated April 10, 2007. It is therefore unnecessary to repeat that description in its entirety. For present purposes, it is sufficient to state the following. Defendant GMACM is a residential mortgage lender that uses direct mailings to attract new customers. Defendant sent a nationwide mailing to 10,071,186 people between October 15, 2004 and April 14, 2005, which *940 Plaintiff maintains failed to meet the requirements of FCRA. Specifically, Plaintiff claimed that the terms were not laid out in a properly "clear and conspicuous" manner as required by section 1681m(d), nor did the mailing amount to a "firm offer" that would justify the use of recipients credit scores under the permissible use exception of section 1681b(c). Defendant has shown that it used external agencies to assemble the list of recipients and develop the mailer in question, and received advice from internal associate legal counsel Peter Hender, compliance manager Shanna Gilroy, and production marketing director Peggy Knauft as to FCRA compliance.

In a ruling dated April 10, 2007, this Court denied in part and granted in part Defendant's motion for summary judgment, and granted Plaintiff's motion for class certification. This Court subsequently denied Defendant's motion to reconsider the partial denial of summary judgment. Following that ruling, the Supreme Court issued its opinion in *Safeco Ins. Co. of America, et al. v. Burr, et al.*, 551 U.S. ----, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). In *Safeco*, the Supreme Court interpreted the same wilfulness standard upon which FCRA liability is based in this case (15 U.S.C. § 1681n), though the underlying FCRA requirement was a different one (15 U.S.C. § 1681m(a) rather than 15 U.S.C. § 1681b(c)(1)(B)). Defendant now argues that this Court should reconsider its denial of summary judgment based on Defendant's claim that willfulness cannot lie under the standard established in *Safeco*. In the alternative, Defendant argues that it should be allowed to immediately appeal this issue to the Seventh Circuit,

in light of the importance of interpreting the new Supreme Court ruling and the likelihood of settlement should this action move forward.

## 2. LEGAL STANDARD ON MOTION TO RECONSIDER

[1] The standards for evaluating a motion to reconsider are discrete and limited. Such a motion will only be granted:

> where the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

See *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983)).

## 3. ANALYSIS OF MOTION TO RECONSIDER

Defendant is correct that *Safeco* concerns the same basic standard of liability to be used in evaluating parties' interpretations of FCRA. See 15 U.S.C. § 1681n (establishing a common standard of private-action liability for all violations of the law). This Court must now consider whether summary judgment was appropriate in light of the Supreme Court's reframing of FCRA language regarding willfulness.

### a. Summary of Safeco Holdings

In *Safeco*, the Court considered 15 U.S.C. § 1681a(k)(1)(B) (I), which requires that consumers be advised whenever there is "an increase in any charge for ... any insurance" as a result of a credit report. Defendants had interpreted this language as applying only to ongoing customers, rather than new customers, assuming that *941 it would be impossible to "increase" the rates or charges on those who had never before been charged. As a result, the *Safeco* Defendants did not provide the required

532 F.Supp.2d 938
532 F.Supp.2d 938
**532 F.Supp.2d 938**

Page 3

FCRA notice to new customers who were given substandard terms as a result of their credit reports. The Court disagreed with Defendants' interpretation of section 1681a(k)(1)(B)(I) and, after a lengthy analysis of FCRA's history and purpose, found that FCRA did require that notice be given.

However, because the statutory language was "less-than-pellucid" on this point, and in light of "a dearth of guidance" on interpreting that language, the Supreme Court found that Defendants had not acted "willfully" in interpreting section 1681a(k)(1)(B)(I) incorrectly. In making this determination, the Court made several important points. With respect to the "willful" standard for liability under Section 1681n, the Supreme Court found that willfulness for FCRA purposes can be founded on either a knowingly wrong or a reckless basis. *Safeco*, 551 U.S. at ---- - ----, 127 S.Ct. 2201. It then established a two stage process for determining whether or not a party's interpretation was reckless: first, the reading of the statute must have been objectively unreasonable; and second, in making that unreasonable determination the party must have run "a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at ---- - ----, 127 S.Ct. 2201.

The Supreme Court focused on several different factors in determining that the Safeco Defendant's interpretation "was not objectively unreasonable":

-**Reasonableness of Defendants' rationale based on statutory text:** "On the rationale that 'increase' presupposes prior dealing, Safeco took the definition as excluding initial rate offers for new insurance, and so sent no adverse action notices to Burr and Masey. While we disagree with Safeco's analysis, we recognize that its reading has a foundation in the statutory text."

-**Likelihood that Defendant's interpretation would convince a court:** whether Defendant's rationale is "founded on a sufficiently convincing justification to have persuaded the District Court to adopt it and rule in Safeco's favor."

-**Absence of judicial or administrative guidance:** "Before these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the Federal Trade

Commission."

*Id.* at ---- - ----, 127 S.Ct. 2201. Based on the above factors, the Supreme Court determined that Safeco's interpretation was not objectively unreasonable, and that it was therefore unnecessary to consider the more difficult line-drawing determination of whether or not the defendant "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 19-20.

Defendant filed this motion in the hopes that this Court would reconsider its denial of Defendant's motion for summary judgment and find that, as a matter of law, it is impossible for a reasonable jury to find willfulness in their failure to interpret FCRA's firm offer requirement correctly. It should be noted that the underlying interpretive question in *Safeco* was significantly more straightforward; there, the question was whether or not 1681m(a) applied to new customers-a yes or no determination-while the instant case centers on the mailer contents required in order to qualify as a firm offer of credit under 1681b(c)(1)(B). That said, *Safeco* nonetheless provides the courts with a general framework and some guideline considerations for considering whether a party has **\*942** been reckless in its interpretation of a FCRA requirement sufficient to warrant liability under section 1681n. First, *Safeco* requires a threshold determination of whether or not GMACM's interpretation of 1681b(c)(1)(B) was objectively unreasonable based on the clarity of the statutory text, the availability of judicial or administrative interpretation of that text, and the likelihood of judicial agreement with that determination. Second, if the interpretation was objectively unreasonable, it must then be determined whether Defendant's error amounted to recklessness, or mere carelessness or negligence.

b. *Whether GMACM's interpretation was objectively unreasonable*

[2] It must be said at the outset of this analysis that GMACM's interpretation of FCRA's "firm offer" language is not entirely clear from its memorandum in support of its motion to reconsider. Defendant repeatedly claims that its "interpretation of the FCRA has found support in other courts," and that "numerous courts to this day continue to render decisions that tend to demonstrate that GMACM did

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

not violate the FCRA in this case." *See, e.g.,* Recons. Mot. at 7. However, in this filing Defendant largely focuses on interpretive points that are not in question in this case, rather than laying out and defending its interpretation of FCRA. *See* Recons. Mot. at 7-8. For example, Defendant argues that particular terms such as interest rate and repayment period are not required, despite the fact that this is not in contention. *See* Summ. J. Op. at 20 ("[T]he line around 'firm offers' cannot be solely determined by the presence of [sic] absence of terms such as total loan amount, or the rate of interest, or the term of repayment."). Similarly, Defendant argues that conditions are allowed under FCRA, which this Court has already acknowledged. *See id.* at 18 ("While some of the additional conditions are expressly allowed under FCRA ... the number and opacity of the conditions make the offer elusory ..."). It is not necessary to evaluate these interpretive points for reasonableness.

To clarify, what is at issue is whether Defendant was objectively reasonable in believing that, where an offer "will be honored if the consumer is determined ... to meet the specific criteria used to select the consumer for the offer,"*see* Summ. J. Mem. at 2 (citing 15 U.S.C. § 1681a(*l* )), it constitutes a "firm offer" despite the lack of *any* terms and the presence of *a multitude* of *opaque* conditions. Essentially, Defendant adopted the interpretation of "firm offer" later rejected by the Seventh Circuit in *Cole; that* whether or not the offer would have been honored is dispositive, regardless of the amount of information provided or conditions attached to the offer. *See Cole v. U.S. Capital, Inc.,* 389 F.3d 719, 727-28 (7th Cir.2004) ("To determine whether the offer of credit comports with the statutory definition, a court must consider the *entire* offer and the effect of *all* the material conditions that comprise the credit product in question. If, after examining the entire context, the court determines that the "offer" was a guise for solicitation rather than a legitimate credit product, the communication cannot be considered a firm offer of credit.) (emphasis in the original).

*i. Reasonableness of Defendants' rationale based on statutory text*

Like the text under consideration in *Safeco,* the FCRA language regarding the "firm offer" requirement is "less-than-pellucid." FCRA defines a firm offer as:

> any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used **\*943** to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following: [list of acceptable conditions]

15 U.S.C. § 1681a(*l* ). Defendant is therefore correct in its assertion that the statute does not outline specific terms that a firm offer must contain. *See* Recons. Mem. at 5-6. However, a firm offer is at heart an offer, and it is not entirely clear what can be "honored" if a mailer contains no information regarding the nature of the credit being offered. Also, according to the statutory scheme of FCRA it seems natural to require those accessing credit reports to provide some information in the resultant mailer to warrant that access. *See Cole,* 389 F.3d at 726-27.

In excluding essentially all substantive offer information from its mailer, Defendant arguably followed the letter of the law without adopting its spirit. Nonetheless, whether or not Defendant may have erred in interpreting FCRA does not determine whether that interpretation was "reasonable." Defendant has asserted that the language in question carries no explicit requirement of terms and allows for conditions. This is reasonable. Indeed, other courts have found that the Seventh Circuit's *Cole* opinion-requiring more-inappropriately added additional requirements that simply aren't supported by the statutory language. *See, e.g., Nasca v. J.P. Morgan Chase Bank, N.A.,* 2007 WL 678407, at \*3-4 (S.D.N.Y.2007).

*ii. Absence of judicial or administrative guidance*

Defendant designed and implemented the mailer in early 2004 and, at that time, there was a relatively limited and somewhat inconsistent universe of authority on this subject. Defendant overstates the matter in asserting that *no* legal authority existed at the time; as Plaintiff points out, at the time of the mailing Defendant could have drawn upon a circuit court ruling and an administrative commentary, both of which contained *Cole*-like language suggesting that a mere promotion would not be sufficient for FCRA purposes. *See* Pl.'s Resp. at 4 (citing *Trans*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

_Union Corp. v. FTC,_ 267 F.3d 1138, 1142-43 (D.C.Cir.2001)); Commentary on the Fair Credit Reporting Act, 55 Fed.Reg. 18804 at 18807 (May 4, 1990) (to be codified at 16 C.F.R. pt. 600).

However, while to some extent this supplies the "guidance from the courts of appeals or the Federal Trade Commission" that the Supreme Court found lacking in _Safeco,_ it nonetheless does not provide objective clarity on the question of what constitutes a firm offer. The _Trans Union_ opinion represented only a single appellate court on this issue, and the language cited by Plaintiff amounts to the relatively opaque advice that mailers should be more like "guaranteed offers of credit" and less like "catalogs and sales pitches." _See Trans Union,_ 267 F.3d at 1142-43. Similarly, while the FTC statement precludes the sending of mere "promotional material" on a similar rationale as that which was later used in _Cole,_ this commentary comes from an administrative body whose authority on the subject was expressly limited by the Supreme Court. _See Safeco,_ 551 U.S. at ----, 127 S.Ct. 2201 (stating that the FTC "has only enforcement responsibility, not substantive rulemaking authority, for the provisions in question, _see_15 U.S.C. §§ 1681s(a)(1), (e)").

Also, as Defendant points out there were opinions at the time that appeared to favor Defendant's looser interpretation of the requirement. _See_ Def.'s Recons. Mot. at 6 (citing _Sampson v. Western Sierra Acceptance Corp.,_ 2003 WL 21785612 (N.D.Ill. Aug. 1, 2003) (finding that although "[t]he certificate fails to specify the amount of credit or _any_ other terms of the credit, such as the interest rate" dismissal **\*944** was nonetheless appropriate because the plaintiffs "[did] not allege that defendants failed to honor the offer of credit"), amended on recons. by _Sampson v. Ridge Chrysler/Plymouth LLC,_ 2005 WL 78958 (N.D.Ill. Jan. 13, 2005); and _Tucker v. Olympia Dodge of Countryside, Inc.,_ 2003 WL 21230604, at \*3-4 (N.D.Ill.2003) ("FCRA does not condition the validity of a 'firm offer of credit' upon its inclusion of certain terms, such as a rate of interest. Instead 'firm offer' is defined in terms of a creditor's own undisclosed, predetermined criteria.")).

Plaintiff tries to downplay the significance of these opinions. She argues that they are only other district courts and are therefore not binding or authoritative. _See_ Pl.'s Resp. at 9 ("[In _Safeco_] District Court

opinions are not mentioned; this is an extension of the concept that District Court opinions are not binding, whereas the decisions from Courts of Appeals are."). However, the Supreme Court did use a district court opinion-that of the lower court that tried _Safeco_ itself-in finding support for the reasonableness of that defendant's interpretation of FCRA. _Safeco,_ 551 U.S. at ----, 127 S.Ct. 2201 (finding that the defendant's view was bolstered by "a sufficiently convincing justification to have persuaded the District Court to adopt it and rule in Safeco's favor"). Likewise, while Defendant's ability to find _some_ opinions that seem to agree with its interpretation would appear to be mere cherry picking, in light of the importance _Safeco_ placed on judicial agreement as proof of reasonableness, _see infra_ sec. iii, the fact that at least some judges faced with similar facts found in favor of Defendant's view argues against a finding of recklessness.

For this reason, while it cannot be said that the instant matter involves the same "dearth of guidance" as was found in _Safeco,_ it nonetheless cannot be said that the legal rules were "clearly established." _See Safeco,_ 551 U.S. at ----, 127 S.Ct. 2201 (citing _Saucier v. Katz,_ 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Therefore, this factor also supports a finding that Defendant was not "objectively unreasonable" in its interpretation of FCRA's requirements.

_iii. Likelihood that Defendant's interpretation would convince a court_

The Supreme Court placed significant weight on the fact that a court might have favored a party's interpretation of FCRA as proof that the interpretation was not reckless. _See, e.g., Safeco,_ 551 U.S. at ----, ----, n. 20, 127 S.Ct. 2201 ("[I]t would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator. Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts ..."). This Court will therefore consider whether courts have favored similar interpretations to that which was adopted by Defendant.

This Court does not have the advantage of looking to a lower court's ruling as in _Safeco,_ which allowed the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

532 F.Supp.2d 938
532 F.Supp.2d 938
**532 F.Supp.2d 938**

Supreme Court to look at how the very same set of facts had been ruled on by a court. However, as Plaintiff urges us to do, it is not unreasonable to satisfy this factor of the *Safeco* analysis by considering how other courts have treated Defendant's interpretation of the "firm offer" requirement, to help determine the objective reasonableness of the approach. As Defendant points out, some subsequent decisions applied a very loose standard to the terms required of a firm offer under FCRA, rejecting arguments that there were too many conditions and insufficient terms. *See, e.g.,* *945*Soroka v. JP Morgan Chase & Co., 500 F.Supp.2d 217, 221-22 (S.D.N.Y.); Nasca, 2007 WL 678407, at *3-4* (expressly rejecting *Cole* ); *Soroka v. Homeowners Loan Corp.,* 2006 WL 4031347, at *5 (M.D.Fla. June 12, 2006) ("While the terms were not disclosed on the face of the offer, the material terms were ascertainable with minimal effort."); *Kennedy v. Chase Manhattan Bank USA, NA,* 369 F.3d 833 (5th Cir.2004) ( "[F]irm offer of credit really means a firm offer if you meet certain criteria").

Therefore, it appears that the interpretation of "firm offer" used by Defendant has been accepted by other courts. In light of this, and the other factors drawn from the Supreme Court's ruling in *Safeco,* this Court finds that Defendant's interpretation of FCRA's "firm offer" requirement was not objectively unreasonable.

*iv. Additional factors not considered in Safeco*

The memoranda of both parties address additional matters that were largely considered in this Court's previous summary judgment opinion. *See generally,* Def.'s Recons. Mem. (discussing defense witness credibility and Defendant's intent); Pl.'s Resp. (alleging evidence of bad faith, such as Defendant's failure to provide FCRA's required 'clear and conspicuous disclosures and the fact that Defendant continued to use an identical mailer post-*Cole'*). However, these matters focus on the subjective factors surrounding the situation in which Defendant interpreted FCRA. While some of these factors have appeared compelling to this Court in the past, in light of this Court's finding above that GMACM's interpretation was not "objectively unreasonable" there is no need to move beyond the limited factors considered in *Safeco. See, e.g., Safeco,* 551 U.S. at --- - - ----, ---- n. 20, 127 S.Ct. 2201 (declining to consider defendant's alleged bad faith, finding that

where a defendant has "followed an interpretation that could reasonably have found support in the courts," a party's "subjective intent" is irrelevant).

**4.    ANALYSIS    OF    "CLEAR    AND CONSPICUOUS" REQUIREMENT**

In its previous summary judgment opinion, this Court found that "in light of this Court's ruling that Defendant failed to meet the requirements of a 'firm offer' under FCRA, Plaintiff has no additional claim under section 1681m." *See* Summ. J. Op. at 23. While this Court has reconsidered the possibility of GMACM's actions being interpreted as "willful," there is no reason to alter the previous finding that there was no firm offer contained in that document. Therefore, there is also no need for this Court to reconsider the failure of Plaintiff's claim under section 1681m.

**5. ANALYSIS OF INTERLOCUTORY APPEAL**

Defendant has moved for immediate appeal on a single issue: "Can a defendant be found to have willfully violated a statute where the acts or omissions purportedly constituting the violation were not defined as a violation of the statute when the defendant engaged in the conduct in question?" However, as summary judgment is now appropriate, Defendant's motion for immediate appeal is moot.

**6. CLASS CERTIFICATION**

[3] This Court granted Defendant's motion to certify a class under Federal Rule 23 on April 10, 2007. The parties have so far been unable to produce a list of potential class members, much less provide them with notice. *See* Status Report of July 10, 2007 (Doc. No. 216) (describing ongoing efforts to produce mailing list). Therefore, to the extent that non-representative class members have not been made aware of this action prior to termination*946 of the case, the intended class is invalid. *See Smith v. Shawnee Library Sys.,* 60 F.3d 317 (7th Cir.1995) (holding that under Fed.R.Civ.P. 23(c)(2), 23(b)(3) class members must receive reasonable notice and the opportunity to opt out as an "absolute requirement for a court to exercise jurisdiction over the class members") (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)); *see also Schrader v. Selective Serv. Sys.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

532 F.Supp.2d 938
532 F.Supp.2d 938
**532 F.Supp.2d 938**

*Local Board No. 76 of Wisconsin et al.*, 470 F.2d 73, 75 (7th Cir.1972) (ruling that failure to provide necessary notice invalidates the class). This Court's order certifying the class is therefore vacated and held for naught.

## 7. CONCLUSION

For the foregoing reasons, Defendant's motion for reconsideration is GRANTED, and its motion for immediate appeal is DISMISSED as moot. Its amended motion for summary judgment-previously denied in part and granted in part-is now GRANTED. Class certification is invalid.

N.D.Ill.,2007.
Murray v. GMAC Mortg. Corp.
532 F.Supp.2d 938

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

LEXSEE 2008 U.S. APP. LEXIS 8864

### NANCY R. MURRAY, Plaintiff-Appellant, v. GMAC MORTGAGE CORPORATION, Defendant-Appellee.

#### No. 07-2776

#### UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

*2008 U.S. App. LEXIS 8864*

**March 11, 2008 \* , Submitted**

\*  This successive appeal has been submitted to the original panel under Operating Procedure 6(b). After examining the briefs and the record, we have concluded that oral argument is unnecessary. See Fed. R. App. P. 34(a); Cir. R. 34(f).

**April 18, 2008, Decided**

**NOTICE:**    PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:**  [*1]
Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 05 C 1229. David H. Coar, Judge.
*Murray v. GMAC Mortg. Corp., 532 F. Supp. 2d 938, 2007 U.S. Dist. LEXIS 53777 (N.D. Ill., 2007)*

**DISPOSITION:**    AFFIRMED.

**COUNSEL:** For NANCY R. MURRAY, Plaintiff - Appellant: Daniel A. Edelman, EDELMAN, COMBS & LATTURNER, Chicago, IL USA.

For GMAC MORTGAGE CORPORATION, Defendant - Appellee: Thomas J. Cunningham, LOCKE LORD BISSELL & LIDDELL, Chicago, IL USA.

**JUDGES:** Before FRANK H. EASTERBROOK, Chief Judge, ILANA DIAMOND ROVNER, Circuit Judge, ANN CLAIRE WILLIAMS, Circuit Judge.

**OPINION**

**Order**

This appeal is controlled by *Murray v. New Cingular Wireless Services, Inc., No. 06-2477, 2008 U.S. App. LEXIS 8004 (7th Cir. Apr. 16, 2008).* Plaintiff contends that the mailer sent by GMAC Mortgage violates the Fair Credit Reporting Act in two ways: First, it does not contain a "firm offer of credit" because some terms, such as the minimum line of credit and maximum fees, were omitted; second, the disclosure of the consumer's right to prevent access to credit records in the future is not "conspicuous." The district court held that the mailing was deficient on both counts, but that statutory damages are unavailable because GMAC Mortgage did not act recklessly when making these errors.

Our opinion in *New Cingular* holds that the  [*2] omission of material terms is compatible with a "firm offer of credit." As in *New Cingular,* it is conceivable that the offeror's reservation of a right to change terms could be understood as a power not to extend credit even if the consumer continues to meet the criteria used for the screening, but plaintiff has not endeavored to show that GMAC Mortgage understood or used the power in that way. As in *New Cingular,* the suit relies on the text of the offer rather than a course of practice. On this record, GMAC Mortgage made a "firm offer of credit."

As for the disclosure: The language appears in 8-point type on the back side of the flyer. It occupies two

of ten paragraphs, all in the same size type. Two of the other eight paragraphs are set off (one by a graphic logo, one by a boldface heading), and because the statutory disclosure is less distinctive than other nearby text it is not "conspicuous." But as in *New Cingular* this error cannot be called reckless. The flyer almost satisfies the FTC's regulatory definition, adopted after this flyer was mailed. The FTC deems 8-point type conspicuous if the first page of a mailing bears a reference, in 12-point type (and equivalent in visibility [*3] to other type on the page), to the disclosure on the other side. GMAC Mortgage's mailing contains a reference on the first page, but it is smaller than other type on that page. That GMAC Mortgage came close to meeting the FTC's definition shows that it did not act recklessly, as we understood that term in *New Cingular.*

    AFFIRMED

# EXHIBIT 3

U.S.C.A. - 7th Circuit
RECEIVED LMB

APR 22 2008

GINO J. AGNELLO
CLERK

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

### Appeal No. 07-2776

---

### NANCY MURRAY,

**Plaintiff - Appellant,**

v.

### GMAC MORTGAGE CORPORATION,

**Defendant - Appellee.**

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division,
Hon. David Coar, presiding

Case No. 05 C 1229

---

## MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF
## DISTRICT COURT ON ACCOUNT OF SETTLEMENT OF CASE

---

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

Plaintiff-appellant respectfully requests that this Court enter an order vacating its order of April 18, 2008 affirming the Court below, on account of the fact that the parties had previously entered into a settlement agreement and were documenting the same at the time of the Court's order.

In further support, plaintiff states as follows:

1.    On March 18, 2008, after negotiations between the parties facilitated by Rocco Spagna of this Court's settlement conference office, the parties agreed to terms of a settlement of this matter.

2.    Since March 18, 2008, the parties have worked to document and complete this settlement. This included (a) the provision of information regarding other consumers who had similar claims as were brought in this matter; (b) the drafting of a settlement agreement, which was reviewed and approved by GMAC Mortgage and e-mailed to counsel for plaintiff on April 1, 2008; (c) the revision of that agreement by both parties, which was reduced to final form on April 8, 2008; (d) the signature of that agreement by plaintiffs and other consumers; and (e) the transmittal of these signatures on April 14, 2008 to counsel for GMAC Mortgage.

3.    At present, the only items necessary to complete this settlement are (a) the signature of the settlement agreement by a representative of GMAC Mortgage and (b) performance under that agreement.

4.    Upon the completion of these remaining tasks, the parties would have filed a motion to voluntarily dismiss this action pursuant to Fed.R.App.P. 42.

5.    Plaintiff believed that the settlement conference office had advised the Court of the settlement of this matter by the parties, thereby making the entry of a decision in this appeal unnecessary.

6.    In light of the foregoing, vacating the Court's order of April 18, 2008 on the

1

merits of the appeal would be in the interests of justice. The decision was designated as non-precedential under Fed.R.App.P. 32.1, as the appeal "was controlled by *Murray v. New Cingular Wireless Services, Inc.*, No. 06-2477 (7th Cir. Apr. 16, 2008)." (Order at 1.) Thus, no adverse and unjust result would come from the vacation of the Court's order in this appeal.

WHEREFORE, plaintiff-appellant respectfully requests that this Court enter an order vacating its order of April 18, 2008 affirming the Court below.

Respectfully submitted,

Thomas E. Soule

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (fax)
courtecl@edcombs.com

## CERTIFICATE OF SERVICE

I, Thomas E. Soule, hereby certify that on April 22, 2008, I caused the preceding document to be filed with the Court, with a true copy of the same being served upon the following individuals by facsimile and U.S. mail on the same date:

Thomas J. Cunningham
J. Matthew Goodin
Angela Stinson-Marti
Phillip R. Perdew
Locke Lord Bissell & Liddell LLP
111 S. Wacker Dr.
Chicago, IL 60606
(312) 443-0700
(312) 443-0336 (fax)



Thomas E. Soule

2

# EXHIBIT 4

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### Appeal No. 07-2776

**NANCY MURRAY,**

**Plaintiff-Appellant,**

v.

**GMAC MORTGAGE CORPORATION,**
doing business as DITECH.COM

**Defendant-Appellee.**

U.S.C.A. — 7th Circuit
R E C E I V E D

APR 2 5 2008 RMS

GINO J. AGNELLO
CLERK

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division,
Hon. David H. Coar, presiding

Case No. 05 C 1229

## DEFENDANT-APPELLEE GMAC MORTGAGE CORPORATION'S
## RESPONSE TO PLAINTIFF-APPELLANT'S MOTION TO VACATE
## ORDER AFFIRMING JUDGMENT OF DISTRICT COURT ON
## ACCOUNT OF SETTLEMENT OF CASE

Thomas J. Cunningham
Hugh S. Balsam
P. Russell Perdew
J. Matthew Goodin
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  312.443.0472
Facsimile:  312.896.6472
jmgoodin@lockelord.com

CHI1 1483868v.1

Defendant-Appellee GMAC Mortgage, LLC, f/k/a GMAC Mortgage Corporation ("GMACM") respectfully requests that this Court deny Plaintiff-Appellant Nancy Murray's ("Murray's") Motion to Vacate Order Affirming Judgment of District Court on Account of Settlement of Case, on account of the fact that 1.) Murray offers no basis for vacating the court's opinion other than her claim that an enforceable settlement agreement exists, a matter not before this Court; and 2.) GMACM contests the enforceability of the settlement agreement given that Murray's performance under the agreement was rendered impossible as a result of this Court's order of April 18, 2008, and by virtue of the changed circumstances that destroyed the value of the performance Murray promised.

In further support of its opposition to Murray's motion, GMACM states as follows:

1.     Murray offers this Court no justification for "vacating" its opinion. The Federal Rules of Appellate Procedure and the Rules of this Court provide methods by which an unsuccessful party may seek to have a panel's opinion reviewed and possibly modified, but a "Motion to Vacate . . . on Account of Settlement" is not one of them. Murray offers this Court no basis for vacating its decision in this case other than her assertion that an enforceable settlement agreement was reached by the parties – an issue that is not before this Court.

2.     GMACM contests the enforceability of the settlement agreement Murray argues should result in the vacation of this Court's opinion.

3.     In a series of discussions in late March, 2008 following the parties' completion of briefing in this case and prior to the rendering of this Court's decision of April 18, 2008, attorneys for the parties reached accord on a set of terms by which they indicated they were willing to settle the matter.

4.     GMACM's performance under the terms discussed by counsel would be the payment of money to Murray and her counsel.

2

5.     Murray's performance under the terms discussed by counsel would be the dismissal with prejudice of this appeal, thereby eliminating any risk GMACM faced that this Court would reverse the District Court's decision in GMACM's favor and return the case to the District Court for further costly proceedings.

6.     Counsel for the parties reduced the terms to an unsigned written agreement and sent it to their respective clients for review, approval, and execution. Before GMACM signed the agreement, this Court issued its decision affirming the District Court's summary judgment in GMACM's favor.

7.     To the extent any oral settlement agreement between the parties was in fact reached, Illinois law would govern its enforcement.

8.     Illinois law excuses one party to a contract from performing its obligations under certain circumstances. For example, when "an unanticipated circumstance . . . has made performance of the promise vitally different from what should reasonably have been within the contemplation of the parties when the contract was entered," the "doctrine of impossibility" excuses performance. *Illinois-American Water Co. v. City of Peoria*, 774 N.E.2d 383, 391 (3d Dist. 2002); *In re Marriage of Corkey*, 645 N.E.2d 1384, 1389 (2d Dist. 1995).

9.     Similarly, performance is excused when there is "a frustrating event not reasonably foreseeable and the value of the parties' performance [has been] totally or almost totally destroyed by the frustrating cause." *Illinois-American Water Co.*, 774 N.E.2d at 390-91 (labeling this "the doctrine of commercial frustration"); *Farm Credit Bank of St. Louis v. Dorr*, 620 N.E.2d 549, 555-56 (5th Dist. 1993); *American Nat'l Bank v. Richoz*, 545 N.E.2d 550, 553 (2d Dist. 1989).

10.     Here, GMACM's proposal to pay money to Murray was made in consideration for Murray's proposal to eliminate the risk that GMACM might face continued costly litigation.

3

The value of this exchange for GMACM was the elimination of risk. That risk was then eliminated before the parties could consummate the settlement and before either party performed. In the parlance of *Illinois-American Water Co.*, the "value of the parties' performance [was] totally or almost totally destroyed by the frustrating cause." 774 N.E.2d at 390-91.

11.    Moreover, Murray's promised performance has been rendered impossible by this Court's April 18, 2008 opinion and order. Murray's performance under the terms of the settlement agreement counsel discussed would have required her to dismiss her case with prejudice. That is no longer possible – the case has been resolved by this Court and nothing remains to dismiss with prejudice.

WHEREFORE, for all the foregoing reasons, Defendant-Appellee respectfully requests that this Court deny Plaintiff-Appellant's Motion to Vacate Order Affirming Judgment of District Court on Account of Settlement of Case and for such other and further relief as this Court may deem just and reasonable.

Date:  April 25, 2008                      Respectfully submitted,

                                           GMAC MORTGAGE CORP. d/b/a DITECH.COM

                                           By: _____
                                                One of Its Attorneys

Thomas J. Cunningham
Hugh S. Balsam
P. Russell Perdew
J. Matthew Goodin
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: 312.443.0472
Fax: 312-896-6472
E-mail: jmgoodin@lockelord.com

4

## CERTIFICATE OF SERVICE

I, Thomas J. Cunningham, certify that on April 25, 2008, I caused the foregoing to be

filed and served upon the following by hand delivery:

*Counsel for Plaintiff-Appellant:*

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603

_____
Thomas J. Cunningham

5

# EXHIBIT 5

U.S.C.A. – 7th Circuit
R E C E I V E D

APR 2 8 2008 FmS

GINO J. AGNELLO
CLERK

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### Appeal No. 07-2776

### NANCY MURRAY,

**Plaintiff - Appellant,**

v.

### GMAC MORTGAGE CORPORATION,

**Defendant - Appellee.**

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division,
Hon. David Coar, presiding

Case No. 05 C 1229

## MOTION FOR LEAVE TO FILE, INSTANTER, REPLY IN SUPPORT OF
## MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF
## DISTRICT COURT ON ACCOUNT OF SETTLEMENT OF CASE

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

Plaintiff-appellant respectfully requests that this Court grant plaintiff leave to file, *instanter*, a reply in support of her motion for an order vacating the Court's order of April 18, 2008, and further requests that the following stand as said reply:

As defendant concedes, the parties had reached an oral agreement to settle the case, with the assistance of Rocco Spagna of this Court's settlement conference office, reduced the terms of that agreement to writing, and circulated the agreement for signatures. (Response, ¶¶3-6.) *Dillard v. Starcon International, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007), held that "oral settlement agreements are enforceable under Illinois law if there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement. The essential terms must be definite and certain so that a court can ascertain the parties' agreement from the stated terms and provisions. Whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subjective beliefs." (Citations and quotation marks omitted.)

The parties' objective conduct demonstrates that an agreement was in place. The parties discussed this litigation with Mr. Spagna, who facilitated a deal agreed upon by both parties; afterwards, the parties took specific action to formalize that agreement. Defendant's claim that there was a mere "proposal to pay money... in consideration for Murray's proposal to eliminate the risk that GMACM might face continued costly litigation" is wrong. (Response, ¶10.) There was a contract. Plaintiff took no action contrary to the parties' agreement and will, as required under the settlement agreement, waive her right to petition for *certiorari* and thus end any "continued costly litigation."

Defendant claims that an "unanticipated circumstance," or a "frustrating event not reasonably foreseeable," would allow a party to back out of a contract. (Response, ¶¶8-9.) There are two main reasons why litigants enter into settlement agreements: to avoid the further expense and inconvenience of litigation, and to avoid the possibility of an adverse result. The parties here

1

entered into a settlement agreement for these reasons. At the time of the agreement, the case was on appeal, and the parties did not know who would win or lose. Total victory, or total defeat, in litigation are not unanticipated circumstances, and are foreseeable.

Defendant implicitly argues that GMAC Mortgage could not have anticipated the possibility that it would win on the merits in this Court, or that such a result was not reasonably foreseeable. Defendant prevailed in the Court below; it must have known that it was at least possible that they could have prevailed in this Court as well.

Furthermore, the litigation is not over. Plaintiff may file a petition for a writ of *certiorari* until July 17, 2008. Thus, there is a risk of continued litigation – absent the parties' settlement agreement. Plaintiff intends to stand by its agreement to settle this matter, made in good faith after participating in negotiations led by the settlement conference office. She would have done so if the Court's decision had favored her instead of GMAC Mortgage. Had she reneged on her agreement, her participation with the settlement conference's mediation would have been in bad faith, and a complete waste of the Court's resources. GMAC Mortgage's conduct here can properly be described in those terms.

Here, this Court was evidently unaware that Mr. Spagna of the settlement conference office had mediated a settlement between the parties here. Defendant opportunistically attempts to use this as a way to not honor its contract with plaintiff. As plaintiff has not breached the contract, and was diligent in pursuing the consummation of that contract, the Court's vacation of that order would be in the interests of justice.

WHEREFORE, plaintiff-appellant respectfully requests that the preceding stand as her reply in support of her motion seeking an order vacating the Court's previous order of April 18, 2008 affirming the Court below.

2

Respectfully submitted,



_____
Thomas E. Soule

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (fax)
courtecl@edcombs.com

## CERTIFICATE OF SERVICE

I, Thomas E. Soule, hereby certify that on April 28, 2008, I caused the preceding document to be filed with the Court, with a true copy of the same being served upon the following individuals by facsimile and U.S. mail on the same date:

Thomas J. Cunningham
J. Matthew Goodin
Angela Stinson-Marti
Phillip R. Perdew
Locke Lord Bissell & Liddell LLP
111 S. Wacker Dr.
Chicago, IL 60606
(312) 443-0700
(312) 443-0336 (fax)

_____
Thomas E. Soule

3

# EXHIBIT 6

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

May 7, 2008

*By the Court:*

| | |
|---|---|
| NANCY R. MURRAY,<br>       Plaintiff-Appellant,<br><br>No. 07-2776       v.<br><br>GMAC MORTGAGE CORPORATION,<br>      Defendant-Appellee. | ] Appeal from the United<br>] States District Court for<br>] the Northern District of<br>] Illinois, Eastern Division.<br>]<br>] No. 05 C 1229<br>]<br>] David H. Coar,<br>]     Judge. |

The following are before the court:

1. **MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF DISTRICT COURT ON ACCOUNT OF SETTLEMENT OF CASE**, filed on April 22, 2008, by counsel for appellant.

2. **DEFENDANT-APPELLEE GMAC MORTGAGE CORPORATION'S RESPONSE TO PLAINTIFF-APPELLANT'S MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF DISTRICT COURT ON ACCOUNT OF SETTLEMENT OF CASE**, filed on April 25, 2008, by counsel.

3. **MOTION FOR LEAVE TO FILE, INSTANTER, REPLY IN SUPPORT OF MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF DISTRICT COURT ON ACCOUNT OF SETTLEMENT OF CASE**, filed on April 28, 2008, by counsel for appellant.

**IT IS ORDERED** that #1 is **DENIED**. When this court's order issued, this case had not been settled. A post-decision settlement does not support vacatur. *See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994).

# EXHIBIT 7

U.S.C.A. – 7th Circuit
R E C E I V E D

MAY – 9 2008  RJT

GINO J. AGNELLO
CLERK

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### Appeal No. 07-2776

### NANCY MURRAY,

**Plaintiff - Appellant,**

v.

### GMAC MORTGAGE CORPORATION,

**Defendant - Appellee.**

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division,
Hon. David Coar, presiding

Case No. 05 C 1229

### MOTION TO RECONSIDER ORDER OF MAY 7, 2008 DENYING
### MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF DISTRICT COURT

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

Plaintiff-appellant respectfully requests that this Court reconsider the order of May 7, 2008, denying plaintiff-appellant's motion to vacate this Court's order affirming the judgment of the District Court. In support of this motion, plaintiff states as follows:

1. This Court's order of May 7, 2008 stated that, "when this Court's [April 18, 2008] order issued, this case had not been settled. A post-decision settlement does not support *vacatur*. See *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994)."

2. Plaintiff respectfully submits that the finding that "this case had not been settled" prior to this Court's April 18, 2008 order is incorrect.

3. Plaintiff's motion stated that "on March 18, 2008, after negotiations between the parties facilitated by Rocco Spagna of this Court's settlement conference office, the parties agreed to terms of a settlement of this matter." (Motion to Vacate, ¶1.) Following this agreement to settle the case, the parties took concrete steps to consummate that settlement. On April 8, 2008, the parties' agreement had been reduced to final written form by the parties. This agreement had been signed by plaintiff and other consumers; these signatures were transmitted to counsel for defendant-appellee GMAC Mortgage on April 14, 2008. (*Id.*, ¶2.)

4. *Defendant's response to the motion to vacate conceded that a settlement agreement had been reached.* Specifically, defendant stated that "in a series of discussions in late March, 2008 following the parties' completion of briefing in this case *and prior to the rendering of this Court's decision of April 18, 2008*, attorneys for the parties reached accord on a set of terms by which they indicated they were willing to settle the matter.... Counsel for the parties reduced the terms to an unsigned written agreement and sent it to their respective clients for review, approval and execution." (Response to Motion to Vacate at ¶¶3, 6 (emphasis added).)

5. Fed.R.App.P. 33 provides, with respect to settlement conferences, that "before a

1

settlement conference, the attorneys must consult with their clients and obtain as much authority as feasible to settle the case." By participating in the settlement conference on March 18, 2008 and agreeing to settle the case, counsel for the parties bound their respective clients.

6.    The only argument raised by defendant in opposition to the motion to vacate was that "circumstances had changed" between the time the parties agreed to settle this matter and the Court's April 18, 2008 order, through an "unanticipated circumstance" and a "frustrating event [that was] not reasonably foreseeable." (Response, ¶¶ 8, 9.) *At no point did defendant deny that the parties entered into a contractual agreement to settle this appeal.* (See Motion for Leave to File Reply at 1.)

7.    The facts presented by plaintiff, and conceded by defendant, show that there was an oral settlement agreement – made by counsel of the parties, with their authority – on March 18, 2008. This was formalized in a written document agreed to by the parties (through their counsel) on April 8, 2008. These undisputed events relating to the parties' settlement took place *prior to this Court's order of April 18, 2008.*

8.    As plaintiff stated in her proffered reply brief, filed on April 28, 2008, oral settlement agreements are enforceable "if there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement. The essential terms must be definite and certain so that a court can ascertain the parties' agreement from the stated terms and provisions. Whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subjective beliefs." *Dillard v. Starcon International, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007) (citations and quotation marks omitted). The record shows that there was an offer and acceptance made on March 18, 2008. The terms were made definite through a "meeting of the minds" – specifically, the negotiation and revision of a written settlement agreement by counsel for the parties, evidenced by counsels' final agreement to a written

2

settlement agreement on April 8, 2008, and circulation of that agreement for client signatures thereafter.

9.    *U.S. Bancorp Mortgage*, which was cited by this Court, is distinguishable.  The Supreme Court considered "whether appellate courts in the federal system should vacate civil judgments of subordinate courts in cases that are settled after appeal is filed or *certiorari* sought." *U.S. Bancorp Mortgage*, 513 U.S. at 19.  Specifically, "[U.S.] Bancorp and Bonner stipulated to a consensual plan of reorganization, which received the approval of the Bankruptcy Court. The parties agreed that confirmation of the plan constituted a settlement that mooted the case. Bancorp, however, also requested that we exercise our power under 28 U.S.C. §2106 to vacate the judgment of the Court of Appeals. Bonner opposed the motion." *Id.* at 20.  The Supreme Court declined to vacate the Court of Appeals's decision, holding that "mootness by reason of settlement does not justify *vacatur* of a judgment under review. This is not to say that *vacatur* can never be granted when mootness is produced in that fashion. As we have described, the determination is an equitable one, and exceptional circumstances may conceivably counsel in favor of such a course." *Id.* at 29.

10.    Here, plaintiff seeks to vacate the order of this Court, and not the District Court's judgment. In reaching the settlement in this case, the parties understood that the District Court's order would not be affected; the settlement would eliminate the appeal, leavig the District Court's order in repose. The parties in *U.S. Bancorp Mortgage* were asking that the Supreme Court vacate the action of another Court pursuant to settlement; plaintiff does not seek that relief.

11.    Moreover, *U.S. Bancorp Mortgage* spoke of *vacatur* as an equitable remedy. Plaintiff respectfully submits that the favored result would be the one that encourages parties to resolve appeals through settlement. The parties did just that through a settlement agreement negotiated with the assistance of this Court's settlement conference office. The settlement

3

agreement bound both parties prior to the April 18, 2008 order, contrary to the conclusion reached on May 7, 2008.

12.    Thus, this Court made a clear factual error in finding that there was no settlement prior to April 18, 2008, and misapplied the decision in *U.S. Bancorp Mortgage*.  Accordingly, reconsideration of the Court's May 7, 2008 order is warranted.

WHEREFORE, plaintiff-appellant respectfully requests that this Court reconsider its order of May 7, 2008, denying plaintiff-appellant's motion to vacate this Court's order of April 18, 2008, affirming the judgment of the District Court.

Respectfully submitted,

Thomas E. Soule

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (fax)
courtecl@edcombs.com

4

## CERTIFICATE OF SERVICE

I, Thomas E. Soule, hereby certify that on May 9, 2008, I caused the preceding document to be filed with the Court, with a true copy of the same being served upon the following individuals by facsimile and U.S. mail on the same date:

Thomas J. Cunningham
J. Matthew Goodin
Angela Stinson-Marti
Phillip R. Perdew
Locke Lord Bissell & Liddell LLP
111 S. Wacker Dr.
Chicago, IL 60606
(312) 443-0700
(312) 443-0336 (fax)



Thomas E. Soule

5

# EXHIBIT 8

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

May 14, 2008

*By the Court:*



| | |
|---|---|
| NANCY R. MURRAY,<br>      Plaintiff-Appellant, | ] Appeal from the United<br>] States District Court for<br>] the Northern District of |
| No. 07-2776      v. | ] Illinois, Eastern Division.<br>] |
| GMAC MORTGAGE CORPORATION,<br>      Defendant-Appellee. | ] No. 05 C 1229<br>]<br>] David H. Coar,<br>]    Judge. |

Upon consideration of the **MOTION TO RECONSIDER ORDER OF MAY 7, 2008 DENYING MOTION TO VACATE ORDER AFFIRMING JUDGMENT OF DISTRICT COURT**, filed on May 9, 2008,

**IT IS ORDERED** that the motion is **DENIED**.

# EXHIBIT 9

JOHN E. CONVINGTON, Plaintiff, v. MITSUBISHI MOTORS NORTH AMERICA, INC. and UNITED AUTO WORKERS UNION LOCAL 2488, Defendants.

Case No. 04-cv-1315

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

*2007 U.S. Dist. LEXIS 38080*

March 26, 2007, Decided
March 27, 2007, E-Filed

**SUBSEQUENT HISTORY:** Motion denied by *Covington v. UAW Union Local 2488, 2007 U.S. Dist. LEXIS 38082 (C.D. Ill., Apr. 26, 2007)*

**COUNSEL:** [*1] John E Covington, Plaintiff, Pro se, Peoria, IL.

For United Auto Workers Union Local 2488, Defendant: Stanley Eisenstein, LEAD ATTORNEY, KATZ FRIEDMAN EAGLE EISENSTEIN & JOHNSON, Chicago, IL; Scott A Schoettes, LATHAM & WATKINS, Chicago, IL.

For Mitsubishi Motors North America, Inc., Defendant: Joel E Krischer, LEAD ATTORNEY, LATHAM & WATKINS, Los Angeles, CA; John R Hayes, Scott A Schoettes, LEAD ATTORNEYS, LATHAM & WATKINS, Chicago, IL.

**JUDGES:** Joe B. McDade, United States District Judge.

**OPINION BY:** Joe B. McDade

**OPINION**

**ORDER**

Before the Court are the Motion for Summary Judgment filed by the Defendant, Mitsubishi Motors North America ("MMNA"), on September 15, 2006 [Doc. 50] and the Motion for Summary Judgment filed by the defendant, United Auto Workers Union Local 2488 ("UAW 2488"), on October 6, 2006 [doc. 54]. For the reasons that follow, both motions are GRANTED.

**A.**

**Background**

**1.**

**Procedural History**

The Plaintiff filed a motion to proceed *in forma pauperis* ("IFP") on September 13, 2004 [Doc. 1]. That motion was denied and this matter was dismissed, prior to the filing of a responsive pleading, because it appeared that the statute of [*2] limitations on the Plaintiff's claim had expired [Doc. 2]. The Plaintiff timely appealed and the Seventh Circuit Court of Appeals vacated that Order and remanded this matter for further proceedings [Doc. 19]. Upon remand, the Plaintiff was granted IFP status and a complaint was filed on December 22, 2005 [Doc. 22]. After a motion to dismiss was denied [Doc. 34], based on the Seventh Circuit mandate, the Plaintiff filed an amended complaint on May 18, 2006 [Doc. 38]. Both Defendants seek summary judgment on the allegations contained in the amended complaint.

On February 8, 2007, a hearing was held, in which the Plaintiff appeared, on various motions including a *Federal Rule of Civil Procedure 56(f)* motion in which the Plaintiff requested additional time to conduct discovery. That motion was denied and a subsequent hearing was set for March 22, 2007 for oral arguments on the motions for summary judgment. The Plaintiff failed to appear at the March 22 hearing and this Court found that the Plaintiff had thereby waived any additional arguments on summary judgment. The Court also notes that certain Orders, notices, and minutes that were [*3] mailed to the Plaintiff have been returned to the Court as undeliverable [Docs. 72-75].

**2.**

**Factual History**

The undisputed evidence reveals that the Plaintiff was employed by MMNA on January 3, 1989. As an assembly line worker, the Plaintiff was a member of UAW 2488 and subject to a Collective Bargaining Agreement ("CBA") between UAW 2488 and MMNA. From November 23, 1998 to January 12, 1999, the Plaintiff missed work because he was incarcerated. The Plaintiff's employment was terminated on January 12, 1999 pursuant to MMNA's attendance policies.

In the amended complaint, the Plaintiff alleges six counts: counts 1, 3, 4, and 6 against MMNA and counts 2 and 5 against UAW 2488. Against MMNA, the Plaintiff alleges that the Defendant violated the CBA by failing to comply with the "just cause" and "last chance" provisions of the agreement (count 1); that it failed to hire (or rehire) him in January 6, 2003 because of his race (count 3); that MMNA committed the actions in count 1 negligently (count 4); and that it failed to hire (or rehire) him on October 15, 2004 [1] (count 6). Specifically, the Plaintiff alleges that MMNA terminated him without just cause and failed to rehire [*4] him in violation of the last chance provisions of the CBA. The Plaintiff further alleges that the Defendants conspired to keep the existence of these provisions from the Plaintiff and that he did not know of the provisions until he received discovery on October 15, 2004 in a state case.

> 1    Defendant MMNA contends that this date must be in error and that the Plaintiff in fact meant January 6, 2003. The Plaintiff does not comment on this discrepancy, as such, the Court will accept the date of October 15, 2004 as listed in the amended complaint.

Against UAW 2488, the Plaintiff alleges that the Union failed to arbitrate his termination and fairly represent him in violation of the CBA (count 2) and the Plaintiff alleges that the Defendant committed the acts in count 2 negligently (count 5). Specifically, the Plaintiff asserts that UAW 2488 did not arbitrate his termination, thereby failing to fairly represent him, because of his race.

It is undisputed that when the Plaintiff's employment was terminated, the Plaintiff [*5] submitted a grievance on January 15, 1999 to MMNA that was denied. (Scott Andrews Declaration Ex. A). UAW 2488 appealed that decision on March 8, 1999 - an appeal that also was denied by MMNA. (Andrews Dec. Ex. B). UAW 2488 appealed this decision and sought arbitration of the dispute. (Andrews Dec. Ex. C). However, by a letter dated February 28, 2000, UAW 2488 decided that the Plaintiff's case could not be won in arbitration and it withdrew the grievance. (Andrews Dec. Ex. D). The Plaintiff was informed that he could appeal this decision. Upon the Plaintiff's appeal to the International Executive Board of

the union regarding the withdrawal of the grievance, a hearing was held on September 26, 2000. (Andrews Dec. Ex. F). This final appeal was denied on January 4, 2001. (Andrews Dec. Ex. F).

In the interim, the Plaintiff filed a charge alleging a violation of Section 8 of the National Labor Relations Act, 29 U.S.C. § 158, with the National Labor Relations Board. This charge was denied by the regional director on November 30, 2000 and the Plaintiff was again informed how to appeal the decision. (Andrews Dec. Ex. E). There is no additional evidence in the record [*6] that the Plaintiff pursued any further appeals regarding UAW 2488's (or MMNA's) conduct during the grievance and appeals process. [2]

> 2    In the Plaintiff's response to UAW 2488's motion, he indicates that he disputes a number of these facts. However, the Plaintiff offers no evidence to show a genuine issue as to any of these material facts.

It is further undisputed that the CAB does not contain a "last chance agreement" clause. (Andrews Dec. P30). Rather, the last chance agreement is a form of grievance settlement between MMNA, UAW 3488, and an employee. (Andrews Dec. P31). Such a settlement never was offered or suggested by MMNA in relation to the Plaintiff's termination. (Andrews Dec. P31). However, it appears that a Last Chance Agreement was entered into by MMNA, UAW 2488, and a Darlene E. Feiste on February 18, 1999 (Pl. Resp. Doc. 65 Ex. F). The Defendants also entered into similar agreements with a Jeffrey Hobbs on June 27, 1997, July 8, 1996, and May 23, 1995 (Pl. Resp. Doc. 70, Ex. G and H), Marilee [*7] Hall on September 23, 1998 (MMNA Ex. F, COV 0621-0624), Steven Atkinson on July 8, 1996 (MMNA Ex. F, COV 0630-0633), and at least three others. (MMNA Ex. F, COV 0638-0640, COV 1012-1017, COV 1350-1355).

The evidence finally reveals that MMNA laid off over 1000 associates in September and October, 2004. (Melvin Hall Affidavit P4). From that time to August 13, 2006, MMNA has not hired any new production or maintenance employees. (Hall Aff. P5).

3.

**Prior Lawsuits**

Shortly after his termination, the Plaintiff began filing complaints against MMNA and UAW 2488 alleging, among other things, that he was wrongfully terminated. In his first complaint, filed on January 28, 2000 in this Court, *John Covington v. Mitsubishi Motor Manufacturing of America, Inc.*, 00-cv-1049 ("Covington 1"), the Plaintiff alleged that the Defendant wrongfully termi-

nated him on account of his race in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-2.* (MMNA Ex. D). Summary judgment was granted in favor of the Defendant on this claim by an Order dated July 2, 2001. (MMMA Ex. A). The Plaintiff's remaining claims in Covington 1, a failure to promote [*8] claim, a retaliation claim, an Americans with Disabilities Act (ADA) claim, a worker's compensation claim, and a hostile work environment claim, were all dismissed with prejudice for the failure to exhaust administrative remedies. (MMMA Ex. A). An appeal of this decision to the Seventh Circuit Court of Appeals was dismissed on October 5, 2001. (MMNA Ex. I).

During Covington 1, it appears that the Plaintiff and MMNA were involved in a discovery dispute over documents to be produced by MMNA. From correspondence from attorney Matthew Rawlinson, who represented MMNA in Covington 1, to the Plaintiff, MMNA made certain documents available for inspection to the plaintiff beginning on September 21, 2000. (MMNA Exs. E, E-2). These documents include the Last Chance agreements listed above and bates-stamped COV 0001 to COV 2027. (MMNA Exs. E-3, E-6). The discovery dispute was resolved by Magistrate Judge Byron G. Cudmore in an order dated January 17, 2001. (MMNA Ex. G). In that order, Judge Cudmore noted that the documents were made available by MMNA in Bloomington, Illinois and that the Plaintiff failed to review the documents notwithstanding their availability. (MMNA Ex. G, p. 3). Specifically, [*9] Judge Cudmore indicated: "The Court is amazed that the Plaintiff has not visited and reviewed the records complied by Defendant." (MMNA Ex. G, p. 3).

"Covington 2 [3]" is a tortured state court case captioned, *John E. Covington v. Mitsubishi Motors Manufacturing of America,* 01-ch-316, and originally filed in the Circuit Court for Peoria County in August, 2001. (MMNA Ex. J) [4]. This case has a complicated procedural history that was outlined by this Court in an Order dated January 20, 2004, in *John Covington v. Mitsubish Motor Manufacturing of America,* 03-cv-1189, and will not be repeated here. In brief, the Plaintiff claimed that MMNA fired him in retaliation for the filing of a worker's compensation claim, among other things. (MMNA Ex. K, L). The Plaintiff then amended his complaint to allege that MMNA had failed to rehire him in January, 2003. (MMNA Ex. N). Judgment was entered for MMNA and against the Plaintiff by a trial court Order dated November 4, 2004. (MMNA Ex. O). This judgment was affirmed by the Illinois Court of Appeals on November 8, 2005. (MMNA Ex. P). There is no showing that the Plaintiff appealed this decision to the Illinois Supreme Court.

3    MMNA, in light of the number of amendments to the complaint in this case and the removal and ultimate remand of this case, has labeled it Covington 2 and 3.

[*10]

4    The "Filed" stamp on this complaint is unreadable; however, the Plaintiff indicates that he served the document on August 11, 2001.

Subsequent to filing the case at bar, the Plaintiff filed another lawsuit in this Court, captioned *John E. Covington v. Mitsubishi Motors of North America,* 05-cv-1230, on August 8, 2005. The Plaintiff made similar allegations to the claims made in the case at bar: that, pursuant to *42 U.S.C. § 1981,* MMNA had wrongfully failed to rehire the Plaintiff through a last chance agreement because of his race. By an Order dated August 22, 2005, the Court dismissed the case as time barred and frivolous. (MMNA Ex. S). The Seventh Circuit Court of Appeals summarily affirmed the dismissal by an order dated October 31, 2005. (MMNA Ex. T).

**B.**

**Discussion**

1.

**Summary Judgment Standard**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving [*11] party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id. at 325.*

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001);* see also *Celotex Corp., 477 U.S. at 322-24.* "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).*

This Court must nonetheless "view the record [*12] and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).* In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).* Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).* However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

2.

**Res Judicata**

MMNA first argues that the Plaintiff's claims are barred by the doctrine of *res judicata.* [*13] [5] Illinois law governs the preclusive effect of Illinois state court judgments, *Hicks v. Midwest Transit, Inc., 479 F.3d 468, 2007 WL 609925, *2 (7th Cir. 2007),* and federal law governs the preclusive effect of federal court judgments. See *Highway J Citizens Group v. United States DOT, 456 F.3d 734, 741 (7th Cir. 2006).* The doctrine provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).* The requirements are generally similar: there must be "(1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or privies in the two suits." *Doe v. Allied-Signal, Inc., 985 F.2d 908, 913 (7th Cir. 1993)* (federal law); *Hicks, 479 F.3d 468, 2007 WL 609925, *2* (state law).

> 5   UAW 2488 does not argue that *res judicata* bars the Plaintiff's action against it.

[*14] There is no doubt that in both Covington 1 and Covington 2 final judgment on the merits was rendered: in each case, summary judgment was granted in favor of the Defendant. There also is not doubt that there is identity of the parties: MMNA, or its predecessor, Mitsubishi Manufacturing of America, is a Defendant in each of the prior suits and this suit. The question is whether there is an identity of the causes of action.

Pursuant to federal and Illinois law, in order to determine whether a claim could have been raised, Courts employ the "same transaction" test:

> a cause of action consists of a single core of operative facts giving rise to a remedy.... Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost. A plaintiff may not avoid an earlier judgment on the merits by merely concocting a new legal theory.
>
> *Id.* (quoting *Doe v. Allied-Signal, Inc., 985 F.2d 908, 913 (7th Cir. 1983)).*

See *Manicki v. Zeilmann, 443 F.3d 922, 924 (7th Cir 2006)* (noting that the Illinois Supreme Court adopted the transaction test in *River Park, Inc. v. City of Highland Park, 184 Ill. 2d 290, 703 N.E.2d 883, 893-94, 234 Ill. Dec. 783 (Ill. 1998)).* [*15] In this case, the Plaintiff's claims against MMNA arise from the same operative fact: his firing on January 12, 1999. To be sure, the Plaintiff's theories of recovery have been different. In Covington 1, he asserted that MMNA discriminated against him because of his race when they fired him. In Covington 2, he asserted that MMNA retaliated against him for filing a worker's compensation claim when they fired him. He also asserted in Covington 2 that MMNA failed to rehire him or respond to applications for employment. (MMNA Ex. L). In this case, the Plaintiff asserts that MMNA violated the CBA because of his race when they fired him. In each instance, the facts used to support each claim are different; however, the single core fact giving rise to each claim is the firing. See *Garcia v. Village of Mount Prospect, 360 F.3d 630, 637-638 (7th Cir. 2004)* (stating that "causes of action . . . will constitute the same cause of action [] [as a prior suit] if the claims arise from the same group of operative facts even if there is not a substantial overlap of evidence" (internal editing marks and citations omitted)). As such, the Plaintiff's claims against MMNA in this case [*16] are subject to *res judicata.*

The purpose of the doctrine of *res judicata* is "finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, *but as to any other admissible matter which might have been offered for that purpose."* *Highway J Citizens Group, 456 F.3d at 741* (quoting *Nevada v. United States, 463 U.S. 110, 129-130, 103 S. Ct. 2906, 77 L. Ed. 2d 509 (1983)).* This purpose is met by the conclusion that this lawsuit is the Plaintiff's third bite at attempting to reveal the impro-

priety of his termination. In each instance, the Plaintiff merely has changed the legal theory upon which he proceeds. The Plaintiff also appears to change the factual allegations in order to meet the particular theory he advocates - in one instance he missed work because of injury or illness, and in another he missed work because he was incarcerated. Regardless of how or why the Plaintiff argues that MMNA improperly terminated his employment, these claims could have been brought in either Covington 1 or Covington 2. Instead the Plaintiff [*17] has chosen to file a new lawsuit for every theory of recovery. Allowing the Plaintiff to continue to do so would be contrary to the letter and spirit of the doctrine of *res judicata*.

2.

### Claims against UAW 2488 and MMNA related to the CBA

The Plaintiff claims that the Defendants violated the CBA by failing to comply with a Last Chance provision. In addition, the Plaintiff claims that UAW 2488 violated the CBA by failing to fairly represent him in the grievance proceedings. Even if the Plaintiff's claims against MMNA are not precluded, these related claims must fail because they are time-barred.

The law is clear as to the statute of limitations that applies: the Plaintiff has 6 months, after exhausting grievance or arbitration remedies, to file suit pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). See *DelCostello v. Int'l Bhd. Of Teamsters, 462 U.S. 151, 164, 172, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983)*. This rule was reiterated by the Seventh Circuit, when the Plaintiff appealed his matter after the motion to dismiss was granted, and is thus law of the case. There is no question that the Plaintiff knew that the grievance had been [*18] withdrawn by a letter dated February 28, 2000. (Dec. of Scott Andrews, Ex. D). There is also no question that his appeal to the International Executive Board of the UAW was denied by a certified letter dated January 4, 2001. (Andrews Dec. Ex. F). Thus, the limitations period expired on July 4, 2001 well prior to the filing of the complaint in this lawsuit.

As the Seventh Circuit pointed out, the only way that the Plaintiff can escape the limitations period is by showing that it is tolled. "Equitable tolling of the statute of limitations permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before, even though the defendant took no active steps to prevent him from suing." *Savory v. Lyons, 469 F.3d 667, 673 (7th Cir. 2006)*; *Arrieta v. Battaglia, 461 F.3d 861, 867 (7th Cir. 2006)* (equitable tolling is available "only where the petitioner is unable to file the action within the statutory

period due to extraordinary circumstances outside his control and through no fault of his own"). The Plaintiff must, however show "extraordinary circumstances" that must be balanced [*19] against the prejudice to the Defendants. *Savory, 469 F.3d at 673*.

Equitable estoppel applies when a Plaintiff is "lulled into inaction by the defendants' fraudulent conduct upon which he actually and reasonably relied." *Smith v. Potter, 445 F.3d 1000, 1010-1011 (7th Cir. 2006)*.

The Plaintiff first argues that the filing of an EEOC complaint in Covington I somehow tolled the statute of limitations. There is no showing that the filing of such a complaint regarding race discrimination would toll a limitations period for breach of a CBA.

The Plaintiff next argues that the Defendants actively prevented him from realizing the true nature of his suit by failing to provide discovery related to the last chance agreements. This also is without merit. The discovery that the Plaintiff complains of was made available to him by MMNA in Covington I. That the Plaintiff chose to forego viewing this evidence is the type of lack of diligence that would not toll a statute of limitations. While the Plaintiff now states that he was unable to view the documents because of his financial abilities, he has presented no evidence to that effect. As such, this argument also [*20] is without merit.

Third, the Plaintiff argues that there is a continuing violation that tolls the statute of limitations indefinitely. There is no showing that a breach of contract claim is "continuing" in the manner in which the Plaintiff advocates. The Plaintiff was fired, UAW 2488 grieved the firing and then withdrew the grievance, and the International Union denied the Plaintiff's appeals. At that point, the breach allegedly occurred and the statute of limitation began to run. To find that the breach is a continuing act that presumably can only end once the Plaintiff is rehired would be to render the statute of limitations a nullity.

The Plaintiff finally argues that the Defendants have conspired to prevent him from realizing all of his rights pursuant to the CBA. Besides making this allegation, the Plaintiff has presented no proof other than his subjective belief. [6] The Plaintiff was aware of the provisions of the CBA and used it to grieve his firing. He also should have been aware of the last chance agreements that MMNA entered into with other employees in 2000 when MMNA produced the documents related to these agreements. There is no showing that UAW 2248 conspired with MMNA [*21] to prevent the Plaintiff from filing suit based on a perceived violation of the CBA. Rather, it is apparent that the Plaintiff has merely latched onto this theory as other theories that would vindicate his belief that he was wrongfully terminated have been dismissed.

Thus, despite the Plaintiff's many arguments, he has presented no extraordinary reason to toll the statute of limitations that would justify the prejudice to the Defendant in having to defend claims that are filed years beyond the limitations period.

> 6    The Plaintiff's affidavits are conclusory and lacking in foundation. He merely states: "That the UAW and MMNA conspired to deprive the plaintiff of his right in accordance with his (CBA)." (Aff. Of John Covington P 10).

**3.**

**Failure to rehire**

These claims are part of the Plaintiff's allegations that the Defendants breached the CBA. That is, the Plaintiff is arguing that the Defendant's failed to re-hire him in violation of a last chance provision that he believes is part of the CBA. [*22] Even if the last chance agreement was part of the CBA, this claim is similarly barred by the 6 month statute of limitations. The Plaintiff has again offered no credible reason why the limitations period should be tolled.

Even if these claims are separate and distinct from the Plaintiff's CBA claims -- that is, if they assert a separate failure to hire claim -- they still must fail. These claims were added to this lawsuit by the Amended Complaint on May 18, 2006. The Plaintiff alleges that the Defendant failed to hire him on January 8, 2003 (Count 3) and October 15, 2004 (Count 6) and has brought suit pursuant to *42 U.S.C. § 1981*. These claims are governed by a Illinois' two year statute of limitations that generally covers civil rights actions, See e.g. *Neish v. City of Chicago, 299 F.Supp.2d 866, 869 (N.D. Ill. 2004)*. The first claim, that the Defendant failed to hire him on January 8, 2003 must fail because it is outside the statute of limitations. The second claim, that the Defendant failed to hire him in October 15, 2004 must fail because the Plaintiff has made no showing that he applied for a job at that time. Indeed, the evidence reveals [*23] that the Defendant hired no person around October, 2004 and laid-off personnel during that time period. In either case, the Plaintiff has come forth with no direct or indirect evidence of discrimination. See *Anders v. Waste Management of Wisconsin, 463 F.3d 670, 676 (7th Cir. 2006)* (setting forth the showing a Plaintiff must make in a *§ 1981* case). That is, there is no showing that the Plaintiff applied for a job, that he was rejected, or that another similarly situated person not in the protected class was treated differently. *Blise v. Antaramian, 409 F.3d 861, 866-867 (7th Cir. 2005)*. The Plaintiff only presents his subjective belief that he was discriminated against.

The Plaintiff has presented no evidence from which a rational trier of fact could conclude that he was discriminated against. Instead, the Plaintiff has attached various court documents which are only marginally relevant to this lawsuit. He also has attached documents related to his incarceration which are wholly irrelevant to this lawsuit (it is completely irrelevant why he was absent from work prior to his firing). Finally, his affidavits are completely conclusory, made of legal [*24] conclusions, and lacking in any facts that would counter the material facts and evidence presented by the Defendants. [7] It is black letter law that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment." *Keri v. Board of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir. 2006)*.

> 7    The Plaintiff's responses to the motions for summary judgment are not sworn statements and are therefore not evidence.

**C.**

**Conclusion**

In summary, the Plaintiff's claims against MMNA are barred by the doctrine of *res judicata*. The Plaintiff could have, and should have, brought his claims against MMNA in either Covington 1 or Covington 2. The Plaintiff's claims against MMNA and UAW 2488 related to the CBA and last chance agreements are time-barred as they were filed beyond the 6-month limitations period. The Plaintiff has presented no extraordinary circumstances or fraud on the part of the Defendants that would toll the limitations [*25] period. Finally, the Plaintiff has presented no evidence that would show that MMNA discriminated against him when it failed to hire (or rehire) him in January 8, 2003 and October 15, 2004. Notwithstanding the Plaintiff's many arguments regarding a conspiracy between the Defendants and their alleged discrimination against him, the Plaintiff has presented no evidence that the Defendants behaved improperly when his employment was terminated on January 12, 1999.

For these reasons, the Defendants' motions for summary judgment must be GRANTED. The Clerk is DIRECTED to enter judgment in favor of Mitsubishi Motors North America, Inc. and United Auto Workers Union Local 2488 and against the Plaintiff, John E. Covington. Case terminated.

Entered this 26th day of March, 2007

s/ Joe B. McDade

United States District Judge

# EXHIBIT 10

TRANS HELICOPTERE SERVICE, a French limited company, Plaintiff, v. JET SUPPORT SERVICES, INC., a Delaware corporation, Defendant. JET SUPPORT SERVICES, INC., a Delaware corporation, Counterclaimant, v. TRANS HELICOPTERE SERVICE, a French limited company, Counterdefendant.

No. 03 C 0498

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2004 U.S. Dist. LEXIS 25182*

December 13, 2004, Decided

**PRIOR HISTORY:** *Trans Helicoptere Serv. v. Jet Support Serv., 2004 U.S. Dist. LEXIS 5287 (N.D. Ill., Mar. 30, 2004)*

**DISPOSITION:** Defendant's motion for summary judgment on Counts I and VI granted.

**COUNSEL:** [*1] For TRANS HELICOPTERE SERVICE, plaintiff: Dawn E Kahn, Timothy J. Storm P.C., Chicago, IL; Timothy J. Storm, Timothy J. Storm, P.C., Wauconda, IL.

For JET SUPPORT SERVICES, INC., defendant: Monte Loren Mann, Courtney D Tedrowe, Novack & Macey, Chicago, IL.

For JET SUPPORT SERVICES, INC., counter-claimant: Monte Loren Mann, Courtney D Tedrowe, Novack & Macey, Chicago, IL.

For TRANS HELICOPTERS SERVICE, counter-defendant: Dawn E Kahn, Timothy J. Storm P.C., Chicago, IL; Timothy J. Storm, Timothy J. Storm, P.C., Wauconda, IL.

For JET SUPPORT SERVICES, INC., counter-claimant: Monte Loren Mann, Courtney D Tedrowe, Novack & Macey, Chicago, IL.

For TRANS HELICOPTERS SERVICE, counter-defendant: Dawn E Kahn, Timothy J. Storm P.C., Chicago, IL; Timothy J. Storm, Timothy J. Storm, P.C., Wauconda, IL.

**JUDGES:** Samuel Der-Yeghiayan, United States District Court Judge.

**OPINION BY:** Samuel Der-Yeghiayan

**OPINION**

**MEMORANDUM OPINION**

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Jet Support Services, Inc's ("Jet") motion for summary judgment on Counts I and VI of Plaintiff Trans Helicopter Service's ("THS") amended complaint. For the reasons [*2] below, we grant summary judgment on both counts.

**BACKGROUND**

Jet provides programs that fund the maintenance and repair of jet aircraft engines for the benefit of their customers who are the owners and operators of the jet aircraft engines. Jet does not personally provide engine maintenance and repair services, but rather provides a program to fund the services by third parties in the form of an engine maintenance service contract ("EMS Contract"). To obtain an EMS Contract, the customer must pay a one-time enrollment fee, an initial engine inspection fee and a monthly fee.

On or about December 29, 1997, Plaintiff Trans Helicoptere Service ("THS") entered into an EMS Contract with Jet for both engines of a Cessna Citation II aircraft ("Contract 436-1"). Section V(d) (iv) of Contract 436-1 is pertinent for the fraud claim in the instant action and it outlines Jet's policy for early termination of the contract, allowing a credit towards a replacement aircraft when certain conditions are met. In relevant part, Section V(d)(iv) states:

In the event . . . the Customer sells the Aircraft and the purchaser does not wish to enroll in the Program . . . then the Customer shall [*3] be eligible for a credit (the "Credit") for certain amounts paid into the Trust to be applied toward any subsequently acquired aircraft (the Replacement Aircraft") which the Customer enrolls in the Program. Once a Replacement Aircraft is accepted by [Jet] as being eligible for the Program, the Credit may be used to reduce the amount of the Pro Rata or Buy-In due on the Replacement Aircraft. The amount of the credit shall be equal to 100% of all amounts paid with respect to the engine(s) after deducting all expenditures made on behalf of, and expenses attributable to, the Engine(s).

On or about August 24, 1998, THS entered into another EMS Contract with Jet for coverage of both engines of a Falcon F100 aircraft ("Contract 476-1").

THS alleges that in or about February, 2001, THS contacted Jet to inform Jet that the aircraft covered by Contract 436-1 was sold to a new owner and contract 436-1 had not been transferred with the aircraft. THS claims that, pursuant to § V(d)(iv) of contract 436-1, THS requested the account balance of Contract 436-1 be transferred to Contract 476-1, which covered the Falcon F100 aircraft which was still owned by THS. According to THS, Jet contacted [*4] the new owner of the Cessna Citation II aircraft, Delta Romeo, Inc. ("Delta Romeo"), and induced Delta Romeo to assert a claim of ownership over Contract 436-1 against THS.

THS contends that around February of 2001 Jet decided not to transfer the balance from Contract 436-1 to Contract 476-1. In April of 2001, John Haskins ("Haskins"), President of Jet, wrote a letter to THS and Delta Romeo addressing certain issues and requesting that the parties resolve the dispute regarding Contract 436-1. Jet informed Trans H via letter dated May 2, 2001, that Contract 476-1 was being placed on "credit hold" due to arrearage in payments. From June 20, 2001, until March 5, 2002, Delta Romeo and THS litigated the issue of ownership in the Northern District of Illinois (case number: 01 C 4684)("Delta Romeo litigation"). The Delta Romeo litigation terminated when Delta Romeo filed a stipulation to dismiss the action with prejudice and on March 5, 2002, the court granted the motion to dismiss with prejudice and as part of the dismissal Jet was not required to transfer the trust balance to THS or Delta Romeo.

In a letter dated July 30, 2001, from Haskins to Michael Dreyfus, President [*5] of THS ("Haskins letter"), Haskins addressed certain issues in dispute between THS and Jet. THS claims that two particular statements within the letter give rise to their allegations of fraud, negligent misrepresentation and breach of fiduciary duty. THS claims that Jet promised that: (1) Jet would transfer a credit or "trust balance" owed to THS under Contract 436-1 to Contract 476-1, and (2) the trust balance equaled $ 40,571.12. THS contends that the balance was never transferred by Jet and that the balance of the trust account was in excess of $ 100,000. On September 14, 2001, Jet informed THS by letter that Contract 476-1 was being terminated for delinquent payments and in March of 2002, the contract was in fact cancelled.

On January 23, 2003, THS filed the instant action. On April 11, 2003, Jet filed a motion to dismiss the fraud claim (Count VI), the negligent misrepresentation claim (Count VII), and the breach of fiduciary duty claim (Count VIII). On March 30, 2004, we granted the motion to dismiss Counts VII and VIII of THS's amended complaint, and denied the motion to dismiss Count VI. Jet has now filed a motion for summary judgment on the breach of contract claim relating [*6] to Contract 436-1 (Count I) and on the fraud claim relating to Contract 436-1 (Count VI).

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In seeking a grant of summary judgment the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (quoting *Fed. R. Civ. P. 56(c)*). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id. at 325.* Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [*Rule 56*], must set forth specific facts showing that there is a [*7] genuine issue for trial." *Fed. R. Civ. P. 56(e).* A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Rather, a genuine issue of material fact exists when "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000).* The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson, 477 U.S. at 255; Bay v. Cassens Transport C., 212 F.3d 969, 972 (7th Cir. 2000).*

## DISCUSSION

Jet argues that we should bar the claims included in Counts I and VI under the doctrine of *res judicata* because the issues could have been raised and resolved in the Delta Romeo litigation. Jet also argues that the claims included in Counts I and VI should be barred because they were compulsory counterclaims [*8] in the Delta Romeo litigation.

### I. Doctrine of Res Judicata

The doctrine of *res judicata* is utilized by the courts to bar "relitigation of claims that were or could have been asserted in an earlier proceeding." *D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York 112 F.3d 257, 259 (7th Cir. 1997).* Three required elements for the doctrine of *res judicata* are: "(1) an identity of the parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits." *Id.* The doctrine of *res judicata* "is designed to ensure the finality of judicial decisions." *Car Carriers, Inc. v. Ford Motor Co, 789 F.2d 589, 593-97 (7th Cir. 1986)*(indicating that the doctrine is not "a mere matter of practice or procedure inherited from a more technical time than ours . . . [but, rather] it is a rule of fundamental and substantial justice, of public policy and of private peace,' which should be cordially regarded and enforced by the courts. . . .")(quoting *Hart Steel Co. v. Railroad Supply Co, 244 U.S. 294, 299, 61 L. Ed. 1148, 37 S. Ct. 506, 1917 Dec. Comm'r Pat. 417 (1917)).* The doctrine of *res judicata* also "encourages reliance [*9] on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes." *Id* (quoting *Brown v. Felsen, 442 U.S. 127, 131, 60 L. Ed. 2d 767, 99 S. Ct. 2205 (1979)).* In addition, the doctrine of *res judicata* has been deemed to be "essential to the maintenance of social order; for, the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if . . . conclusiveness did not attend the judgments of such tribunals." *Id.* (quoting *Alexander v. Chicago Park Dist., 773 F.2d 850, 853 (7th Cir. 1985)).*

### A. Identity of Parties

Jet argues that both Jet and THS were parties in the Delta Romeo litigation. Although Jet and THS were not the only parties in the Delta Romeo litigation we agree that there is an identity of the parties.

### B. Identity of Causes of Action

The Seventh Circuit uses the "same transaction test" to determine if there is an identity of the causes of action. *Car Carriers, Inc., 789 F.2d at 593.* Under the "same transaction test" the scope of a cause of action "consists of a single core of operative facts' which give rise to a remedy.'" *Id. (quoting Alexander, 773 F.2d at 854).* [*10] Thus, under the doctrine of *res judicata*, "once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost . . . [and] a mere change in the legal theory does not create a new cause of action.'" *Id.* (quoting in *part Alexander, 773 F.2d at 854).*

Jet argues that in the Delta Romeo litigation Jet and Delta Romeo sought to have the court determine the parties' rights in relation to Contract 436-1. According to Jet, the claims brought by THS in the instant action relating to Jet's alleged breach of the contract and the alleged fraud concerning THS's right to the trust balance all could have been raised in the Delta Romeo litigation and, because the claims involved the same core of facts, the claims were required to be raised. Jet contends that the Delta Romeo litigation dealt with THS's right to the same trust balance that is at issue in the instant action. Jet claims that in the Delta Romeo litigation the court did not require Jet to transfer Contract 436-1 or any trust balance to THS or Delta Romeo

THS failed to directly address any of the elements for *res judicata* in its answer and instead provided [*11] a vague and convoluted dialogue concerning the similarity of the claims in the instant action and those in the Delta Romeo litigation. THS claims that "ownership of Contract 436-1 remained where it had been all along -- with THS." (Ans. 5). THS argues that the set of facts at issue in the Delta Romeo litigation "provides no basis for preclusion of THS's claims regarding JSSI's improper actions in connection with Contract 436-1 . . . [and that] nothing in the Delta Romeo Litigation, including the Stipulation to Dismiss, even purported to address these matters." (Ans. 5).

However, contrary to THS's assertions, the same core of facts and issues in the instant action in regards to Counts I and VI were raised in the Delta Romeo litigation. In Count I of the amended complaint in the instant action THS asserts that Jet breached Contract 436-1 by failing "to provide and/or pay for parts and labor for" scheduled and unscheduled "maintenance items submitted by THS. . . ." (A. Compl. Par. 16(a)(b)). THS also asserts in Count I that Jet breached Contract 436-1 by improperly canceling the contract and refusing to provide a credit "toward and other aircraft and/or EMS Contract.

. . ." (A. Compl. [*12] Par 16). In Count VI of the amended complaint in the instant action THS asserts that Jet engaged in fraud in July of 2001 when Haskins falsely indicated by letter that the trust balance was being transferred from Contract 436-1 to 476-1. (A. Compl. Par. 50-51, 65).

Such matters are clearly intertwined with the facts included in the Delta Romeo litigation. For example, THS admits, pursuant to Local *Rule 56.1*, that in the Delta Romeo litigation, Jet brought an interpleader claim against Delta Romeo and THS to resolve Jet's liability regarding the trust account which is at issue in the instant action and that in the interpleader claim Jet denied any wrongdoing. (R SF 15). THS does not provide a denial as to these facts, but instead indicates that the allegation by Jet is "incomplete" and refers the court to the entire interpleader document. (R SF 15). Even if such a response could be considered a denial, it is an evasive response and THS failed to provide a citation to the page in the document that supported such a denial. *See Local Rule 56.1; Dent v. Bestfoods, 2003 U.S. Dist. LEXIS 14871, 2003 WL 22025008, at *1 n.1 (N.D. Ill. 2003)*(indicating that a 56.1 denial is improper if the denial is [*13] not accompanied by specific references to admissible evidence or at least evidence that represents admissible evidence."); *Jankovich v. Exelon Corp., 2003 U.S. Dist. LEXIS 1466, 2003 WL 260714, at *5 (N.D. Ill. 2003)*(indicating that evasive denials that do not directly oppose an assertion are improper and thus the contested fact is deemed to be admitted pursuant to Local *Rule 56.1*). Thus, THS acknowledges that in the Delta Romeo litigation that Jet brought the interpleader claim against Delta Romeo and THS in order to resolve the rights concerning Contract 436-1 and that in the claim Jet asserted that it was not guilty of any wrongdoing. Thus, that would have been the appropriate juncture for THS to bring its claims if THS believed that Jet had engaged in fraud and other wrongdoing concerning Contract 436-1.

As indicated above, Contract 436-1 dealt with both engines of a Cessna Citation II aircraft. In the complaint in the Delta Romeo litigation, Delta Romeo specifically alleged that "JSSI has refused *either* to transfer the funds relating to the EMS contract to another THS aircraft *or* to allow Delta Romeo to use those funds with respect to the engines on the Citation II." (DR. Compl. [*14] Par. 23). Delta Romeo alleged in the Delta Romeo litigation that Jet wrote both to THS and Delta Romeo indicating that until THS and Delta Romeo resolved the rights concerning the trust funds, Jet would hold the balance in the trust. (DR. Compl. Par. 23). Delta Romeo further alleged that Jet "wrongfully refused to . . . allow the balance of funds relating to the EMS contract to be used for the maintenance and service of the Citation II's engines." (DR. Compl. Par. 27). These are a few examples of why

the core of operative facts in the Delta Romeo litigation and in the instant action are the same.

We also note that the Haskins letter that is the main piece of evidence relied upon by THS to support its fraud claim was allegedly dated July 30, 2001, which is well before the dismissal with prejudice in the Delta Romeo litigation. THS clearly could and should have brought the claims regarding Jet's alleged breach of contract and fraud relating to Contract 436-1 in the Delta Romeo litigation. Therefore, we conclude that there is an identity of the causes of action.

C. Final Judgment

In the Delta Romeo litigation the case was dismissed with prejudice pursuant to a stipulation. THS [*15] has not responded at all to Jet's contention that the dismissal with prejudice constitutes a final judgment for *res judicata* purposes. The Seventh Circuit has made it clear that if a suit is "dismissed with prejudice, any issue concerning the bar of the statute of limitations to the refiling of the suit will be moot because a suit that has been dismissed with prejudice cannot be refiled; the refiling is blocked by the doctrine of res judicata." *Elmore v. Henderson, 227 F.3d 1009, 1011 (7th Cir. 2000)*. However, in regards to the doctrine *of res judicata the* Seventh Circuit has also stated that "the test for finality is not whether the suit is dismissed with prejudice or without prejudice, on the merits or on a jurisdictional ground or on a procedural ground such as failure to exhaust administrative remedies when exhaustion is not a jurisdictional requirement . . . [but, rather the] test is whether the district court has finished with the case." *Hill v. Potter, 352 F.3d 1142, 1144-1145 (7th Cir. 2003)*; *See also Golden v. Barenborg, 53 F.3d 866, 871 (7th Cir. 1995)* (finding that there was a final judgment for res judicata purposes [*16] where plaintiff agreed to a stipulated dismissal with prejudice). Under either standard elucidated by the Seventh Circuit, we find that there was a final judgment in the Delta Romeo litigation for *res judicata* purposes.

D. Further Considerations

As indicated above, all of the elements for the doctrine of *res judicata* are met in regards to the instant action. We also conclude that the interests of the courts are served by the application of the doctrine of *res judicata* in this action and such a ruling promotes fairness and the administration of justice. It would be unfair after the resolution of the issues surrounding THS and Contract 436-1 in the Delta Romeo litigation, for THS to years later spring claims upon Jet that were or could have been addressed in the Delta Romeo litigation. It was necessary for THS to bring its claims at that juncture to ensure finality regarding the Contract 436-1 ownership and all issues surrounding the same core of facts and to avoid

future vexatious litigation by THS. The interests of the efficient operation of the judicial system and judicial economy would have been served had THS brought its claims when they were on the forefront in [*17] the Delta Romeo action.

II. Compulsory Counterclaims

Jet argues that the claims included in Counts I and VI should be barred because, even if they are not barred under the doctrine of *res judicata*, the claims were compulsory counterclaims in the Delta Romeo litigation and could and should have been raised in the Delta Romeo litigation. *Federal Rule of Civil Procedure 13(a)* states the following:

> (a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

[*18]

*Fed. R. Civ. P.13(a)*. The goal in creating *Rule 13(a)* was to promote "judicial economy; to avoid a multiplicity of actions by resolving in a single lawsuit all disputes that ensue from a common factual background." *In re Price, 42 F.3d 1068, 1073 (7th Cir. 1994). Id.* In determining whether *Rule 13(a)* applies "the inquiry is not intended to be a wooden application of the common transaction label,' but rather a careful examination of the factual allegations underlying each claim in determining whether the test is met." *In re Price, 42 F.3d 1068, 1073 (7th Cir. 1994)* (quoting *Burlington Northern R. Co. v. Strong 907 F.2d 707, 711 (7th Cir. 1990))*. A compulsory counterclaim is a counterclaim "that must be filed to preserve the defendant's rights . . . [and] if made the basis of a separate suit it would be barred either by the force of

*Rule 13(a)* itself, or by the prohibition in the doctrine of res judicata against splitting one's cause of action." *Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1367 (7th Cir. 1990)*. The Seventh Circuit utilizes the "logical relationship" test to determine [*19] whether or not a "transaction or occurrence" is the same under *Rule 13(a)*. *Burlington Northern R. Co., 907 F.2d at 711*. Under the test "the words transaction or occurrence' should be interpreted liberally in order to further the general policies of the federal rules and carry out the philosophy of *Rule 13(a)* . . . [and] as a word of flexible meaning, transaction' may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. . . ." *Id.*

THS argues that any claims that it would have had against Jet in the Delta Romeo litigation would have been permissive cross-claims rather than counter claims and THS argues that cross claims are not required to be raised. In regards to cross claims *Federal Rule of Civil Procedure 13(g)* states the following:

> (g) Cross-Claim Against Co-Party. A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim [*20] may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

*Fed. R. Civ. P. 13(g)*. Jet responds by arguing that in the Delta Romeo litigation Jet asserted an interpleader claim against THS and Jet became the interpleader-plaintiff. According to Jet, at that juncture Jet and THS became opposing parties with respect to Contract 436-1 and the trust balance. Jet also contends that since it filed the interpleader claim, which was a cross-claim, THS was obligated to respond with cross-claims against Jet that THS could and should have brought. According to Jet, once a cross-claim is filed, the co-parties become opposing parties for the purposes of compulsory counter-claims.

We agree with the reasoning presented by Jet. A counterclaim is not limited to a claim brought by a defendant against a plaintiff. Rather a counterclaim is defined merely as "[a] claim for relief asserted against an opposing party after an original claim has been made. . . ." Black's Law Dictionary 353 (7th ed. 1999). This defi-

nition is consistent with the reference in *Federal Rule of Civil Procedure 13(a)* [*21] to an "opposing party" rather than to a plaintiff and defendant. *Fed. R. Civ. P. 13(a)*. While the initial filing of a crossclaim in an action is permissive, once the cross claim is filed, it is a claim like any other claim in an action. Thus, the compulsory counterclaim provisions would logically apply to any counterclaims that could be brought in response to a crossclaim. As indicated above, *Rule 13(a)* is intended to promote judicial economy and to ensure that all claims relating to a set of facts are resolved together. Thus, such goals would only be served by requiring responsive compulsory counterclaims to be filed when a crossclaim is filed because the court will necessarily have to address the issues and facts connected to the crossclaim. If the court is going to address the merits of the crossclaim, then all of the same goals behind *Rule 13 (a)* would apply to ensuring that related responsive claims to the crossclaim are resolved in the same action as the crossclaim.

THS contends that its responsive claim to Jet's crossclaim in the Delta Romeo litigation is a cross claim and is governed by *Rule 13(g)*. However, in reality such a claim by THS would be both a crossclaim [*22] and a counterclaim, and thus, the claim would need to comply with both *Rule 13(g)* and *Rule 13(a)*. Although *Rule 13(g)* would only render its filing permissive, THS would also need to comply with *Rule 13(a)* which renders the claim mandatory. Courts in other Circuits have

agreed with this application of *Rule 13(a)* to crossclaims. *See e.g. Rainbow Mgmt. Group, Ltd. v. Atlantis Submarines Hawaii, L.P., 158 F.R.D. 656, 659 (D. Hawaii 1994)*. The facts and issues included in the Delta Romeo litigation were such that THS's claims in response to the crossclaim by Jet were compulsory counterclaims and THS thereby waived its right to file such claims by not doing so in the Delta Romeo litigation. *See Burlington Northern R. Co., 907 F.2d at 710* (recognizing that the compulsory counterclaim rule is a "harsh rule," but stating that "the rule serves a valuable role in the litigation process, especially in conserving judicial resources" and, in balancing the "competing interests[,] . . . the convenience of the party with a compulsory counterclaim is sacrificed in the interest of judicial economy."). Therefore, even if the claims asserted by THS in Counts I and VI [*23] were not barred by the doctrine of *res judicata* we would find that they are barred because they were compulsory counterclaims in the Delta Romeo litigation.

## CONCLUSION

Based on the foregoing analysis we grant Jet's motion for summary judgment on Counts I and VI. Counts II, III, IV, and V remain alive in this action.

Samuel Der-Yeghiayan

United States District Court Judge

Dated: December 13, 2004

# EXHIBIT 11

247 Fed.Appx. 823
247 Fed.Appx. 823, 2007 WL 2692336 (C.A.7 (Wis.))
**(Cite as: 247 Fed.Appx. 823, 2007 WL 2692336 (C.A.7 (Wis.)))**

Page 1

**H**Easley v. Reuss
C.A.7 (Wis.),2007.
This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Seventh Circuit Rule 32.1. (Find CTA7 Rule 32.1)
United States Court of Appeals,Seventh Circuit.
Cynthia EASLEY, Individually and as Administrator of the Estate of Christopher B. Easley, Plaintiff-Appellant,
v.
Sergeant. Michael B. REUSS, Defendant-Appellee.
No. 06-1646.

Submitted June 22, 2007.<sup>FN*</sup>

> FN* This successive appeal has been submitted to the panel that decided the original appeal. See Operating Procedure 6(b). After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. See Fed. R.App. P. 34(a)(2).
> Decided Sept. 14, 2007.

**Background:** Mother of suspect who was shot and killed by police officers brought § 1983 suit against highest-ranking officer at scene, alleging that he failed to control his fellow officers. The United States District Court for the Eastern District of Wisconsin, Thomas J. Curran, J., 2005 WL 3448061, granted summary judgment for officer. Appeal was taken.

**Holdings:** The Court of Appeals held that:
(1) res judicata barred claims against officer in his official capacity; and
(2) collateral estoppel barred claims against officer in his individual capacity.

Affirmed.

See also 382 F.3d 693.

West Headnotes

[1] Judgment 228 ⚖569

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k569 k. Judgment on Motion or Summary Proceeding in General. Most Cited Cases
Civil rights action brought by mother of suspect who was shot and killed by police officers was decided on its merits, for purposes of res judicata analysis, even though mother had failed to respond to officers' motion for summary judgment, since district court independently reviewed the officers' proposed facts and arguments and concluded that the force used against the suspect was reasonable. Fed.Rules Civ.Proc.Rule 41(b), 28 U.S.C.A.

[2] Judgment 228 ⚖585(2)

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k585 Identity of Cause of Action in General
                228k585(2) k. What Constitutes Identical Causes. Most Cited Cases
Mother of suspect who was shot and killed by police officers advanced same claims in subsequent lawsuit against highest-ranking officer at scene as she had raised in earlier lawsuit against the shooting officer and others in the immediate vicinity, for purposes of res judicata analysis, since both lawsuits arose out of the same set of facts.

[3] Judgment 228 ⚖627

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(C) Persons Who May Take Advantage of the Bar
            228k627 k. Parties of Record and Privies in General. Most Cited Cases
Highest-ranking officer at scene where suspect was shot and killed by police officers, who was sued by suspect's mother in his official capacity for failing to control the officers, was in privity with the shooting officer, for purposes of res judicata analysis.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

247 Fed.Appx. 823
247 Fed.Appx. 823, 2007 WL 2692336 (C.A.7 (Wis.))
**(Cite as: 247 Fed.Appx. 823, 2007 WL 2692336 (C.A.7 (Wis.)))**

Page 2

[4] **Judgment 228 ☞587**

228 Judgment
  228XIII Merger and Bar of Causes of Action and
Defenses
    228XIII(B) Causes of Action and Defenses
Merged, Barred, or Concluded
      228k587 k. Theory of Action or Recovery.
Most Cited Cases
Where decision in civil rights action brought by
mother of suspect who was shot and killed by police
officers against shooting officer and others in the
immediate vicinity established that they did not use
excessive force, claim preclusion barred subsequent
claims brought against highest-ranking officer at
scene in his individual capacity for failure to
intervene. U.S.C.A. Const.Amends. 4, 14.

*824 Appeal from the United States District Court
for the Eastern District of Wisconsin. No. 02 C 1065.
Thomas J. Curran, Judge.
Charles A. Boyle, Boyle & Associates, Chicago, IL,
for Plaintiff-Appellant.
Amy J. Doyle, Crivello, Carlson & Mentkowski,
Milwaukee, WI, for Defendant-Appellee.

Before Hon. JOHN L. COFFEY, Circuit Judge, Hon.
KENNETH F. RIPPLE, Circuit Judge and Hon.
MICHAEL S. KANNE, Circuit Judge.

**ORDER**

**1 In 2004 we affirmed the denial of Cynthia
Easley's motion to vacate the grant of *825 summary
judgment in a suit she brought under 42 U.S.C. §
1983 against several Wisconsin police officers and
municipalities after one of the officers shot and killed
her son Christopher. See Easley v. Kirmsee, 382 F.3d
693 (7th Cir.2004). In the present suit, also brought
under § 1983, Easley has sued Sergeant Michael
Reuss, the highest-ranking officer at the scene. The
district court granted summary judgment for Reuss.
Because both claim and issue preclusion bar Easley's
present suit, we affirm.

Reuss was not in the immediate vicinity when
Christopher was shot and killed in October 2006.
Rather, Reuss was called in as backup when an
officer, on patrol in a residential neighborhood,

spotted Christopher bleeding and wielding a knife
and determined that he matched the description in an
area-wide alert of an armed, emotionally-disturbed,
and intoxicated individual that was roaming in the
area that night. After Christopher refused to heed the
officer's commands to put down the knife, Reuss
asked the officer whether he had a non-lethal weapon
in his possession, but he did not. Two more officers
then arrived, and the four spread out to secure the
area before pursuing further action against
Christopher. As they were doing so, several other
officers from different townships also arrived on the
scene. Suddenly, Christopher darted in a different
direction. While Reuss was therefore repositioning
his squad car, he heard over his radio that
Christopher had been shot by one of the officers from
a different township.

Easley brought her first suit, ("Easley I"), in
September 2001 against the shooting officer, alleging
he used excessive force, against the officers who
were in the immediate vicinity, alleging they failed to
intervene, and against the townships they
represented-including the City of Lake Geneva which
is Reuss' employer-alleging that they failed to
properly train the officers. Reuss, though, was not a
party to this suit. The district court granted the
defendants' motion for summary judgment after
Easley failed to respond. The court found that the use
of force was reasonable and that the officers were
adequately trained. See Easley v. Kirmsee, No. 01-C-
938 (E.D.Wis. Nov.26, 2006). Easley did not appeal
that ruling, but instead filed a Rule 60(b) motion to
reconsider. The court denied it, and we upheld that
denial on appeal.

In the meantime, in October 2002, Easley initiated
the instant lawsuit against Reuss in both his official
and individual capacities. Easley alleged that Reuss-
as the highest ranking officer at the scene-violated
Christopher's Fourth and Fourteenth Amendment
rights by failing to control his fellow officers and
order them to procure less than lethal force before
attempting to apprehend Christopher. The district
court granted Reuss's motion for summary judgment,
finding that the doctrine of res judicata (claim
preclusion) barred the claim against him in his
official capacity, and that Reuss was entitled to
qualified immunity on the claim against him in his
individual capacity. Reuss appealed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*\*2** We first turn to the district court's application of claim preclusion (res judicata) to Easley's claims against Reuss in his official capacity. Claim preclusion bars not only issues actually decided in a prior suit, but also those that could have been raised. _Highway J Citizens Group v. United States Dep't of Transp.,_ 456 F.3d 734, 741 (7th Cir.2006). It requires (1) a prior final judgment on the merits; (2) the same claim; and (3) the same parties or their privies. _Tartt v. Nw. Cmty. Hosp.,_ 453 F.3d 817, 822 (7th Cir.2006). Easley argues that none of the three requirements\*826 for claim preclusion are satisfied here.

[1] She first contends that Easley I was not decided on its merits, but rather on "procedural irregularities." This characterization is not supported by the district court's decision in that case. It is true that Easley failed to respond to the defendants' motion for summary judgment, but the district court emphasized that "summary judgment cannot be granted merely because the opponent of the motion fails to respond." The district court thus independently reviewed the defendants' proposed facts and arguments and concluded that "the force used against Christopher was reasonable." In any event, even a dismissal for failure to prosecute or otherwise comply with the rules of civil procedure (other than dismissal for lack of jurisdiction) _is_ an adjudication on the merits. _See_ Fed.R.Civ.P. 41(b).

[2] Easley then insists that she is not advancing the same claims in her new lawsuit because the legal theories she is asserting are different. But Easley misapprehends the concept of a claim: for _res judicata_ purposes "a claim is not an argument or a ground but the events claimed to give rise to a right to a legal remedy." _Bethesda Lutheran Homes & Servs., Inc. v. Born,_ 238 F.3d 853, 857 (7th Cir.2001). It is clear from our review of Easley's complaints that they both arise out of the same set of facts. Cloaking the facts in new legal theories does not establish a new claim. _See Cannon v. Loyola Univ. of Chicago,_ 784 F.2d 777, 780 (7th Cir.1986).

[3] Easley finally argues that claim preclusion does not apply because Reuss was not a party to her previous suit. But "res judicata bars subsequent suits against those who were not party to a prior suit if their interests are closely related to those who were." _Tartt v. Northwestern Comm. Hosp.,_ 453 F.3d 817,

822 (7th Cir.2006); _Garcia v. Vill. of Mount Prospect,_ 360 F.3d 630, 636 (7th Cir.2004). And we have explained that such privity exists between government entities and their employees when such employees are sued in their official capacities. _See Gray v. Lacke,_ 885 F.2d 399, 405 (7th Cir.1989). _See also Hafer v. Melo,_ 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (noting that claims against officers in their official capacity "represent another way of pleading an action against an entity of which an officer is an agent.") Thus, the district court correctly applied the doctrine of _res judicata_ to bar Easley's claims against Reuss in his official capacity.

**\*\*3** We turn now to the claims against Reuss in his individual capacity, which Reuss argues are barred under the doctrine of collateral estoppel (issue preclusion). Reuss raised this argument in his motion for summary judgment, but the district court did not address it in its order. An appellee, though, may urge an alternate ground for affirmance that he raised below and that is supported by the record so long as it does not enlarge the relief previously given the appellee. _See Morley Co. v. Maryland Cas. Co.,_ 300 U.S. 185, 191, 57 S.Ct. 325, 81 L.Ed. 593 (1937); _Ill. Sch. Dist. Agency v. Pacific Ins. Co.,_ 471 F.3d 714, 722 (7th Cir.2006). It follows that we may consider Reuss's argument because the district judge decided the merits of Easley's claims in Reuss's favor. _See, e.g., Williams v. Seniff,_ 342 F.3d 774, 793 (7th Cir.2003)

The doctrine of collateral estoppel provides that once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit involving a party to the prior litigation. _Harrell v. U.S. Postal Service,_ 445 F.3d 913, 921 (7th Cir.2006). There are four specific elements to issue preclusion: (1) the issue is the same as one involved in the prior action; (2) the issue was actually litigated; (3) the determination\*827 of the issue was necessary to the prior judgment; and (4) the party against whom preclusion is invoked was fully represented in the prior action. _Wash. Group Int'l, Inc. v. Bell, Boyd, & Lloyd LLC,_ 383 F.3d 633, 636 (7th Cir.2004). And it makes no difference that Reuss is being sued in his individual capacity because it is well settled that collateral estoppel may be used defensively by a party who was not a party to the previous suit against a plaintiff like Easley who has had one full and fair opportunity to litigate a given

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

issue. See *Blonder-Tongue Laboratories, Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 325, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Newman v. State of Ind.*, 129 F.3d 937, 942 (7th Cir.1997).

[4] Easley only generally challenges the first prong of the test, again asserting that the issues differ because she has advanced new legal theories. But to establish a claim for failure to intervene, a plaintiff must show that the officer had reason to know "that any constitutional violation has been committed by another law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir.2003). In other words, Easley's claim can succeed only if Christopher's shooting by Reuss's subordinates violated constitutional standards, which according to the decision in Easley I, it did not. Under the doctrine of collateral estoppel, Easley may not now relitigate whether the underlying shooting was justified.

Accordingly, the judgment of the district court is AFFIRMED.

C.A.7 (Wis.),2007.
Easley v. Reuss
247 Fed.Appx. 823, 2007 WL 2692336 (C.A.7 (Wis.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

**JAMES V. TALANO, M.D., Plaintiff, v. ROBERT O. BONOW, M.D., Defendant.**

**Case Number: 00 C 1208**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 17387*

**September 10, 2002, Decided**
**September 16, 2002, Docketed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted. Summary judgment entered in favor of the defendant and against the plaintiff.

**COUNSEL:** For JAMES V TALANO, plaintiff: Peter A. Cantwell, Stephen Falk Boulton, Cantwell & Cantwell, Chicago, IL.

For ROBERT O BONOW, defendant: William George Miossi, John Michael Dickman, John E. Bucheit, Winston & Strawn, Chicago, IL.

**JUDGES:** John F. Grady, United States District Judge.

**OPINION BY:** John F. Grady

**OPINION**

*MEMORANDUM OPINION*

Before the court is defendant's motion for summary judgment. For the reasons stated below, the motion is granted.

*BACKGROUND*

James V. Talano, M.D., brings this action against Robert O. Bonow, M.D., alleging that defendant "engaged in a campaign to cause" the removal of plaintiff from his position as Medical Director of the echocardiography unit at Northwestern Memorial Hospital (the "Hospital") and plaintiff's eventual resignation from his job as a cardiologist with the Northwestern Medical Faculty Foundation, Inc. ("NMFF").

The relevant facts are not in dispute. Plaintiff was employed by NMFF as a cardiologist until his resignation on May 1, 1996. Defendant has been the Chief of NMFF's Division of Cardiology [*2] since 1992 and was plaintiff's immediate supervisor before plaintiff re-signed. On October 29, 1997, plaintiff filed a one-count complaint against NMFF alleging that he had been subjected to age discrimination based upon several acts by Dr. Bonow leading up to and resulting in plaintiff's resignation. We will refer to this action as *"Talano I."* On February 18, 1998, plaintiff amended his complaint to allege additional acts of age discrimination and to add a claim for breach of contract. On October 5, 1999, plaintiff moved for leave to file a second amended complaint joining an additional defendant, Dr. Bonow, and alleging a claim for intentional interference with contract against him. Then-Magistrate Judge Guzman denied that motion. *See Talano v. Northwestern Med. Faculty Found., Inc., 1999 U.S. Dist. LEXIS 18455,* No. 97 C 7618, 1999 WL 1080416 (N.D. Ill. Nov. 23, 1999).

NMFF later moved for summary judgment. On August 3, 2000, Judge Nordberg granted that motion and entered judgment in favor of NMFF. *See Talano I, 2000 U.S. Dist. LEXIS 11185,* No. 97 C 7618, 2000 WL 1100337 (N.D. Ill. Aug. 4, 2000). Judge Nordberg denied Dr. Talano's motion for reconsideration. Dr. Talano appealed, and the Seventh Circuit [*3] dismissed the appeal from the August 3 order and affirmed the district court's denial of the motion for reconsideration. *See Talano I, 273 F.3d 757 (7th Cir. 2001).*

On February 29, 2000, Dr. Talano filed the instant action, a one-count complaint against Dr. Bonow, alleging that Dr. Bonow tortiously interfered with the contract between Dr. Talano and NMFF. On February 1, 2002, plaintiff filed an Amended Complaint, adding a count for tortious interference with prospective economic advantage. Defendant now moves for summary judgment, arguing that the instant action is barred by the doctrines of res judicata and collateral estoppel.

*DISCUSSION*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999)*. [*4]   "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995)*.

## A. Res Judicata (Claim Preclusion)

The doctrine of res judicata, which is also known as claim preclusion, bars not only those issues that were actually decided in a prior suit, but also all issues that could have been raised in that action. *See Brzostowski v. Laidlaw Waste Sys., Inc., 49 F.3d 337, 338 (7th Cir. 1995)*. To apply the doctrine, three elements must be present: (1) judgment on the merits in an earlier action; (2) identity of the cause of action between both suits; and (3) identity of the parties or their privies in [*5] the two suits. *See id.* Because the prior litigation was brought in federal court, federal rules of claim preclusion determine whether the present suit is barred. *See Barnett v. Stern, 909 F.2d 973, 977 (7th Cir. 1990)*.

The first requirement, judgment on the merits, is easily met. In *Talano I,* Judge Nordberg granted NMFF's motion for summary judgment and accordingly entered judgment for NMFF. Plaintiff does not dispute that this constituted a judgment on the merits.

The second requirement is an identity of the cause of action in both suits. "A claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action. Two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Brzostowski, 49 F.3d at 338-39* (quoting *Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs., Inc., 31 F.3d 445, 447 (7th Cir. 1994))*. Although a single group of facts may give rise to different theories of recovery, under the federal doctrine of claim preclusion this is a single cause of action, for "'once a transaction has caused [*6] injury, all claims arising from that transaction must be brought in one suit or lost.'" *Shaver v. F.W. Woolworth Co., 840*

*F.2d 1361, 1365 (7th Cir. 1988)* (quoting *Restatement (Second) of Judgments § 24* (1982)). This rule prevents a plaintiff from splitting a cause of action by using several theories of recovery in separate lawsuits. *See id.*

The claims against defendant clearly arise from the same core of operative facts as that in *Talano I.* Both actions are based upon defendant's supervisory actions regarding plaintiff between early 1995 and February 1996, leading to plaintiff's resignation in May 1996. Plaintiff argues that there is no identity of *claims* in the sense that there are different theories of recovery in the two suits. But it is an established principle of claim preclusion that "even though one group of facts may give rise to different claims for relief upon different theories of recovery, there remains a single cause of action." *Prochotsky v. Baker & McKenzie, 966 F.2d 333, 335 (7th Cir. 1992)*. Where, as here, the two suits stem from the same core of operative facts--the same actions taken by the same person in the same [*7] time frame--there is a single cause of action.

The third requirement for claim preclusion is identity of the parties or those in privity with the parties. Employees of a defendant in a prior suit are in privity with the defendant for the purposes of claim preclusion. *See Henry v. Farmer City State Bank, 808 F.2d 1228, 1235 n. 6 (7th Cir. 1986)* (holding that res judicata bars federal RICO claims against directors, officers, employees, and attorneys of bank even though the bank was the only actual party to the prior state court mortgage foreclosure proceedings); *Janusz v. Fasco Indus., 1999 U.S. Dist. LEXIS 3525*, No. 97 C 7976, 1999 WL 162793, at *5 (N.D. Ill. Mar. 12, 1999) (same); *Zahran v. Frankenmuth Mut. Ins. Co., 1996 U.S. Dist. LEXIS 4794*, No. 94 C 4827, 1996 WL 182563, at *3 (N.D. Ill. Apr. 15, 1996) (same). [1] Plaintiff fails to demonstrate that the above-cited cases, *Henry, Janusz,* and *Zahran,* are inapplicable. Moreover, the cases cited by plaintiff are inapposite because they involved the individual-capacity/ official-capacity distinction regarding claims against government employees under *42 U.S.C. § 1983*. Dr. Bonow is an employee of NMFF, the [*8] defendant in *Talano I,* and thus is in privity with NMFF for claim preclusion purposes. Therefore, the third requirement of claim preclusion is satisfied.

> 1   Plaintiff contends that *Zahran* and *Janusz* are "non-precedential" because they are "unpublished" in a reporter. (Plaintiff's Memorandum at 6-7.) Plaintiff is incorrect, and may be confused by the Seventh Circuit's Rule 53, which concerns unpublished orders issued by the Seventh Circuit, but not those issued by this court.

Plaintiff maintains that application of claim preclusion would be "stunningly unfair" because he was not

given a "full and fair opportunity to litigate against Dr. Bonow" in *Talano I.* (Plaintiff's Memorandum at 2-4.) "The requirement that a party have a full and fair opportunity to litigate an issue before res judicata may apply," however, "relates to the procedural opportunity rather than to a judicial determination of the merits of the issue." *Lim v. Central DuPage Hosp.*, 972 F.2d 758, 763-64 (7th Cir. 1992). [*9] We reject plaintiff's argument because he did have a full and fair procedural opportunity to litigate against defendant; he simply failed to take advantage of that opportunity in a timely manner, as Judge Guzman found:

> In the case at bar, there is nothing to show why plaintiff had to wait so long to amend his complaint ... as to Dr. Bonow individually .... Plaintiff should have had enough information to determine whether he wished to sue Dr. Bonow individually or whether he just wanted to sue NMFF .... There is no reason why plaintiff could not have filed an individual claim against Dr. Bonow at any point in time prior to the cutoff of discovery, or at least, prior to the filing of NMFF's motion for summary judgment .... Based on plaintiff's insufficient explanation for his failure to add [Dr. Bonow as] a new defendant in a timely fashion and because of the undue delay and prejudice that would result, plaintiff's motion for leave to file second amended complaint and for joinder of additional defendant is denied.

*Talano I*, 1999 U.S. Dist. LEXIS 18455, 1999 WL 1080416, at *2-3. The mere fact that plaintiff's motion for leave to file a claim against Dr. Bonow was denied does not [*10] mean that plaintiff did not have a fair opportunity to litigate in *Talano I*, as it was due to plaintiff's own dilatory conduct that he was denied leave to file the claim.

Plaintiff also argues that defendant is judicially estopped from asserting the doctrine of claim preclusion because, in *Talano I*, (1) NMFF opposed Dr. Bonow's joinder; (2) NMFF admitted that it had a contract with Dr. Talano; and (3) NMFF asserted that it was independent from the Hospital and from Northwestern University Medical School (the "Medical School"). The doctrine of judicial estoppel "bars a litigant who has obtained a judgment on the basis of proving one set of facts from obtaining a second judgment by turning around and proving that the facts were actually the opposite of what he had proved in the prior case." *Reynolds v. City of Chicago*, 296 F.3d 524, 529 (7th Cir. 2002). The doctrine is

not applicable here. As for the first asserted ground, NMFF did not rely on proving any facts in opposing Dr. Bonow's joinder; it merely argued that Dr. Talano should have joined Dr. Bonow earlier in the litigation. As for the second and third asserted grounds, the judgment obtained by NMFF was [*11] not premised on any relationship between NMFF and the Hospital or Medical School or on the existence of a contract with Dr. Talano. In fact, Judge Nordberg held that Dr. Talano had not met his burden of showing that a binding contract existed. See *Talano I, 2000 U.S. Dist. LEXIS 11185, 2000 WL 1100337*, at *7.

### B. *Collateral Estoppel (Issue Preclusion)*

An alternative ground for granting defendant summary judgment on Count I of the Amended Complaint is collateral estoppel, also known as issue preclusion. In a defensive use of issue preclusion, a plaintiff is estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant. See *Parklane Hosiery v. Shore*, 439 U.S. 322, 329, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979). Defensive use of issue preclusion precludes a plaintiff from re-litigating identical issues merely by switching adversaries; it gives plaintiffs a strong incentive to join all potential defendants in the first action. See *id.* at 329-30. Unlike claim preclusion, there is no requirement that the party claiming issue preclusion have been a party or in privity with a party to the prior suit. "For collateral [*12] estoppel to apply, four elements must be met: (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994).

In Count I, plaintiff asserts a claim against defendant for tortious interference with plaintiff's contract with NMFF. "Under Illinois law, the elements of a tortious interference with contract claim are as follows: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach." *Wheel Masters, Inc. v. Jiffy Metal Prods. Co.*, 955 F.2d 1126, 1129 (7th Cir. 1992) (applying Illinois law). The first element of this claim was litigated [*13] and decided against plaintiff in *Talano I.* Judge Nordberg ruled that Dr. Talano failed to meet his burden of showing that a binding contract existed between Dr. Talano and NMFF. This determination

was essential to the final judgment, and it appears that plaintiff was fully represented in *Talano I.* All of the requirements of collateral estoppel are satisfied.

Plaintiff contends that he is advancing a new argument that an oral contract existed between him and NMFF, an issue that Judge Nordberg never addressed. However, plaintiff did argue in *Talano I* that oral promises had been made to him and that those alleged oral promises should supplement the alleged written contract. Judge Nordberg considered and rejected that argument. *See Talano I, 2000 U.S. Dist. LEXIS 11185, 2000 WL 1100337,* at *5-7. Plaintiff cannot attempt to re-litigate the same issue he has already lost against NMFF simply by bringing it against Dr. Bonow. Claim preclusion bars Count I of the Amended Complaint.

***CONCLUSION***

For the foregoing reasons, defendant's motion for summary judgment is granted.

DATE: September 10, 2002

ENTER:

John F. Grady, United States District Judge

**JUDGMENT IN A CIVIL CASE** [*14]   - Date: 9/13/2002

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that summary judgment is entered in favor of the defendant and against the plaintiff.

# EXHIBIT 13

LEXSEE 2008 U.S. DIST. LEXIS 241



Analysis
As of: Aug 08, 2008

**RICHARD J. BURKE, Plaintiff, vs. THE LAKIN LAW FIRM, PC, and BRADLEY M. LAKIN, Defendants.**

**Case No. 07-cv-0076-MJR**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IL-LINOIS**

*2008 U.S. Dist. LEXIS 241*

**January 3, 2008, Decided**
**January 3, 2008, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at *Burke v. Lakin Law Firm, P.C., 2008 U.S. Dist. LEXIS 833 (S.D. Ill., Jan. 7, 2008)*

**PRIOR HISTORY:** *Burke v. Lakin Law Firm PC, 2007 U.S. Dist. LEXIS 21100 (S.D. Ill., Mar. 26, 2007)*

**COUNSEL:** [*1] For Richard J. Burke, Plaintiff: C. John Pleban, LEAD ATTORNEY, Lynette M. Petruska, LEAD ATTORNEY, Pleban & Associates LLC, St. Louis, MO.

For Lakin Law Firm PC, The, Defendant: James N. Foster, Jr., LEAD ATTORNEY, John B. Renick, LEAD ATTORNEY, Michelle M. Cain, LEAD ATTORNEY, McMahon, Berger et al. - St. Louis, Generally Admitted, St. Louis, MO.

For Bradley M. Lakin, Defendant: James N. Foster, Jr., LEAD ATTORNEY, John B. Renick, LEAD ATTOR-NEY, Michelle M. Cain, LEAD ATTORNEY, McMahon, Berger et al. - St. Louis, Generally Admitted, St. Louis, MO; Robert J. Sprague, Sprague & Urban, Belleville, IL.

For Richard J. Burke, Counter Defendant: C. John Pleban, LEAD ATTORNEY, Pleban & Associates LLC, St. Louis, MO.

**JUDGES:** MICHAEL J. REAGAN, United States District Judge.

**OPINION BY:** MICHAEL J. REAGAN

**OPINION**

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

**A. Introduction and Factual/Procedural Background**

On January 29, 2007, Burke filed this action against Bradley Lakin and the Lakin Law Firm (LLF) alleging breach of contract, an action for an accounting, fraudulent misrepresentation, and tortious interference with a contract and/or business expectancy (Doc. 3). On March 30, 2007, LLF filed its answer and raised counterclaims [*2] alleging breach of contract, breach of fiduciary duty, and tortious interference with a contract and/or business expectancy (Doc. 44).

After the Court granted leave to do so, Burke filed his first amended complaint on July 30, 2007 (Doc. 66) renumbering Counts III and IV as Counts IV and V, clarifying facts common to all counts, clarifying facts relevant to certain counts, and adding an additional count as Count III under the Illinois Wage Payment and Collection Act. After the Court again granted leave to do so, Burke filed his second amended complaint on December 7, 2007 (Doc. 96) wherein he withdrew Count II, the action for accounting, renumbered Count III as Count II, and added an additional count for quantum meruit as Count III. LLF has not amended its counterclaims at any time.

On May 7, 2007, Burke moved to dismiss LLF's counterclaims (Doc. 49). LLF filed a response on June 6, 2007 (Doc. 58), and Burke submitted his reply on June 18, 2007 (Doc. 59). Having fully reviewed these filings, the Court now **GRANTS IN PART AND DENIES IN PART** Burke's motion to dismiss (Doc. 49).

**B. Analysis**

Dismissal is warranted under *Rule 12(b)(6)* if the complaint fails to set forth "enough facts to state [*3] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, -- U.S. --, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); EEOC v. Concentra Health Services, Inc., 496 F.3d 773, 776 (7th Cir. 2007).* In making this assessment, the District Court accepts as true all well-pled factual allegations and draws all reasonable inferences in LLF's favor. *See St. John's United Church of Christ v. City of Chicago, 502 F.3d 616, 625 (7th Cir. 2007).*

1. LLF's Counterclaim for Breach of Contract

First, Burke moves this Court to dismiss LLF's counterclaim for breach of contract. Burke argues that LLF's counterclaim is deficient in that it fails to allege essential elements of a breach of contract claim. Specifically, he argues that LLF does not plead that it performed all required conditions under the contract or that Burke breached any term of the agreement. Burke also argues that LLF improperly relies on the covenant of good faith and fair dealing.

The notice pleading standard of *Federal Rule of Civil Procedure 8(a)(2)* provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This lenient pleading standard requires only that a [*4] pleading provide fair notice of the claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).* In *Bell Atlantic*, the Supreme Court further addressed the requirements of *Rule 8*, explaining that:

> a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . .

*Bell Atlantic, 127 S.Ct. at 1964-65* (internal citations omitted). Stated another way, the complaint or counterclaim should be dismissed if the "factual detail . . . [is] so

sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under *Rule 8.*" *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007).* While a counterclaim need not include detailed facts, it must allege facts which set forth the essential elements of the claim. *See Doherty v. City of Chicago, 75 F.3d 318, 326 (7th Cir. 1996).*

The essential elements of a breach of contract claim under Illinois [*5] law are: (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. *Village of S. Elgin v. Waste Mgmt. of Ill., 348 Ill. App. 3d 929, 810 N.E.2d 658, 669, 284 Ill. Dec. 868 (Ill.App.Ct. 2004).*

Here, LLF does not allege all of the essential elements of a breach of contract claim, such as that it performed all of the contract's required conditions. Additionally, LLF's counterclaim fails to set forth the specific terms of the contract that Burke allegedly breached. Though *Federal Rule of Civil Procedure 10(c)* provides that "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading," no such exhibit is attached to the counterclaim even though LLF refers to "Exhibit A" therein (See Doc. 44). LLF should have attached the exhibit to its counterclaim or else pled the terms of the contract.

With respect to the claim for breach of the duty of good faith, the parties argue as to whether Illinois law permits a cause of action for breach of the implied covenant of good faith and fair dealing. The confusion of the parties on this issue appears to arise from a distinction between the doctrine's application [*6] in tort versus contract. It is clear that Illinois does not recognize a cause of action in tort for breach of the implied covenant of good faith, except in a narrow set of cases in the insurance context. *Voyles v. Sandia Mortgage Corp., 196 Ill. 2d 288, 751 N.E.2d 1126, 1131, 256 Ill. Dec. 289 (Ill. 2001)* (explaining the Court's decision in *Cramer v. Ins. Exchange Agency, 174 Ill. 2d 513, 675 N.E.2d 897, 221 Ill. Dec. 473 (Ill. 1996)*, **which created an exception in circumstances where an insurer breaches its duty to settle a third-party action brought against the insured).** In essence, Illinois courts have determined that there is no need for an independent tort action for the breach of the duty of good faith because a party can typically recover under a contract theory. *See Bass v. SMG, Inc., 328 Ill. App. 3d 492, 765 N.E.2d 1079, 1090, 262 Ill. Dec. 471 (Ill.App.Ct. 2002); Martin v. Federal Life Ins. Co., 109 Ill. App. 3d 596, 440 N.E.2d 998, 1005-06, 65 Ill. Dec. 143 (Ill.App.Ct. 1982).*

Similarly, there is no separate cause of action in the area of contracts for breach of the implied duty of good

faith and fair dealing. However, the doctrine may be implicated in a breach of contract claim under certain circumstances. The doctrine's application is thoroughly explained in *Perez v. Citicorp Mortg., Inc.*, 301 Ill. App. 3d 413, 703 N.E.2d 518, 234 Ill. Dec. 657 (Ill.App.Ct. 1998).

> Every [*7] contract, as a matter of law, includes a duty of good faith and fair dealing, absent an express disavowal by the parties.

> The obligation of good faith and fair dealing is a derivative principle of contract law and is essentially used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions.

> These implied covenants are generally implicated where one party to a contract is given broad discretion in performance. "The doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."

> Notwithstanding these implied covenants, however, "[p]arties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith [. . .] Express covenants abrogate the operation of implied covenants so courts will not permit implied agreements to overrule or modify the express contract of the parties."

*Perez, 703 N.E.2d at 525* (quoting *Resolution Trust Corp. v. Holtzman, 248 Ill. App. 105, 618 N.E.2d 418, 423-24, 187 Ill. Dec. 827 (Ill.App.Ct. 1993)*) [*8] (citations omitted). Thus, the covenant is only implicated if particular provisions in the contract are susceptible to conflicting interpretations.

LLF does not appear to plead breach of the implied covenant of good faith as a separate cause of action, but rather as a component of its breach of contract claim. However, the inclusion of a reference to the implied covenant of good faith at this time is unnecessary unless LLF intends to suggest that there is an ambiguity as to the meaning of the contract. This does not appear to be the case, as LLF's breach of contract claim appears to reference breaches of particular provisions. Unfortu-

nately, the Court is unable to determine whether this is so, because the contract is not attached to LLF's counterclaim.

Accordingly, the Court **GRANTS** Burke's motion to dismiss LLF's breach of contract counterclaim **without prejudice and with leave to re-file.**

2. LLF's Counterclaim for Breach of Fiduciary Duty

Next, Burke moves this Court to dismiss LLF's counterclaim for breach of fiduciary duty. Burke argues that because he was not a partner at LLF, he owed no heightened fiduciary duty. Without a heightened fiduciary duty, he argues that LLF's allegation [*9] that he took steps to set up a competing law firm is insufficient to state a claim for breach of fiduciary duty.

In its counterclaim, LLF alleges far more than Burke suggests, including seven separate types of conduct by which Burke allegedly breached his fiduciary duties. The Court cannot dismiss LLF's claim for breach of fiduciary duty wholesale, because Burke has only attacked one of these instances of conduct in his motion for dismiss -- the allegation that he began preparations to set up a competing firm. Contrary to Burke's argument, however, LLF also specifically alleges that Burke "actively commenced competition with [LLF] while still employed by [LLF]." Doc. 44, p.11, P 10(g). This allegation is sufficient to raise a claim for breach of fiduciary duty and LLF's counterclaim will not be dismissed.

With respect to the allegation that Burke took steps to set up a competing law firm, the parties argue about whether Burke, Supervising Attorney of the Class Action Department, had a heightened fiduciary duty. Though officers and directors may be held to a heightened fiduciary duty, *see Cooper Linse Hallman Capital Mgmt., Inc. v. Hallman, 368 Ill. App. 3d 353, 856 N.E.2d 585, 305 Ill. Dec. 780 (2006),* a determination of this [*10] issue is not necessary in order to resolve the motion at hand.

As a general matter, all employees owe fiduciary duties of loyalty to their employers "not to (1) actively exploit their positions within the corporation for their own personal benefits, or (2) hinder the ability of the corporation to conduct the business for which it was developed." *FoodComm Intern. v. Barry, 328 F.3d 300, 303 (7th Cir. 2003).* While lawyers are not "necessarily bound by the same fiduciary constraints that apply to nonlawyer officers and directors," lawyers do owe fiduciary duties to their employers. *See Dowd & Dowd, Ltd. v. Gleason, 181 Ill. 2d 460, 693 N.E.2d 358, 364-65, 230 Ill. Dec. 229 (Ill. 1998)* (hereinafter *Dowd I*).

While a departing attorney may undertake arrangements to set up a competing firm, their fiduciary duties impose limitations on his or her conduct. *Id. at 366.* As

the Illinois Supreme Court notes, it is often difficult to draw the line between permissible and impermissible conduct in such circumstances. *Id. at 364*. Consequently, whether a fiduciary duty has been violated depends on the particular facts involved in each case. *See id. 365-67; Foodcomm Int'l v. Barry, 328 F.3d 300, 304 (7th Cir. 2003); Everen Secs., Inc v., A.G. Edwards & Sons, Inc., 308 Ill. App. 3d 268, 719 N.E.2d 312, 318, 241 Ill. Dec. 451 (Ill.App.Ct. 1999)*. [*11] Here, it is sufficient to note that under certain circumstances an attorney's conduct while preparing to start a competing firm may constitute a breach of fiduciary duty, even where heightened duty is not implicated.

Given the Federal Rules of Civil Procedure's notice pleading standard, LLF's claim that Burke breached his fiduciary duty to the firm when he "planned and took steps to set up a competing law firm" cannot be dismissed. At this stage, LLF need only set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic, 127 S. Ct. at 1965*. Accepting LLF's factual allegations as true and drawing all reasonable inferences in LLF's favor, the Court finds LLF's claim that Burke's conduct in setting up a competing law firm to be plausible on its face.

Accordingly, the Court **DENIES** Burke's motion to dismiss LLF's breach of fiduciary duty counterclaim.

3. LLF's Counterclaim for Tortious Interference

Finally, Burke moves this Court to dismiss LLF's counterclaim for tortious interference with a contract or business expectancy. Under Illinois law, the elements for a cause of action for tortious interference with a contract or business expectancy are: "(1) the [*12] existence of a valid business relationship or expectancy; (2) the defendants' knowledge of plaintiff's relationship or expectancy; (3) purposeful interference by the defendants that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship or termination of the relationship; and (4) damages to plaintiff resulting from such interference." *Dowd & Dowd, Ltd. v. Gleason, 352 Ill. App. 3d 365, 816 N.E.2d 754, 767, 287 Ill. Dec. 787 (Ill.App.Ct. 2004)* (hereinafter *Dowd II*).

Burke argues that LLF has failed to adequately plead essential elements of the claim because LLF does not allege that particular clients or employees left the firm or breached any contract as a result of Burke's actions. Additionally, Burke argues that pre-departure solicitation of clients is a requisite for a tortious interference claim involving lawyers.

Burke is correct in noting that LLF only alleges that he solicited employees to leave the firm and solicited employees to convince LLF's clients to leave the firm. However, a claim of tortious interference requires more

than mere solicitation. The wrongdoer's acts must actually result in a breach of contract, a termination of a business relationship, or otherwise "prevent [*13] the plaintiff's legitimate expectancy from ripening into a valid business relationship." *Dowd II, 816 N.E.2d at 767*. LLF fails to allege that Burke's attempts to lure employees and clients away were successful. Moreover, if Burke's alleged actions were unsuccessful, it is difficult to see how LLF can make a showing of damages under a theory of tortious interference.

Finally, the parties argue at length whether pre-departure solicitation of clients is a prerequisite in a tortious interference claim involving lawyers. Burke points to *Dowd I* and *Dowd II* for this proposition. *See Dowd I, 693 N.E.2d at 371; Dowd II, 816 N.E.2d at 769*. In *Dowd I* and *Dowd II*, the Illinois courts analyzed what efforts a departing attorney may properly take in soliciting the firm's clients. Nowhere does either decision indicate that pre-departure solicitation is required in a tortious interference claim. To be sure, pre-departure solicitation may be relevant to the question of whether actions taken by a departing attorney constitute impropriety or "purposeful interference," especially in the context of a breach of fiduciary duty. But to find that pre-departure solicitation is a prerequisite for a tortious interference [*14] claim in this context would mean that even the most extreme post-departure conduct by an attorney in soliciting his former employer's clients could not constitute "purposeful interference."

The Court declines Burke's invitation to extend *Dowd I* and *Dowd II* in this manner. To survive a motion to dismiss under *Rule 12(b)(6)*, it is sufficient that LLF allege some improper conduct related to the tortious interference claim. While those allegations may include pre-departure solicitation of clients, the Court is not persuaded that post-departure misconduct by an attorney is in all cases insufficient to sustain a claim for tortious interference in this context. Therefore, LLF need only allege that Burke engaged in some improper conduct in soliciting the firm's clients.

Because LLF failed to properly plead all essential elements, the Court **GRANTS** Burke's motion to dismiss the tortious interference counterclaim **without prejudice and with leave to re-file**.

C. Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** Burke's motion to dismiss (Doc. 49). The Court **DENIES** Burke's motion to dismiss LLF's breach of fiduciary duty counterclaim, **GRANTS** Burke's motion to dismiss LLF's breach of contract counterclaim, [*15] and **GRANTS** Burke's motion to dismiss LLF's tortious interference counterclaim. Additionally, the Court **DIS-**

2008 U.S. Dist. LEXIS 241, *

**MISSES** LLF's breach of contract and tortious interference counterclaims **without prejudice and with leave to re-file.**

Accordingly, the Court **DIRECTS** LLF to file its amended counterclaim by **January 18, 2008.** Additionally, the Court **DIRECTS** Burke to file a responsive pleading to LLF's amended counterclaim by **February 4, 2008.**

**IT IS SO ORDERED.**

**DATED this 3rd day of January 2008.**

s/ Michael J. Reagan

**MICHAEL J. REAGAN**

**United States District Judge**

# EXHIBIT 14

LEXSEE 2008 U.S. DIST. LEXIS 49602

**KATHLEEN ROCHE , D.C., d/b/a/ BACK DOCTORS, LTD., individually and on behalf of others similarly situated, Plaintiff, v. LIBERTY MUTUAL MANAGED CARE, INC., LIBERTY MUTUAL INSURANCE COMPANY, and LIBERTY MUTUAL FIRE INSURANCE COMPANY d/b/a/LIBERTY MUTUAL, Defendant.**

**Case No. 07-cv-331-JPG**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

*2008 U.S. Dist. LEXIS 49602*

**June 30, 2008, Decided
June 30, 2008, Filed**

**COUNSEL:** [*1] For Kathleen Roche, individually and on behalf of all others similarly situated, doing business as Back Doctors, Ltd., Plaintiff: Kevin T. Hoerner, LEAD ATTORNEY, Becker, Paulson et al., Generally Admitted, Belleville, IL; Paul M. Weiss, LEAD ATTORNEY, Freed & Weiss, LLC, Generally Admitted, Chicago, IL; Richard J. Burke, Jr., Richard J. Burke LLC, St. Louis, Mo.

For Liberty Mutual Managed Care, Inc., Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, doing business as Liberty Mutual, Defendants: Carol A. Rutter, Randal K. Mullendore, LEAD ATTORNEYS, Husch Blackwell et al, Generally Admitted, St. Louis, MO; Mark G. Arnold, LEAD ATTORNEY, Husch Blackwell Sanders LLP - St. Louis, Generally Admitted, St. Louis, MO; Russell R. Yager, LEAD ATTORNEY, Vinson & Elkins LLP- Texas, Dallas, TX.

**JUDGES:** J. Phil Gilbert, DISTRICT JUDGE.

**OPINION BY:** J. Phil Gilbert

**OPINION**

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendant's Motion to Dismiss (Doc. 33). Plaintiff has responded (Doc. 38) and Defendant has replied (Doc. 44). The Court has reviewed the filings, and hereby ORDERS Plaintiff to SHOW CAUSE why her breach of contract claim should not be dismissed for the reasons set forth below by [*2] the Court.

**BACKGROUND**

**I. PPOs and Silent PPOs** [1]

> 1    The Court has drawn this background information from the operative Complaint, Senate and Congressional Reports on PPOs, and materials from the American Hospital Association and the American Medical Association.

Health insurance plans can be broadly divided into two large categories: indemnity plans (also referred to as "reimbursement" plans), and managed care plans. Indemnity plans reimburse the patient for his medical expenses regardless of who provides the service. Managed care plans, on the other hand, involve an arrangement between the insurer and a selected network of health care providers. Managed care plans offer patients significant financial incentives to use the providers in that network.

A Preferred Provider Organization (PPO) is a managed care technique that has risen in popularity in recent years. Parties to a typical PPO include a health care provider, a PPO network administrator, and various kinds of payors, that is, those companies or entities that are obligated to provide medical benefits to the provider's

patients. Payors may be insurance carriers, health care service plans, employers, trusts, nonprofit health service plans, [*3] governmental units and the like.

Generally, health care providers sign a contract with PPO network administrators in which they agree to accept from PPO payors a rate discounted from their usual and customary rates as payment in full for services provided to the payor's beneficiaries. In exchange, the network administrators promise providers that the payors who join the PPO will pay the provider promptly and/or provide "steerage," that is, financial incentives to their beneficiaries to encourage the beneficiaries to choose PPO providers. The contract between the provider and the PPO network administrator is the "provider agreement." The contract between the PPO network administrator and the payor is the "payor agreement." The provider agreement may or may not delineate who can contract to be a PPO payor.

A silent PPO is a term of art for a kind of PPO abuse. Essentially, a silent PPO occurs when a payor receives a PPO discount to which he is not entitled. For example, suppose a patient with an indemnity insurance plan goes to a provider who is part of a PPO. By definition, the patient with an indemnity insurance plan is not steered toward a provider, but is free to choose any provider [*4] he wishes. The patient typically pays a percentage of the total bill and his insurance pays the rest. In a silent PPO, after the patient pays his share of the bill and the provider submits the outstanding balance to the payor for payment, the payor notices that the provider is a member of a PPO. The payor then proceeds to pay the provider at the PPO discounted rate, instead of the usual and customary rate. If the payor and provider are both members of the PPO, this discount payment may constitute a breach of the PPO contract. If the payor is not a member of the PPO, but pays only the PPO rate, this discount payment may constitute fraud. The conduct at issue in this case falls within the first silent PPO scenario.

## II. Facts

Plaintiff Kathleen Roche is a licenced healthcare provider who signed a provider agreement with First Health Group Corp. (First Health), thereby becoming a provider with the First Health PPO network. Defendant Liberty Group (Liberty) signed a payor agreement with First Health, thereby becoming a payor with the First Health PPO network.

In 2003, Roche treated a patient, who was a covered claimant under a Liberty insurance policy, at her offices in St. Clair County, Illinois. [*5] The claimant sustained injuries in a covered occurrence, and was entitled to have Liberty pay for her medical services. However, the claimant was not covered under a Preferred Provider or Exclusive Provider insurance plan. In fact, Liberty had never even established a Preferred Provider or Exclusive Provider program for its claimants or beneficiaries. Accordingly, neither Liberty nor First Health referred the patient to use Roche's services. They did nothing to steer or direct the patient in any way to Roche, nor did they make any attempt to discover if Roche was a PPO provider before Roche provided her services to the patient.

Roche submitted a bill for her usual and customary charges to Liberty. Liberty then submitted the bill to First Health for review. Upon determining that Roche was a First Health PPO provider, Liberty tendered payment to Roche at the PPO discounted rate for the services provided, along with an explanation of reimbursement form (EOR). The EOR represented that the claim had been reimbursed pursuant to the First Health Network and stated, "This preferred provider has agreed to reduce this charge below fee schedule or usual and customary charges for your business." [*6] It also explained "This bill was reviewed in accordance with your contract with First Health." Roche contends that Liberty was not entitled to take the PPO discount and is liable to her for the difference between her usual and customary rate and the PPO rate Liberty paid. Roche advances the alternate theories of breach of contract, unjust enrichment, and violation of the Illinois Consumer Fraud Act.

## ANALYSIS

For purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of the plaintiff. *Erickson v. Pardus, 127 S.Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)* (per curiam ) (quoting *Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)); Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 833 (7th Cir.2007).* The federal system of notice pleading requires only that the plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2).* In order to provide fair notice of the grounds for his claim, the plaintiff must allege sufficient

facts "to raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir.2007)*(quoting [*7] *Twombly, 127 S.Ct. at 1965 (2007))* (internal quotations omitted).

The complaint must offer "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly, 127 S.Ct. at 1965*. Moreover, the Court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim." *R.J.R. Services Inc. v. Aetna Casualty and Surety Co., 895 F.2d 279, 281 (7th Cir.1989)*. However, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly, 127 S.Ct. at 1969 n. 8*.

## I. Breach of Contract Claim

As previously noted, Roche had signed a provider agreement [2] with First Health pursuant to which she became a First Health PPO network provider. Although it may not appear that there is a contractual relationship between Roche and Liberty, Roche contends that the provider agreement and the payor agreement together constitute a contract between herself and Liberty. An implied term of this contract is that Liberty would steer patients to Roche in exchange [*8] for receiving the PPO discount rate. Liberty protests that there is no contract between it and Roche. However, a cursory review by the Court of the express terms of Roche's contract with First Health seems to preclude her from prevailing on the breach of contract theory she advances.

> 2    Roche attached a copy of her provider agreement with First Health to the operative complaint. As such, it is properly before the Court on this motion to dismiss. *See Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002)*.

## A. Illinois Contract Law

The provider agreement specifies that the contract is governed by Illinois law. Under Illinois law, when construing a contract, the Court must give effect to the intent of the parties. *First Bank & Trust Co. v. Village of Orland Hills, 338 Ill. App. 3d 35, 787 N.E.2d 300, 304, 272 Ill. Dec. 485 (Ill. App. Ct. 2003)*. If the terms of a contract are unambiguous, the parties's intent is ascertained solely from the words of the contract itself. *See Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457, 706 N.E.2d 882, 884, 236 Ill. Dec. 8 (Ill.1999); Regency Commercial Associates, LLC v. Lopax, Inc., 373 Ill. App. 3d 270, 869 N.E.2d 310, 316, 311 Ill. Dec. 636 (Ill. App. Ct. 2007)*. It is the Court's duty to construe and enforce the contract as it was written. *Shaffer v. Liberty Life Assur. Co. of Boston, 319 Ill. App. 3d 1048, 746 N.E.2d 285, 288, 253 Ill. Dec. 837 (Ill. App. Ct. 2001)*. [*9] "[P]arties' rights under a contract are limited by the terms expressed therein and a contract must be read in its entirety and effect given to each of its provisions." *Moody v. Federal Exp. Corp., 368 Ill. App. 3d 838, 858 N.E.2d 918, 921, 306 Ill. Dec. 860 (Ill. App. Ct.2006)*. Unless the language of the contract is ambiguous, one party's particular interpretation of its terms at the time of execution is immaterial. *Am. Nat'l Trust Co. of Chi. v. Ky. Fried Chicken of S. Cal., Inc., 308 Ill. App. 3d 106, 719 N.E.2d 201, 211, 241 Ill. Dec. 340 (Ill. App. Ct. 1999)*. Courts are not in the business of rewriting contracts to provide a better bargain for one of the parties. *See Owens v. McDermott, Will & Emery, 316 Ill. App. 3d 340, 736 N.E.2d 145, 154, 249 Ill. Dec. 303 (Ill. App. Ct. 2000)*. Furthermore, "the law is clear that an implied contract cannot coexist with an express contract on the same subject." *Maness v. Santa Fe Park Enterprises, Inc., 298 Ill. App. 3d 1014, 700 N.E.2d 194, 200, 233 Ill. Dec. 93 (Ill. App. Ct.1998)* (listing cases).

## B. Terms of the Provider Agreement

The Provider Agreement states:

> Provider [3] understands that by execution of this Agreement, Provider agrees to participate in a Preferred Provider Panel (PPO Plan) being created by First Health. Provider further understands that First Health will offer to certain Payors the opportunity [*10] to contract with First Health to utilize the services of the health care providers participating in the Preferred Provider Panel. . . . First Health's Payor Agreement with each Payor utilizing Provider's services will require Payor to comply with terms and conditions of Article 4 (Payment Provisions) of this Agreement.

Provider Agreement §1.5

3    "Provider" was defined in section 1.1 as Roche.

The Payment Provisions section of the contract contains a Billing Procedure and a Reimbursement Procedure. The Reimbursement Procedure guarantees that the provider will receive payment within 30 days of receipt of a properly submitted bill. The Payment Provisions section also contains the following language:

> Pursuant to each Payor's Payor Agreement with First Health, Payor shall be liable for the lesser of Provider's billed charges or the amount set forth in Appendix A of this Agreement, 4 less any amounts of copayments, deductibles, and coordination of benefits, when Covered Services are provided to a Participating Patient.

Provider Agreement §4.2(a)

4    Appendix A lists the provider's discount rates for the services performed.

A "Participating Patient" is defined as someone "who ha[s] elected to receive [*11] care from Provider and who [is] covered by the Payor's Benefit or Insurance Plan," and a "Covered Medical Service" is defined as "[a] service provided to a Participating Patient for which the Payor is obligated to pay pursuant to the Payor's Health Plan." "Health Plan" is then broadly defined as follows:

> "Health Plan" means any contract, certificate, policy, plan document or other legally enforceable instrument and amendments thereto issued, sponsored or administered by a Payor under which a Participating Patient may be entitled to health services or health service benefits. These Health Plans *may include, but are not limited to, indemnity plans, health maintenance organizations, insurance group health plans, and worker's compensation plans.*

Provider Agreement § 2.3 (emphasis added).

It appears to the Court that under the express terms of the contract, Roche agreed to accept the PPO discounted rate from Health Care's Payors (such as Liberty) even when the Payor's health plan is not a PPO plan. As the Court understands the contract, even if Roche's patient is covered under an indemnity plan administered by Liberty, which by definition *precludes steerage,* Roche has still agreed to accept [*12] the PPO rate from Liberty. Therefore, it appears that the steerage obligation that Roche wants the Court to find implicit in the contract between her and Liberty would directly contradict the express terms contained in her Provider Agreement. If that is indeed the case, it follows that the Court could not infer such a term.

However, Roche contends that steerage "is the *sine qua non* of the PPO form of managed care, and the essential benefit and consideration from the payors to the preferred providers." This appears to be a contention by Roche that if steerage is not an implied term of the contract, the contract must fail for lack of consideration.

"[A]ny act or promise which is of benefit to one party or disadvantage to the other" can constitute consideration adequate to support a contract. *Ahern v. Knecht, 202 Ill. App. 3d 709, 563 N.E.2d 787 791, 150 Ill. Dec. 660 (Ill. App. Ct. 1990).* A court will generally not inquire into the sufficiency of the consideration, provided the amount of consideration is not "so grossly inadequate as to shock the conscience of the court." *Id.* Here, the Provider Agreement signed by Roche guarantees that she will receive payment for her services within 30 days after billing. This appears to the [*13] Court to be adequate consideration to support the contract.

Therefore, it appears to the Court that the prompt payment guarantee is adequate consideration to support the contract, and that the express terms of the Provider Agreement preclude the Court from finding an implied term of "steerage" in the contract. However, the parties's briefs have not addressed the possibility that the express language of the contract precludes Plaintiff from prevailing on her breach of contract claim. Therefore, the Court will allow supplementary briefing on this issue.

## CONCLUSION

The Court **ORDERS** Plaintiff to **SHOW CAUSE** why the Defendant's Motion to Dismiss as to her breach of contract cause of action should not be granted for the reasons set forth in this Order. Plaintiff **SHALL** file a brief of not more than twenty (20) pages addressing the issues raised in this Order not later than thirty (30) days

2008 U.S. Dist. LEXIS 49602, *13

from the date of entry of this Order. If Defendant wishes to address the issues raised herein, Defendant **SHALL** do so by a brief of not more than twenty (20) pages filed not later than thirty (30) days from the date of entry of this Order.

**IT IS SO ORDERED.**

**DATED: June 30, 2008**

/s/ J. Phil Gilbert

**J. PHIL GILBERT**

**DISTRICT** [*14] **JUDGE**

# EXHIBIT 15

LEXSEE 2007 U.S. DIST. LEXIS 70604

**BEVERLY E. ROBINSON, Plaintiff, v. MORGAN STANLEY, DISCOVER
FINANCIAL SERVICES LLC, KPMG, ROCCO DEGRASSE, TONY DELUCA,
KAREN DOLLMEYER, CAROLE HOFFMAN, BERNICE JEE, KELLY
MCNAMARA-CORLEY, DAVID OPPENHEIM, KERRY PIERCY, DAVID
SUTTER, VESELA ZLATEVA, Defendants.**

**No. 06 C 5158**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 70604*

**September 24, 2007, Decided
September 24, 2007, Filed**

**SUBSEQUENT HISTORY:** Count dismissed at
*Robinson v. Stanley, 2008 U.S. Dist. LEXIS 47597 (N.D.
Ill., June 18, 2008)*

**COUNSEL:** [*1] Beverly E. Robinson, Plaintiff, Pro se,
Grayslake, IL.

For Morgan Stanley, Discover Financial Services, Tony
DeLuca, Karen Dollmeyer, Carole Hoffman, Bernice Jee,
Kelly McNamara-Corley, David Oppenheim, Kerry
Piercy, David Sutter, Vesela Zlateva, Defendants: Sari M.
Alamuddin, LEAD ATTORNEY, Margit E. Anderson,
Ross Harlan Friedman, Morgan Lewis & Bockius, LLP,
Chicago, IL.

For KPMG, Rocco DeGrasse, Defendants: James R.
Figliulo, LEAD ATTORNEY, Figliulo & Silverman,
Chicago, IL; Catherine Mary Towne, Figliulo &
Silverman, PC, Chicago, IL.

**JUDGES:** JAMES F. HOLDERMAN, Chief Judge.

**OPINION BY:** JAMES F. HOLDERMAN

**OPINION**

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On August 24, 2006, *pro se* plaintiff Beverly
Robinson ("Robinson") filed her ten-count complaint in
the Circuit Court of the Nineteenth Judicial Circuit, Lake
County, Illinois. On September 22, 2006, defendants
Morgan Stanley and Discover Financial Services, LLC
properly removed the case to federal court, on the basis
of federal question and supplemental jurisdiction. *See, 28
U.S.C. § 1331; 28 U.S.C. § 1367(a)*; (Dkt. No. 1). Now
pending before the court are two separate motions to
dismiss.

Defendants Morgan Stanley, Discover Financial
Services, [*2] LLC, Tony DeLuca, Karen Dollmeyer,
Carole Hoffman, Bernice Jee, Kelly McNamara-Corley,
David Oppenheim, Kerry Piercy, David Sutter, and
Vesela Zlateva ("the Morgan Stanley Defendants") have
filed a Motion to Dismiss All of Plaintiff's Complaint
Except for the Claims Set Forth in Counts I, Portions of
Count II and Count IX Against Morgan Stanley. (Dkt.
No. 20) ("the Morgan Stanley Defendants' Motion to
Dismiss"). The Morgan Stanley Defendants' Motion to
Dismiss is granted in part and denied in part. Count 1
(Retaliatory Discharge) is dismissed against all individual
defendants; Count 2 (Illinois Whistleblower Act) is
dismissed against all individual defendants and against
defendant Morgan Stanley and defendant Discover
Financial Services, insofar as it asserts claims under §§
10 and 15 of the Illinois Whistleblower Act; Count 3
(Defamation) is dismissed without prejudice; Count 4
(Intentional Infliction of Emotional Distress) is dismissed

2007 U.S. Dist. LEXIS 70604, *2

with prejudice; Count 5 (Fraud) is dismissed without prejudice; Count 6 (Intentional Interference with Economic Relations) is dismissed with prejudice; Count 7 (Illinois Personnel Record Review Act) remains in its entirety; Count 8 (Illinois Equal [*3] Pay Act) is dismissed with prejudice; Count 9 (FMLA) remains in its entirety; and Count 10 (Breach of Contract) is dismissed insofar as it alleges breach of policies set forth in the Employee Handbook.

Defendants KPMG, LLP and Rocco deGrasse have also filed a Motion to Dismiss (Dkt. No. 17) ("KPMG's Motion to Dismiss"). KPMG's Motion to Dismiss is granted in its entirety.

Robinson is given until on or before October 15, 2007 to file a First Amended Complaint consistent with this opinion and order. Defendants are given until October 29, 2007 to answer or plead to the First Amended Complaint.

BACKGROUND

For purposes of addressing the pending 12(b)(6) motions, the court accepts as true the following facts, as set forth in the Complaint:

Plaintiff Beverly Robinson ("Robinson") worked in the Internal Audit Department of Morgan Stanley from October 2, 2000 until August 24, 2004. Throughout her employment, Robinson was located in the Discover Financial Services ("DFS") headquarters building in Riverwoods, Illinois. [1] Robinson began her career at Morgan Stanley as a Senior Auditor in October, 2000, and was promoted to Electronic Data Processing (EDP) Audit Supervisor in August, 2001. Although Robinson's [*4] mid-year review of September, 2001 stated that Robinson was meeting expectations, Robinson was reassigned to the position of Senior Auditor in January, 2002, after returning from almost two months of approved medical leave for major surgery. Along with her demotion and bad review, Robinson was placed "in the lower of two salary grade levels available for the Senior Auditor position." (Compl. P 25). On February 20, 2002, while still working half days pursuant to her FMLA leave, Robinson was put on a corrective action plan.

1  DFS is a wholly owned subsidiary of Morgan Stanley, with its principal place of business in Riverwoods, Illinois.

Robinson's performance appears to have then improved significantly, as she received an "exceeds" performance rating on her mid-year review in July, 2002. However, in December, 2002, Robinson only received a "meets" performance rating. Robinson's boss [2] explained to her that Robinson received this rating because she did not exceed the "exceeds" performance rating from the first half of the year. Additionally, Robinson's boss told her that the July, 2002 evaluation could not be changed because Robinson had already signed it. At that point, Robinson began [*5] meeting with personnel in Human Resources ("HR"), her boss, and Department Vice President David Sutter ("Sutter") to discuss the proper criteria for performance evaluations. Robinson later asked that these meetings be discontinued, due to Sutter's increasing retaliation against her for "taking him to HR." (Compl. P 32). Robinson submitted her 2003 mid-year self evaluation, a positive review, and received no notification of any changes to it.

2  Robinson does not explicitly name her boss in her Complaint.

In October, 2003, Robinson informed Sutter that she wanted to raise some concerns to the Company Audit Director, who was Sutter's boss. Shortly thereafter, Sutter put Robinson on a 60-day corrective action plan, citing Robinson's desire to go over his head as one of the criticisms. Sutter also made reference to the first corrective action plan. During the meeting in which Sutter and Karen Dollmeyer ("Dollmeyer"), a representative from the Human Resources Department in Riverwoods, Illinois, gave Robinson the corrective action plan, Sutter warned Robinson not to discuss her concerns with anyone, "unless she could get the Company Audit Director in private, during the upcoming Morgan Stanley [*6] world-wide audit conference." (Compl. PP 8, 35). In December, 2003, after a restructuring of Robinson's department, Sutter gave Robinson a "needs improvement" year-end review. The October, 2003 corrective action plan was also extended for another 60 days, despite the fact that Sutter failed to obtain feedback from other employees, as requested by Robinson in her meetings with HR and Sutter in early 2003.

On or around February 5, 2004, Robinson delivered a memorandum of approximately twenty-four pages (plus attachments) to the Chief Financial Officer of DFS, [3] detailing legal, regulatory, tax, accounting, auditing, and personnel concerns that Robinson had uncovered as an

2007 U.S. Dist. LEXIS 70604, *6

auditor and as a non-auditor. Robinson had previously attempted to raise these issues through normal audit channels, "but each time was stopped and, in many cases, criticized for her efforts by her audit management." (Compl. P 39). The following day, the CFO and Kelly McNamara-Corley ("McNamara-Corley"), head of the Law Department in Riverwoods, Illinois, informed Robinson that they were launching an investigation into the concerns Robinson had raised in her memo. At the request of the CFO and McNamara-Corley, Robinson [*7] began participating in the investgation by supplying additional information, including documents and names, relevant to the issues raised in Robinson's memo. The investigative team that was assembled to look into Robinson's allegations included David Oppenheim ("Oppenheim") from the Law Department in Riverwoods, Illinois, Bernice Jee ("Jee") from the Human Resources Department (located "somewhere other than Riverwoods, Illinois") (Compl. P 10), Carole Hoffman ("Hoffman") from the Morgan Stanley Law Department in New York, an unnamed Audit Director from New York, [4] and Rocco deGrasse ("deGrasse") a principal of KPMG, along with other KPMG personnel. Early into the investigation ("after less than one day of meeting with Ms. Jee and Ms. Hoffman to discuss the personnel issues"), members of the investigative team tried to convince Robinson that she should leave the company and they offered to "package her out." (Compl. P 44). Robinson reported this attempt to force her to leave the company to the CFO and McNamara-Corley. McNamara-Corley "assured the Plaintiff she had a job in Audit." (Compl. P 45). McNamara-Corley and the CFO agreed to continue the investigation into the personnel issues [*8] raised in Robinson's memo and to have deGrasse participate in this aspect of the investigation. However, deGrasse was seldom present during the investigation and he "left the room for the majority of the time" on the days that he did attend meetings of the investigative team. (Compl. P 46).

> 3   Robinson does not explicitly name the CFO of DFS in her Complaint.
>
> 4   It is possible that this individual was defendant Tony DeLuca, who is described elsewhere in the Complaint as "the Company Audit Director with offices in New York." (Compl. P 12).

On May 7, 2004, Robinson was given the results of the investigation in a meeting attended by herself, Oppenheim, Jee, Hoffman, and deGrasse. Robinson was told that the investigative team "did not determine any

concerns in the audit area," and that they had also determined that there had been no FMLA violations or retaliation against Robinson, although the investigative team acknowledged that some of the personnel issues could have been handled better. (Compl. P 48).

While the investigation was ongoing, Robinson also alleges that she was subjected to retaliation by members of the Audit Department. Sutter was aware that Robinson had instigated the investigation, [*9] and it was apparent to others in the Audit Department that Robinson was "spending her days in the Law Department and never at her desk." (Compl. P 42). Furthermore, almost all of the investigation meetings took place in the same wing as the Audit Department.

Robinson reported this retaliation to the investigative team, who assured her that no retaliation would be tolerated. However, Robinson continued to be subjected to retaliation, as did the one or two people in the Internal Audit Department who still associated with Robinson at that time. Robinson reported the retaliation to Jee, Hoffman, and Kerry Piercy ("Piercy"), Vice President of Human Resources. On or around May 17, 2004, Piercy and another member of Human Resources met with Robinson and "informed her there had been no retaliation" against Robinson or others. (Compl. P 50). No action was ever taken in response to the retaliatory conduct that Robinson continued both to experience and to report.

Shortly after the meeting with Piercy, Robinson's manager Vesela Zlateva ("Zlateva") [5] put Robinson on another corrective action plan. Piercy and Zlateva met with Robinson weekly to give Robinson updates of her performance. At these meetings, [*10] Zlateva "would read a list of complaints" about Robinson. (Compl. P 54). Upon trying to discuss, correct, or question any of the items on Zlateva's list, Robinson was accused of arguing and not accepting feedback. In mid-June, 2004, the company provided Robinson with an outside coach. Nevertheless, on or around August 6, 2004, Robinson was given a Job-in-Jeopardy memo informing Robinson that if her performance did not improve, she would be terminated. On August 24, 2004 Robinson's employment with Morgan Stanley was terminated.

> 5   Zlateva had been Robinson's manager since the restructuring in December, 2003. (Compl. P 36).

In her Complaint, Robinson brings allegations of

retaliatory discharge (Count 1), continuing violations of the Illinois Whistleblower Act (Count 2), continuing tort of defamation (Count 3), intentional infliction of emotional distress (Count 4), fraud (Count 5), intentional interference with economic relations (Count 6), violation of the Illinois Personnel Record Review Act (Count 7), Illinois Equal Pay Act against Morgan Stanley (Count 8), continuing violation of the Family and Medical Leave Act (Count 9), and breach of contract (Count 10).

In their Motion to Dismiss, [*11] the Morgan Stanley Defendants seek dismissal of all of Robinson's Complaint, with the exception of certain claims set forth in Counts 1, portions of Count 2, and Count 9 against Morgan Stanley. (Dkt. No. 20). In KPMG's Motion to Dismiss, defendants KPMG and deGrasse seek dismissal of Robinson's fraud claim and her claim against deGrasse under the Illinois Whistleblower Act. (Dkt. No. 17).

STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, a complaint generally need not contain more than "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).* In other words, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (May 21, 2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* So long as the factual allegations in the complaint "raise a right to relief above the speculative level," the complaint will withstand a 12(b)(6) challenge. *Twombly, 127 S. Ct. at 1965; see also Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, No. 06-3817, 2007 U.S. App. LEXIS 20068, 2007 WL 2389770, at *3 (7th Cir. Aug. 23, 2007).* In conducting its analysis, [*12] the court assumes that all well-pleaded allegations in the complaint are true. *Twombly, 127 S. Ct. at 1965.* However, a plaintiff can plead herself out of court if a complaint includes facts that undermine its own allegations. *Kolupa v. Roselle Park Dist., 438 F.3d 713, 715 (7th Cir. 2006).*

As a general matter, "[c]omplaints need not anticipate or attempt to defuse potential defenses." *Doe v. Smith, 429 F.3d 706, 709 (7th Cir. 2005).* On the other hand, a plaintiff alleging a claim of fraud or mistake must plead with specificity the who, what, where, and when of the alleged fraud or mistake. *Fed. R. Civ. P. 9(b); Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title*

*Ins., 412 F.3d 745, 749 (7th Cir. 2005).*

ANALYSIS

In this case, the Morgan Stanley Defendants seek dismissal of each of Robinson's ten counts, or at least some portion thereof. The court in this opinion addresses each count in turn, in the order in which it was alleged in the Complaint.

1. Count 1 -- Retaliatory Discharge

In Count 1 of her Complaint, Robinson alleges a common law cause of action for retaliatory discharge against Morgan Stanley, DFS, and six of the individual Morgan Stanley defendants. Under Illinois [*13] law, only Robinson's employer can be held liable for the tort of retaliatory discharge. *See Buckner v. Atlantic Plant Maintenance, Inc., 182 Ill. 2d 12, 694 N.E.2d 565, 570, 230 Ill. Dec. 596 (Ill. 1998)* (holding that "the only proper defendant in a retaliatory discharge action is the plaintiff's former employer."). The Supreme Court of Illinois has held that there is no common law cause of action for retaliatory discharge against "agent[s] or employee[s] of the employer who carried out the discharge of the plaintiff on the employer's behalf." *Id. at 569.* At the outset of her Complaint, Robinson alleges that she "is a former employee of Morgan Stanley." (Compl. P 1). Robinson also specifically states that she "worked in the Internal Audit Department of Morgan Stanley . . . from on or around October 2, 2000 through on or around August 24, 2004." (Compl. P 17). Count 1 thus appears to be aimed at Robinson's former employer, Morgan Stanley.

On the other hand, Robinson also alleges that "throughout her employment by Morgan Stanley, [she] was located in the Discover Financial Services (DFS) Headquarters building." (Compl. P 1). DFS is a wholly-owned subsidiary of Morgan Stanley, (Compl. P 3), and Robinson asserts that "[t]he [*14] Defendants have repeatedly claimed the Plaintiff worked for DFS." (Dkt. No. 35 at 3). Recognizing that the true identity of Robinson's former employer as alleged in her Complaint remains an unanswered question of fact, Robinson has brought Count 1 against both Morgan Stanley and DFS. (*Id.*).

"It is the well-settled law of this circuit that *pro se* complaints are to be liberally construed and not held to the stringent standards expected of pleadings drafted by

Case 1:08-cv-04407    Document 9-16    Filed 08/11/2008    Page 6 of 15

Page 5
2007 U.S. Dist. LEXIS 70604, *14

lawyers." *McCormick v. City of Chicago, 230 F.3d 319, 325 (7th Cir. 2000)*. Because Robinson has alleged Count 1 against both Morgan Stanley and DFS as her former employer, the court declines to decide at this time, on the basis of the pleadings alone, whether Morgan Stanley or DFS is Robinson's former employer for purposes of her retaliatory discharge claim. The Morgan Stanley Defendants' Motion to Dismiss is granted as to the individual defendants, and Count 1 is dismissed as alleged against Zlateva, Piercy, DeLuca, Sutter, McNamara-Corley, and Dollmeyer. The Morgan Stanley Defendants' Motion to Dismiss is denied as to Morgan Stanley and DFS.

2. Count 2 -- Continuing Violations of the Illinois Whistleblower Act

In Count 2 of her Complaint, [*15] Robinson alleges various violations of the Illinois Whistleblower Act, *740 Ill. Comp. Stat. 174/1, et seq.* As defendants to Count 2, Robinson names all of the Morgan Stanley Defendants, as well as Rocco deGrasse. [6] Again, the court is confronted with questions regarding the identity of Robinson's employer. By its own terms, the Whistleblower Act only creates a cause of action against an employer. *See 740 Ill. Comp. Stat. 174/30* ("If an employer takes any action against an employee in violation of *Section 15* or *20*, the employee may bring a civil action against the employer"). "'Employer' means: an individual, sole proprietorship, partnership, firm, corporation, association, and any other entity that has one or more employees in this State, except that 'employer' does not include any governmental entity." *740 Ill. Comp. Stat. 174/5*. As discussed above, Robinson has alleged that both Morgan Stanley and DFS were her employers. Therefore, no cause of action exists against Sutter, Zlateva, Piercy, McNamara-Corley, Jee, Hoffman, Oppenheim, DeLuca, or Dollmeyer. Count 2 is dismissed as to all individual defendants, but remains pending against Morgan Stanley and DFS.

6 In her Response to KPMG's [*16] Motion to Dismiss, Robinson agreed to withdraw deGrasse as a defendant under Count 2. (*See* Dkt. No. 28 at 1; Dkt. No. 45 at 2-3). The court construes Robinson's statement as a motion to voluntarily withdraw Count 2 against deGrasse and grants Robinson's motion. Count 2 against deGrasse is dismissed without prejudice.

Furthermore, to the extent that Robinson alleges a

claim against Morgan Stanley and DFS for violations of *§ 10* of the Illinois Whistleblower Act, her claim is dismissed because there is no private cause of action for violations of this section of the statute. *See 740 Ill. Comp. Stat. 174/30* (explicitly creating a cause of action for violations of *§§ 15* and *20*); *Woodley v. RGB Group, Inc., No. 05 C 0548, 2006 U.S. Dist. LEXIS 43862, 2006 WL 1697049, at *5 (N.D. Ill. June 13, 2006)* ("The Whistleblower Act does not create a private cause of action under *Section 10*, however; only *sections 15* and *20* do that.").

Additionally, *§ 15* of the Whistleblower Act only prohibits retaliation against an employee for "disclosing information *to a government or law enforcement agency,* [*17] where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." *740 Ill. Comp. Stat. 174/15* (emphasis added). In this case, Robinson alleges that she "wanted to raise some concerns to the Company Audit Director," (Compl. P 34) and that she:

> delivered a memo of approximately 24 pages plus attachments detailing legal, regulatory, tax, accounting, auditing, and personnel concerns she had uncovered as and [sic] auditor and as a non-auditor to the Chief Financial Officer (CFO) of Discover Financial Services. Plaintiff had previously attempted to raise most, if not all, of these issues through normal audit channels, but each time was stopped and, in many cases, criticized for her efforts by her audit management. The Plaintiff intended to submit the memo to the Chief Executive Officer (CEO) and CFO of both Morgan Stanley and Discover Financial Services, as well as the Morgan Stanley Audit Committee to ensure the appropriate actions could be taken.

(Compl. P 39). Robinson alleges that she then participated in an internal investigation "by supplying additional information, documents, names, and other information about [*18] the issues she had raised in her memo, as well as many additional issues." (Compl. PP 40-41). Robinson alleges that she "started being subjected to retaliation," in part because "Mr. Sutter had been told about the investigation and knew the Plaintiff had submitted it [sic]." (Compl. P 42). Robinson also alleges

that it was obvious to others that she was taking part in the investigation, because she spent an unusual amount of time in the Law Department.

Robinson has clearly alleged that she experienced retaliation in response to *internal* complaints made to her employer. [7] This type of activity is not protected by the Whistleblower Act. *Riedlinger v. Hudson Respiratory Care, Inc., 478 F. Supp. 2d 1051, 1054-55 (N.D. Ill. 2007).* To the extent that Robinson's allegations include a cause of action under *§ 15* of the Whistleblower Act against Morgan Stanley and DFS, Robinson's claim is dismissed. For purposes of clarity, the court notes that the sole remaining allegation under Count 2 is for violations of *§ 20* of the Illinois Whistleblower Act, alleged against Morgan Stanley and DFS.

> 7    Although KPMG was brought into the investigation, KPMG is not a government or law enforcement agency. (Compl. [*19] PP 43, 14) ("KPMG is a public accounting firm with offices in Illinois and which conducts business in Illinois.").

3. Count 3 -- Continuing Tort of Defamation

In her third cause of action, Robinson alleges that Morgan Stanley, DFS, Dollmeyer, Piercy, Sutter, and Zlateva are liable for defamatory statements made about Robinson. Generally, Robinson alleges that the named defendants made false written statements in performance reviews, supporting documents, and public records, and disclosed these statements, along with false verbal statements, to others "within and outside the company." (Compl. PP 85-87, 89, 102). Robinson also alleges that "Defendants used false and/or misleading statements, accusations, and other information in the manufacturing of a poor work record." (Comp. P 102). Robinson does not set forth specific examples of the false statements allegedly made by the named defendants, nor does she describe these statements in any detail. Furthermore, a number of Robinson's allegations do not involve false statements at all (e.g. that defendants made Robinson wait with a security guard in a conspicuous location and that they also told members of the Internal Audit and Law Departments [*20] not to talk to Robinson). (Compl. PP 88, 90, 94-97, 99-100, 104-05).

When proceeding in federal court, a plaintiff's defamation claims are not subject to the heightened pleading standards of *Rule 9. Muzikowski v. Paramount Pictures Corp., 322 F.3d 918, 926 (7th Cir. 2003).* However, in order to satisfy the requirements of notice pleading, a plaintiff claiming defamation must specifically set forth the words alleged to be actionable. *Johnson v. Joliet Junior College, No. 06 C 5086, 2007 U.S. Dist. LEXIS 27558, 2007 WL 1119215, at *3 (N.D. Ill. Apr. 10, 2007) (citing Brown v. GC America, Inc., No. 05 C 3810, 2005 U.S. Dist. LEXIS 28065, 2005 WL 3077608, at *5 (N.D. Ill. Nov. 15, 2005)).* "The reason a plaintiff must, under notice pleading requirements, plead the specific words alleged to be actionable is that knowledge of the exact language used is necessary to form responsive pleadings." *Woodard v. Am. Family Mutual Ins. Co., 950 F. Supp. 1382, 1388 (N.D. Ill. 1997).* Although plaintiffs are required to set forth the defamatory language with enough specificity for the defendant to respond appropriately, plaintiffs "need not allege the defamatory language verbatim." *Flentye v. Kathrein, 485 F. Supp. 903, 2007 WL 1175576, at * 11 (N.D. Ill. 2007)* [*21] (quoting *Emery v. Northeast Ill. Reg'l Commuter R.R. Corp., No. 02 C 9303, 2003 U.S. Dist. LEXIS 16403, 2003 WL 22176077, at *7 (N.D. Ill. Sept.18, 2003)).*

In this case, Robinson has failed to properly allege her claim for defamation. Robinson's vague allegations of "false statements" that were included in unspecified performance reviews, public records, and other documents are insufficient to put the named defendants on notice of the nature of Robinson's claim. Without notice regarding which statements are alleged to be false, defendants are not in a position to properly answer Robinson's defamation claim. For this reason, Count 3 of Robinson's Complaint is dismissed. Because Robinson is proceeding *pro se,* this dismissal is without prejudice and Robinson is granted leave to file an Amended Complaint for purposes of addressing the pleading deficiencies of her defamation claim.

As presently alleged, Count 3 is vague and unspecific. Therefore, the court cannot ascertain at this time whether Robinson's defamation claim is barred by the statute of limitations. In considering whether to replead her defamation claim, Robinson is advised to remain cognizant of the applicable one-year statute of limitations. *735 Ill. Comp. Stat. 5/13-201.* [*22] As the Morgan Stanley Defendants point out, this limitations period generally begins to run at the date of publication of the false statement, although the "discovery rule" may also apply in situations where the plaintiff was unaware

of the defamatory statement until a later point in time. *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, 61 Ill. 2d 129, 334 N.E.2d 160, 164 (Ill. 1975)* ("[W]e have no hesitation in saying that the ends of justice in this case will be served by holding that the plaintiff's cause of action accrued at the time it knew or should have known of the existence of the allegedly defamatory report.").

Robinson is also advised to take note of the Morgan Stanley Defendants' stated intent to rely on a qualified privilege in this case. As described by the Supreme Court of Illinois:

> The qualified privilege serves to enhance a defamation plaintiff's burden of proof. Where no qualified privilege exists, the plaintiff need only show that the defendant acted with negligence in making the defamatory statements to prevail. [citation] However, once a defendant establishes a qualified privilege, a plaintiff must prove that the defendant either intentionally published the material [*23] while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness. [citation]

*Kuwik v. Starmark Star Marketing and Admin., Inc., 156 Ill. 2d 16, 619 N.E.2d 129, 133, 188 Ill. Dec. 765 (Ill. 1993).* Whether a qualified privilege exists is a question of law for the court to decide, with the defendant bearing the burden of proof. *Id. at 134.* At the pleading stage, Robinson has no obligation to anticipate or attempt to defuse this potential defense. *Doe v. Smith, 429 F.3d 706, 709 (7th Cir. 2005).* On the other hand, Robinson may wish to keep in mind the defendants' intent to assert a qualified privilege as she assesses the strengths and weaknesses of her defamation claim.

The Morgan Stanley Defendants have also stated their intent to assert an absolute privilege in regards to any alleged defamatory statements that were made in connection with judicial (or quasi-judicial) proceedings. *See Marchioni v. Board of Educ. of City of Chicago, 341 F. Supp. 2d 1036, 1051 (N.D. Ill. 2004)* ("Once the state court determines that the underlying statement is related to the litigation, there can be no defamation action regardless of a party's 'motive or the unreasonableness of his conduct.'") (quoting *Malevitis v. Friedman, 323 Ill.*

*App. 3d 1129, 753 N.E.2d 404, 407, 257 Ill. Dec. 209 (Ill. App. Ct. 2001)).* [*24] Again, whether this privilege applies to the facts of this case is a question for a later time. On one further point raised by the Morgan Stanley Defendants, the court notes that there is no cause of action for "self-defamation" under Illinois law. *Rice v. Nova Biomedical Corp., 38 F.3d 909 (7th Cir. 1994)* (citing *Layne v. Builders Plumbing Supply Co., 210 Ill. App. 3d 966, 569 N.E.2d 1104, 155 Ill. Dec. 493 (Ill. App. Ct. 1991)).*

Should Robinson choose to replead her defamation claim, after careful consideration of the above-mentioned factors, she is granted leave to file an Amended Complaint for purposes of addressing the pleading deficiencies of Count 3, on or before October 25, 2007, consistent with this order.

4. Count 4 -- Intentional Infliction of Emotional Distress

In Count 4 of her Complaint, Robinson alleges that Morgan Stanley, DFS, Sutter, Zlateva, and Oppenheim are liable for the tort of intentional infliction of emotional distress ("IIED"). In support of her IIED claim, Robinson describes various actions allegedly taken by the named defendants during and after the investigation. During the investigation, Robinson alleges that the defendants did not permit her to inform anyone about her involvement with the investigation, [*25] leaving Robinson without explanation for missed meetings, past due deadlines, and prolonged absences from her desk. Robinson alleges that she informed the defendants about the tremendous amount of stress that this restriction was causing her and asked them to explain the situation to the Audit Department, but the defendants failed to do so. At the same time, Robinson alleges that the defendants told members of the Internal Audit and Law Department not to talk to or associate with Robinson. Additionally, the defendants allegedly retaliated against the Internal Audit Department's administrative assistant for being friends with Robinson by threatening the assistant's job if she did not report information about Robinson to the defendants. The defendants also repeatedly questioned the administrative assistant about Robinson. Another member of the Internal Audit Department was made to feel retaliated against for being friends with Robinson, after he ignored the defendants' warnings to stay away from her.

During the investigation, the Vice President would

not talk to Robinson, avoided her work area, would not meet with her alone, and cancelled all previously scheduled one-on-ones with Robinson. [*26] Furthermore, Robinson's boss started wearing perfume every time he met with her, knowing that Robinson was highly allergic to perfume and that exposure in small areas, such as the room in which they usually met, would cause Robinson to miss days of work. Robinson's boss then criticized her for missing deadlines.

Robinson also alleges that the defendants did not allow Robinson to participate in the summer hours program during the summer of 2004, that they did not pay Robinson for taking a scheduled vacation day on her husband's birthday in late July, and that they refused to allow Robinson to attend out-of-town training that would have provided her with necessary continuing professional education requirements for purposes of maintaining her professional certification and meeting her professional goals.

Robinson alleges that the defendants used false information to manufacture a poor work record. Additionally, the defendants refused to return documents to Robinson at the close of the investigation, while criticizing her for not completing work that she could not perform without these files. Robinson alleges that she was told that members of the Human Resources Department and/or Law Department [*27] were monitoring her actions on surveillance cameras at the end of the investigation. Finally, Robinson alleges that the defendants humiliated her when they terminated her during work hours, went through her desk in view of her co-workers, and made her stand outside the main entrance for over half an hour while people were passing by.

In Illinois, the applicable statute of limitations for an IIED claim is two years. *Pavlik v. Kornhaber, 326 Ill. App. 3d 731, 761 N.E.2d 175, 186, 260 Ill. Dec. 331 (Ill. App. Ct. 2001)*. Robinson filed her lawsuit on August 24, 2006, exactly two years after her employment with Morgan Stanley/DFS was terminated. In arguing for dismissal of Robinson's IIED claim, the Morgan Stanley Defendants note that all but one of the allegations included in Count 4 involve conduct that occurred more than two years before Robinson's lawsuit was filed. The lone allegation that occurred within the limitations period is Robinson's allegation that "Defendants humiliated the Plaintiff when they terminated her during work hours,

went through her desk in view of her co-workers, and made her stand outside the main entrance for over half an hour while people were passing by." (Compl. P 108). The Morgan Stanley Defendants [*28] argue that this allegation alone cannot anchor Robinson's IIED claim within the limitations period, because it is not sufficiently related to the other allegations so as to form a "pattern and course" of outrageous conduct.

Robinson argues that her claim is not time-barred, because where "acts are continuous, by the same actor, and of a similar nature, the prescriptive period for intentional infliction of emotional distress does not commence until the last act occurs or the conduct is abated." *Pavlik, 761 N.E.2d at 187*. Because the "last act" of intentional infliction of emotional distress occurred within the limitations period, Robinson argues that her IIED claim is timely.

In *Pavlik,* the plaintiff complained of a series of unwanted sexual advances that occurred during therapy sessions required by her employer. The Appellate Court of Illinois, First District, held that a phone call and letter received within the limitations period should be considered "a continuation of the ongoing inappropriate dialogue initiated by [the defendant]," such that the culmination of the tortious act was found to have occurred within the limitations period. *Pavlik, 761 N.E.2d at 188*. In contrast to *Pavlik,* [*29] the one act described by Robinson that occurred within the limitations period in this case does not significantly resemble or relate to the earlier acts of which she complains. The majority of the allegations in Robinson's IIED claim describe a pattern and practice of intentionally isolating Robinson, disrupting her ability to perform her job duties, and denying her certain employment benefits. The act that occurred on the date of Robinson's termination is not of a sufficiently similar nature to suggest that it should be considered a continuation of the earlier conduct. While Robinson may have felt "humiliated" at having been terminated during working hours within the sight of her co-workers and friends, the actions allegedly taken by the defendants on August 24, 2004 do not suggest further attempts to shun Robinson, obstruct her ability to perform her duties, or single her out for loss of employee benefits. Because no part of the alleged pattern of extreme conduct took place within the applicable limitations period, the court finds that Robinson's IIED claim is time-barred. Count 4 is therefore dismissed with prejudice.

2007 U.S. Dist. LEXIS 70604, *29

5. Count 5 -- Fraud

In Count 5 of her Complaint, Robinson alleges [*30] that Morgan Stanley, DFS, KPMG, Jee, Hoffman, Oppenheim, McNamara-Corley, DeLuca, and deGrasse engaged in numerous fraudulent misrepresentations regarding both their investigation of the concerns raised in Robinson's memorandum and their handling of Robinson's employment and performance issues. *Federal Rule of Civil Procedure 9(b)* requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b).* It is by now well-settled that a complaint alleging fraud must provide "the who, what, when, where, and how" of the alleged fraudulent action, so as to avoid "the great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir. 2007)* (citations omitted).

In her Complaint, Robinson does not set forth any specific statements or misrepresentations made by individually-named defendants. Rather, Robinson includes general allegations against "Defendants" as a group, without stating details such as what was said, by whom, in what context, or when and where these communications took place. For example, Robinson [*31] alleges in one typical paragraph of her Complaint that, "Defendants misrepresented to the Plaintiff that the investigation, all information she gave them, and her participation would be kept confidential." (Compl. P 124). Robinson does not clarify whether this particular misrepresentation was made in writing or orally, if the misrepresentation was made by the entire investigative team or by certain individuals, if it was made at any particular meeting or made in passing, when it was made, or if it was made more than once.

*Federal Rule of Civil Procedure 9(b)* "require[s] the plaintiff to state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992)* (quoting *Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)).* Furthermore, a plaintiff cannot "lump defendants together and attribute[ ] misrepresentations to them as a group." *Whirlpool Financial Corp. v. GN Holdings, Inc., 873 F. Supp. 111, 119 (N.D. Ill. 1995)* (citing *Sears v. Likens,*

*912 F.2d 889, 893 (7th Cir. 1990)).* [*32] Rather, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 778 (7th Cir. 1994)).* Without further specifics, the named defendants are not in a position to respond to generalized allegation of fraud.

In this case, because Robinson has failed to plead Count 5 with sufficient particularity, it is dismissed. However, Robinson assures that court that "[i]f the Court determines it necessary, the Plaintiff can, and will, file an amended Complaint including specifics" of her fraud count. (Dkt. No. 45 at 3; *see also* Dkt. No. 35 at 9). Robinson is therefore given the opportunity to replead her fraud claim, with particularity, in a First Amended Complaint should she choose to do so.

6. Count 6 -- Intentional Interference with Economic Relations

In Count 6 of her Complaint, Robinson alleges that Morgan Stanley, DFS, Zlateva and Sutter engaged in "intentional interference with economic relations." The Morgan Stanley Defendants argue that there is no such claim under Illinois law, and the court's own review has failed to uncover any case law employing this terminology. Although it is possible [*33] that Robinson meant to allege either intentional interference with contract or intentional interference with prospective economic advantage, as suggested by the Morgan Stanley Defendants in their citation to *Otterbacher v. Northwestern Univ., 838 F. Supp. 1256, 1260-61 (N.D. Ill. 1993)*, Robinson makes no effort to defend Count 6 or to clarify its meaning or scope. Furthermore, as the Morgan Stanley Defendants point out, these torts "usually lie against third-parties who cause the employer/employee relationship to terminate and not against the employer or agent who terminates the employee." *Id.* Accordingly, the court grants the Morgan Stanley Defendants' Motion to Dismiss and dismisses Count 6 with prejudice.

7. Count 7 -- Violation of the Illinois Personnel Record Review Act

In Count 7 of her Complaint, Robinson alleges that Morgan Stanley, DFS, Piercy, Zlateva, Sutter, and Dollmeyer violated the Illinois Personnel Record Review Act, *820 Ill. Comp. Stat. 40/1, et seq.* (the "PRRA"), by using information "which was not included in the

personnel record but should have been as required by [the PRRA]" in a judicial proceeding (Case 2005-SOX000044) and by "soliciting information about Robinson's [*34] association and conversations outside of work." (Compl. PP 149, 151). [8]

> 8 Robinson also alleges that the Morgan Stanley Defendants "plan to further violate this statute by using at least some of the same and/or other documents not included in the plaintiff's personnel file as evidence in federal case # 05C-4258." (Compl. P 150). This type of speculative, future harm is not actionable.

The Morgan Stanley Defendants argue that Robinson's claim necessarily fails because she did not exhaust her administrative remedies, as required by §§ 12(b) and 12(c) of the PRRA. In support of their argument, the Morgan Stanley Defendants cite to *Anderson v. Board of Education of the City of Chicago, 169 F. Supp. 2d 864, 870 (N.D. Ill. 2001)*. While the court is inclined to agree with Judge Gettleman's opinion in the *Anderson* case that the PRRA generally requires exhaustion of administrative remedies, the court notes that this is an affirmative defense that need not be anticipated by Robinson in the filing of her Complaint. *Salas v. Wis. Dep't of Corr. 493 F.3d 913, 922 (7th Cir. 2007)* ("A plaintiff's failure to exhaust administrative remedies is an affirmative defense, which is the defendant's [*35] burden to prove."). The Morgan Stanley Defendants' argument that "Robinson does not allege that she filed a complaint with the Department of Labor" (Dkt. No. 21 at 20) is therefore inappropriately asserted at this time and their request to dismiss Count 7 on these grounds is denied.

8. Count 8 -- Illinois Equal Pay Act Against Morgan Stanley

In Count 8 of her Complaint, Robinson alleges that Morgan Stanley, DFS and Piercy violated the Illinois Equal Pay Act of 2003, *820 Ill. Comp. Stat. 112/1, et seq.*, by "threaten[ing] the Plaintiff with disciplinary action if she were to discuss salaries in any way with other members of the Internal Audit Department located in Riverwoods." (Compl. P 154). Section 10(b) of the Illinois Equal Pay Act states:

> It is unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under this Act. It is unlawful for any employer to discharge or in any other manner discriminate against any individual for inquiring about, disclosing, comparing, or otherwise discussing the employee's wages or the wages of any other employee, or aiding or encouraging any person to exercise his or her rights under this [*36] Act.

*820 Ill. Comp. Stat. 112/10(b)*.

The Morgan Stanley Defendants argue that Robinson "does not allege that she engaged in protected activity (i.e., that she disclosed or discussed wages with other employees) or that she was discharged or disciplined for doing so." (Dkt. No. 21 at 21). However, Robinson has alleged that she was threatened with disciplinary action if she were to engage in activities protected by the Illinois Equal Pay Act. This type of threat could certainly qualify as "interfering" with the exercise of a right provided under the Illinois Equal Pay Act, and the court denies the Morgan Stanley Defendants' request to dismiss Count 8 on these grounds.

On the other hand, the court agrees with the Morgan Stanley Defendants that there is no private cause of action under the Illinois Equal Pay Act for the type of violation alleged by Robinson. Whereas the Illinois Equal Pay Act provides a private cause of action for employees who have been underpaid, *see 820 Ill. Comp. Stat. 112/30(a)*, penalties for all other violations can only be recovered "in a civil action brought by the Director in any circuit court." *820 Ill. Comp. Stat. 112/30(c)*. The court will not find an implied private [*37] right of action where the plain language of the statute assigns enforcement of its provisions to a specific agency. Count 8 is therefore dismissed with prejudice.

9. Count 9 -- Continuing Violation of the Family and Medical Leave Act (FMLA)

Robinson brings Count 9 of her Complaint, for violations of the Family and Medical Leave Act, *29 U.S.C. § 2601, et seq.*, ("the FMLA") against defendants Morgan Stanley, DFS, Sutter, Jee, Piercy, Dollmeyer, and Hoffman. The FMLA explicitly creates a private cause of action by an employee against his or her employer. *See 29 U.S.C. § 2617(a)(2)*. Unlike the common law, the FMLA includes a specific definition of the term "employer":

any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year . . . [including] . . . any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer

*29 U.S.C. § 2611(4)(A)(i), (ii).* As discussed above, the court declines to decide at this point in the proceedings whether Morgan Stanley or DFS should be considered Robinson's [*38] employer, noting that Robinson has alleged her claims against both business entities. The court therefore denies the Morgan Stanley Defendants' Motion to Dismiss Count 9 as it applies to defendants Morgan Stanley and DFS.

Furthermore, although the Seventh Circuit has not addressed the question of whether an individual can be held liable for violations of the FMLA, district courts have consistently found that individual liability under the FMLA is appropriate where an employee "controlled 'in whole or in part' [the plaintiff's] ability to take a leave of absence and return to her position." *Freemon v. Foley, 911 F. Supp. 326, 332 (N.D. Ill. 1995); see also Smith v. Univ. of Chic. Hosps., No. 02 C 0221, 2003 U.S. Dist. LEXIS 20965, 2003 WL 22757754, at *6 (N.D. Ill. Nov. 20, 2003)* (collecting cases).

In this case, the Morgan Stanley Defendants argue that "Robinson's Complaint contains no allegations asserting that any of the individual defendants in this count . . . qualify as an 'employer' under the statute. Thus, her FMLA claims should be dismissed against the individual defendants on this basis alone." (Dkt. No. 21 at 23). This argument misses the mark, as Robinson is not required to allege particular facts at [*39] this point in the proceedings. As recently articulated by the Supreme Court of the United States:

While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss *does not need detailed factual allegations,* a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (May 21, 2007)* (internal citations omitted) (emphasis added). The Seventh Circuit has interpreted this language to mean "only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under *Rule 8.*" *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, No. 06-2949, 499 F.3d 663, 2007 U.S. App. LEXIS 20214, 2007 WL 2406859, at *4 (7th Cir. Aug. 24, 2007).* In *Airborne Beepers,* the Seventh Circuit specifically relied on the Supreme Court's later decision in *Erickson v. Pardus, 127 S.Ct. 2197, 167 L. Ed. 2d 1081 (June 4, 2007),* [*40] which reaffirmed that "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson, 127 S.Ct. at 2200.*

Robinson has brought her FMLA claim against individuals whom she identifies as her supervisor (David Sutter), three Human Resources employees (Kerry Piercy, Karen Dollmeyer, and Bernice Jee), and a member of the Morgan Stanley Law Department (Carole Hoffman). (Compl. PP 5, 7-8, 10, 13). In support of her FMLA claim, Robinson specifically alleges that she received a "meets" performance rating in mid-September, 2001, that she took FMLA leave beginning November 29, 2001, and that, upon her return on January 25, 2002, she was informed by her boss that she was being demoted and would be receiving a bad review. (Compl. PP 23-25). Robinson also alleges that she was put on a corrective action plan on February 20, 2002, while still on half days under FMLA. (Compl. P 27). At a May 7, 2004 meeting with Oppenheim, Jee, Hoffman, and deGrasse, Robinson was informed that her demotion was due to a "restructuring" of her department and was not related to her FMLA leave; however, Robinson alleges [*41] that this was not true, as "no other members of the department had their title or responsibilities lowered." (Compl. PP 48, 156). Furthermore, Robinson's boss told her that the change was a demotion, and "an HR representative with

knowledge of the events" told Robinson "that she was demoted because she went on FMLA." (Compl. P 156).

While the factual allegations included in Robinson's Complaint are not set forth in great detail, the court finds they suffice to paint a picture of the allegations against the Morgan Stanley Defendants, such that the Morgan Stanley Defendants are sufficiently on notice of the claims alleged against them and are in a position to formulate an appropriate response. Robinson's allegations raise her right to relief "above the speculative level," which is all that is required at this point in the proceedings. [9] In other words, the court finds it plausible that each of the named defendants may have exercised some level of control over Robinson's ability to exercise her right to FMLA leave. *Compare Twombly, 127 S. Ct. at 1974* (dismissing the complaint because the plaintiffs . . . "have not nudged their claims across the line from conceivable to plausible"). The [*42] court therefore denies the Morgan Stanley Defendants' Motion to Dismiss Count 9 as it pertains to defendants Sutter, Piercy, Dollmeyer, Jee, and Hoffman.

> 9   The Morgan Stanley Defendants cite to *Burke v. Nalco Chemical Co., No. 96 C 981, 1996 U.S. Dist. LEXIS 10190, 1996 WL 411456, at *2 (N.D. Ill. July 18, 1996)* and *Edwards v. Illinois Circuit Court, No. 98 C 4334, 1999 U.S. Dist. LEXIS 1115, at *8 (N.D. Ill. Feb. 1, 1999)* for the proposition that a complaint cannot survive a motion to dismiss if it does not "at least contain allegations establishing that the defendant is an 'employer' within the meaning of the FMLA." (Dkt. No. 21 at 22-23). While this authority is somewhat persuasive, the court notes that in neither of these cases were the FMLA claims dismissed *solely* for failure to allege that the defendants qualified as "employers" pursuant to the provisions of the FMLA.

10. Count 10 -- Breach of Contract

Finally, in Count 10 of her Complaint, Robinson alleges breach of contract claims against Morgan Stanley, DFS, McNamara-Corley, Sutter, and Zlateva. Specifically, Robinson alleges that her termination was contrary to assurances of continued employment made "by the head of the Law Department for DFS" in late March, [*43] 2004. (Compl. P 164). Additionally, Robinson alleges that the named defendants violated the company's "open door policy," failed to uphold the stated

"Discover value" of "doing the right thing," broke their repeated promises to Robinson that retaliation would not be tolerated, and generally failed to enforce company policies regarding:

> harassment, disrupting of the work place, fraud or other proven acts of dishonesty, falsifying Company documents or records including performance results, and conduct that is likely to cause another employee, customer, or vendor of the Company embarrassment, loss of dignity, feelings of intimidation or loss of opportunity, including all forms of discrimination and harassment.

(Compl. PP 165-68). Robinson attached to her Complaint copies of Morgan Stanley's Code of Conduct, its Open Door Policy, and parts of the Employee Handbook for Morgan Stanley -- Credit Services. (Ex. B-D).

At the outset, the Morgan Stanley Defendants argue that Robinson's breach of contract claim is barred by the Illinois Statute of Frauds, insofar as Robinson relied on verbal assurances of continued employment with Morgan Stanley/DFS. *See 740 Ill. Comp. Stat. 80/1.* In support of this [*44] argument, the Morgan Stanley Defendants cite to *Czapla v. Commerz Futures, LLC, 114 F. Supp. 2d 715, 720 (N.D. Ill. 2000).* In *Czapla,* the district court recognized that contracts for lifetime employment must be made in writing in order to be enforceable under Illinois law. *Id. at 719* (citing *McInerney v. Charter Golf, Inc., 176 Ill. 2d 482, 680 N.E.2d 1347, 223 Ill. Dec. 911 (Ill. 1997)).* However, the *Czapla* court also specifically held that contracts for employment of indefinite duration are presumed to be "at will," and as such fall "outside the statute of frauds." *Id. at 720.* In this case, Robinson alleges that "McNamara-Corley assured the Plaintiff she had a job in Audit" and Robinson received "assurance in or around late March 2004 of continued employment by the head of the Law Department for DFS." (Compl. PP 45, 164). Because these alleged assurances are for employment of an indefinite duration, the statute of frauds does not apply as a bar to Robinson's breach of contract claim.

Next, the Morgan Stanley Defendants argue that Robinson cannot have reasonably believed that McNamara-Corley extended an authorized, enforceable

offer of employment. In support of this argument, the Morgan Stanley Defendants direct the [*45] court to the first page of the Employee Handbook, which was attached as an exhibit to Robinson's Complaint. [10] The Employee Handbook states:

> **In no event shall the hiring of an employee be considered as creating a contractual guarantee of employment for any specific duration. Accordingly, an employee's employment and compensation can be terminated with or without cause or notice at any time at the option of either the employee or the Company.**

> No employee or representative of the Company, other than an authorized officer, has any authority to enter into any agreement for employment for any specific period of time or to make any agreement contrary to the foregoing. Further, no such agreement entered into by an authorized officer of the Company shall be enforceable unless it is in writing and duly executed by the employee and respective officer.

(Compl., Ex. C & D at 2). Based on this language, the court agrees that oral assurances of continued employment cannot be considered enforceable; however, it is unclear from Robinson's complaint whether the assurances made by McNamara-Corley were oral or in writing. Viewing the allegations in the light most favorable to Robinson, the court finds that [*46] the Complaint does not contain any facts inconsistent with a theory of recovery based on written assurances of continued employment with Morgan Stanley/DFS.

> 10    Any exhibits attached to a complaint are considered to be a part of the pleadings. *Moranski v. Gen. Motors Corp., 433 F.3d 537, 539 (7th Cir. 2005)*.

Furthermore, as head of the Law Department for DFS, it is certainly possible that McNamara-Corley may have been an authorized officer of "the Company." The Employee Handbook defines "the Company" as "Morgan Stanley -- Credit Services," and goes on to explain that "Credit Services includes all employees considered to be

part of Discover Financial Services, Inc. and all Morgan Stanley employees having responsibilities for Discover Financial Services, Inc." (Compl., Ex. C & D at 2). Robinson also argues that McNamara-Corley had apparent authority to function as an authorized officer of Morgan Stanley/DFS, if not actual authority. Again, the court finds nothing in Robinson's Complaint that would necessarily preclude her from recovering for breach of contract. The court thus denies the Morgan Stanley Defendants' request to dismiss Count 10 on the basis that no authorized contract for continued [*47] employment could have existed under the facts alleged by Robinson.

Finally, the Morgan Stanley Defendants argue that the clear and express disclaimer at the beginning of the Employee Handbook precludes Robinson from bringing breach of contract claims based on alleged violations of the policies contained in the Employee Handbook. At the beginning of the Employee Handbook, page one states:

> **The contents of this handbook are general and intended solely as a guide. The language used and the information contained herein are not intended to constitute or create, nor are they to be construed to constitute or create, the terms of an employment contract between the Company (or any of its subsidiaries or affiliates) and any employee, or a guarantee of employment for any specific duration.**

(Compl., Ex. C & D at 2). A clear and forthright disclaimer "is a complete defense to a suit for breach of contract based on an employee handbook." *Workman v. United Parcel Service, Inc., 234 F.3d 998, 1000 (7th Cir. 2000)*. Count 10 is therefore dismissed, insofar as it argues breach of the policies set forth in the Employee Handbook.

## CONCLUSION

For the foregoing reasons, the Morgan Stanley Defendants' Motion to [*48] Dismiss, (Dkt. No. 20), is granted in part and denied in part. Count 1 (Retaliatory Discharge) is dismissed against individual defendants Vesela Zlateva, Kerry Piercy, Tony DeLuca, David Sutter, Kelly McNamara-Corley, and Karen Dollmeyer; Count 2 (Illinois Whistleblower Act) is dismissed against individual defendants David Sutter, Vesela Zlateva,

Kerry Piercy, Kelly McNamara-Corley, Bernice Jee, Carole Hoffman, David Oppenheim, Tony DeLuca, and Karen Dollmeyer, and against defendant Morgan Stanley and defendant Discover Financial Services insofar as Count 2 asserts claims under §§ 10 and 15 of the Illinois Whistleblower Act; Count 3 (Defamation) is dismissed without prejudice; Count 4 (Intentional Infliction of Emotional Distress) is dismissed with prejudice; Count 5 (Fraud) is dismissed without prejudice; Count 6 (Intentional Interference with Economic Relations) is dismissed with prejudice; Count 7 (Illinois Personnel Record Review Act) is not dismissed and remains in its entirety; Count 8 (Illinois Equal Pay Act) is dismissed with prejudice; Count 9 (FMLA) is not dismissed and remains in its entirety; and Count 10 (Breach of Contract) is dismissed insofar as it alleges breach of [*49] policies set forth in the Employee Handbook. KPMG's Motion to Dismiss, (Dkt. No. 17), is granted in its entirety; Count 2 (Illinois Whistleblower Act) is dismissed against individual defendant Rocco deGrasse and Count 5 (Fraud) is dismissed against defendant Rocco deGrasse and defendant KPMG, without prejudice.

Robinson is given until on or before October 15, 2007 to file a First Amended Complaint consistent with this opinion and order. Defendants are given until October 29, 2007 to answer or plead to the First Amended Complaint. The parties are to hold a *Rule 26(f)* scheduling conference on or before November 9, 2007 and file an agreed Form 35 on or before November 15, 2007. The case is set for a report on status and scheduling conference at 9:00 a.m. on November 21, 2007.

Date: September 24, 2007

JAMES F. HOLDERMAN

Chief Judge, United States District Court